# EXHIBIT A

CREDIT AGREEMENT

Dated as of December 26, 2006

among

TRADE AM INTERNATIONAL, INC.

and

EACH OF ITS SUBSIDIARIES THAT ARE SIGNATORIES HERETO

as Borrowers

CRATOS CAPITAL MANAGEMENT, LLC
as administrative agent and arranger,

and

The Other Lenders Party Hereto

TABLE OF CONTENTS

Page

ARTICLE I.        DEFINITIONS AND ACCOUNTING TERMS ..................................................1
    Section 1.01        Defined Terms ......................................................................................1
    Section 1.02        Other Interpretive Provisions...............................................................32
    Section 1.03        Accounting Terms ...............................................................................33
    Section 1.04        Rounding .............................................................................................33
    Section 1.05        Times of Day .......................................................................................33
    Section 1.06        Intentionally Omitted...........................................................................33
    Section 1.07        Currency Equivalents Generally..........................................................33
ARTICLE II.       THE COMMITMENTS AND BORROWINGS ..........................................34
    Section 2.01        The Loans ............................................................................................34
    Section 2.02        Borrowings, Conversions and Continuations of Loans......................35
    Section 2.03        Intentionally Omitted...........................................................................37
    Section 2.04        Prepayments.........................................................................................37
    Section 2.05        Termination or Reduction of Commitments.........................................40
    Section 2.06        Repayment of Loans ...........................................................................40
    Section 2.07        Interest .................................................................................................41
    Section 2.08        Unused Line Fee ..................................................................................42
    Section 2.09        Computation of Interest and Fees ........................................................42
    Section 2.10        Evidence of Debt .................................................................................42
    Section 2.11        Payments Generally; Agent's Clawback ..............................................42
    Section 2.12        Sharing of Payments by Lenders .........................................................45
    Section 2.13        Joint and Several Liability of Borrowers.............................................46
ARTICLE III.      TAXES, YIELD PROTECTION AND ILLEGALITY ................................48
    Section 3.01        Taxes....................................................................................................48
    Section 3.02        Illegality...............................................................................................50
    Section 3.03        Inability to Determine Rates ................................................................50
    Section 3.04        Increased Costs; Reserves on LIBOR Rate Loans .............................51
    Section 3.05        Compensation for Losses.....................................................................52
    Section 3.06        Survival................................................................................................53
ARTICLE IV.      CONDITIONS PRECEDENT TO BORROWINGS ....................................53

TABLE OF CONTENTS
(continued)

Page

Section 4.01    Conditions of Initial Borrowing ...........................................53
Section 4.02    Conditions to all Borrowings.............................................58
ARTICLE V.    REPRESENTATIONS AND WARRANTIES ...............................59
Section 5.01    Existence, Qualification and Power.........................................59
Section 5.02    Authorization; No Contravention .........................................59
Section 5.03    Governmental Authorization; Other Consents .............................59
Section 5.04    Binding Effect.........................................................60
Section 5.05    Financial Statements; No Material Adverse Effect; No Internal
Control Event.........................................................60
Section 5.06    Litigation ............................................................61
Section 5.07    No Default ............................................................61
Section 5.08    Ownership of Property; Liens; Investments ................................61
Section 5.09    Environmental Compliance ...............................................62
Section 5.10    Insurance.............................................................63
Section 5.11    Taxes.................................................................63
Section 5.12    ERISA Compliance ......................................................63
Section 5.13    Subsidiaries; Equity Interests; Loan Parties .............................64
Section 5.14    Margin Regulations; Investment Company Act; Public Utility
Holding Company Act....................................................64
Section 5.15    Disclosure ............................................................65
Section 5.16    Compliance with Laws ...................................................65
Section 5.17    Intellectual Property; Licenses, Etc .....................................65
Section 5.18    Solvency ..............................................................65
Section 5.19    Casualty, Etc .........................................................65
Section 5.20    Labor Matters .........................................................66
Section 5.21    Collateral Documents ..................................................66
Section 5.22    Deposit Accounts, Securities Accounts ...................................66
Section 5.23    Anti-Terrorism Laws ...................................................66
Section 5.24    Broker's, Finder's or Similar Fees .....................................66
Section 5.25    Collateral ............................................................66
ARTICLE VI.    AFFIRMATIVE COVENANTS .........................................67

TABLE OF CONTENTS
(continued)

Page

| | | |
|---|---|---|
| Section 6.01 | Financial Statements | 67 |
| Section 6.02 | Certificates; Other Information | 69 |
| Section 6.03 | Notices | 73 |
| Section 6.04 | Payment of Obligations | 74 |
| Section 6.05 | Preservation of Existence, Etc | 74 |
| Section 6.06 | Maintenance of Properties | 74 |
| Section 6.07 | Maintenance of Insurance | 74 |
| Section 6.08 | Compliance with Laws | 74 |
| Section 6.09 | Books and Records | 75 |
| Section 6.10 | Inspection Rights | 75 |
| Section 6.11 | Use of Proceeds | 75 |
| Section 6.12 | Covenant to Guarantee Obligations and Give Security | 75 |
| Section 6.13 | Compliance with Environmental Laws | 78 |
| Section 6.14 | Preparation of Environmental Reports | 79 |
| Section 6.15 | Further Assurances | 79 |
| Section 6.16 | Compliance with Terms of Leaseholds | 79 |
| Section 6.17 | Intentionally Omitted | 79 |
| Section 6.18 | Lien Searches | 80 |
| Section 6.19 | Material Contracts | 80 |
| Section 6.20 | Deposit Accounts; Control Agreements | 80 |
| Section 6.21 | Supply Arrangement | 81 |
| Section 6.22 | Protection of Collateral | 81 |
| Section 6.23 | Post-Closing Matters | 81 |
| ARTICLE VII.    NEGATIVE COVENANTS | | 82 |
| Section 7.01 | Liens | 82 |
| Section 7.02 | Indebtedness | 83 |
| Section 7.03 | Investments | 84 |
| Section 7.04 | Fundamental Changes | 85 |
| Section 7.05 | Dispositions | 85 |
| Section 7.06 | Restricted Payments | 86 |

TABLE OF CONTENTS
(continued)

<div align="right">Page</div>

| | | |
|---|---|---|
| Section 7.07 | Change in Nature of Business | 86 |
| Section 7.08 | Transactions with Affiliates | 86 |
| Section 7.09 | Burdensome Agreements | 87 |
| Section 7.10 | Use of Proceeds | 87 |
| Section 7.11 | Financial Covenants | 87 |
| Section 7.12 | Capital Expenditures | 88 |
| Section 7.13 | Amendments of Organization Documents | 89 |
| Section 7.14 | Accounting Changes | 89 |
| Section 7.15 | Prepayments, Etc. of Indebtedness | 89 |
| Section 7.16 | Amendment, Etc. of Indebtedness | 89 |
| ARTICLE VIII. | EVENTS OF DEFAULT AND REMEDIES | 89 |
| Section 8.01 | Events of Default | 89 |
| Section 8.02 | Remedies upon Event of Default | 92 |
| Section 8.03 | Application of Funds | 92 |
| ARTICLE IX. | AGENT | 93 |
| Section 9.01 | Appointment and Authority | 93 |
| Section 9.02 | Rights as a Lender | 93 |
| Section 9.03 | Exculpatory Provisions | 94 |
| Section 9.04 | Reliance by Agent | 94 |
| Section 9.05 | Delegation of Duties | 95 |
| Section 9.06 | Resignation of Agent | 95 |
| Section 9.07 | Non-Reliance on Agent and Other Lenders | 96 |
| Section 9.08 | Agent May File Proofs of Claim | 96 |
| Section 9.09 | Collateral and Guaranty Matters | 96 |
| ARTICLE X. | MISCELLANEOUS | 97 |
| Section 10.01 | Amendments, Etc. | 97 |
| Section 10.02 | Notices; Effectiveness; Electronic Communications | 99 |
| Section 10.03 | No Waiver; Cumulative Remedies | 101 |
| Section 10.04 | Expenses; Indemnity; Damage Waiver | 101 |
| Section 10.05 | Payments Set Aside | 103 |

TABLE OF CONTENTS
(continued)

Page

Section 10.06    Successors and Assigns .................................................103
Section 10.07    Treatment of Certain Information; Confidentiality ..........107
Section 10.08    Right of Setoff ...........................................................108
Section 10.09    Interest Rate Limitation ..............................................108
Section 10.10    Counterparts; Integration; Effectiveness ......................109
Section 10.11    Survival of Representations and Warranties ..................109
Section 10.12    Severability ................................................................109
Section 10.13    Replacement of Lenders ..............................................109
Section 10.14    Governing Law; Jurisdiction; Etc..................................110
Section 10.15    Waiver of Jury Trial ....................................................111
Section 10.16    No Advisory or Fiduciary Responsibility.......................111
Section 10.17    USA PATRIOT Act Notice .........................................112
Section 10.18    Time of the Essence....................................................112
Section 10.19    ENTIRE AGREEMENT ..............................................112
Section 10.20    Parent as Agent for Borrowers .....................................112

## SCHEDULES

| | |
|---|---|
| Schedule 2.01 | Commitments and Applicable Percentages |
| Schedule 5.03 | Certain Authorizations |
| Schedule 5.06 | Disclosed Litigation |
| Schedule 5.08(b) | Existing Liens |
| Schedule 5.08(c) | Owned Real Property |
| Schedule 5.08(d)(i) | Leased Real Property (Lessee) |
| Schedule 5.08(d)(ii) | Leased Real Property (Lessor) |
| Schedule 5.08(e) | Existing Investments |
| Schedule 5.09 | Environmental Matters |
| Schedule 5.10 | Insurance |
| Schedule 5.13 | Subsidiaries and Other Equity Investments; Loan Parties |
| Schedule 5.17 | Intellectual Property Matters |
| Schedule 5.22(a) | Deposit Accounts |
| Schedule 5.22(b) | Securities Accounts |
| Schedule 7.02 | Existing Indebtedness |
| Schedule 7.09 | Burdensome Agreements |
| Schedule 10.02 | Agent's Office, Certain Addresses for Notices |

## EXHIBITS

| | |
|---|---|
| Exhibit A | Administrative Questionnaire |
| Exhibit B | Assignment and Assumption |
| Exhibit C | Borrowing Base Certificate |
| Exhibit D | Committed Loan Notice |
| Exhibit E | Compliance Certificate |
| Exhibit F-1 | Revolving Loan Note |
| Exhibit F-2 | Term Loan A Note |
| Exhibit F-3 | Term Loan B Note |
| Exhibit G | Security Agreement |
| Exhibit H | Stock Pledge Agreement |

LEGAL_US_E # 72583224.10

# CREDIT AGREEMENT

This **CREDIT AGREEMENT** ("**Agreement**") is entered into as of December 26, 2006, among **TRADE AM INTERNATIONAL, INC.**, a Texas corporation ("**Parent**"), each of Parent's Subsidiaries identified on the signature pages hereof (such Subsidiaries, together with Parent, are referred to hereinafter each individually as a "**Borrower**," and individually and collectively, jointly and severally, as the "**Borrowers**"), each lender from time to time party hereto (collectively, the "**Lenders**" and individually, a "**Lender**"), and **CRATOS CAPITAL MANAGEMENT, LLC**, a Delaware limited liability company, as the arranger and administrative agent for the Lenders (in such capacity, together with its successors and assigns in such capacity, the "**Agent**").

## PRELIMINARY STATEMENTS:

The Borrowers have requested that the Lenders provide a term loan facility and a revolving loan facility, and the Lenders have indicated their willingness to lend on the terms and subject to the conditions set forth herein.

In consideration of the mutual covenants and agreements herein contained, the parties hereto covenant and agree as follows:

## ARTICLE I.
## DEFINITIONS AND ACCOUNTING TERMS

**Section 1.01    Defined Terms**.  As used in this Agreement, the following terms shall have the meanings set forth below:

"**ABC Export Group**" means, collectively, (i) ABC Exports, a partnership organized under the laws of India, (ii) Devgiri Exports, a partnership organized under the laws of India, (iii) ABC Industries, a partnership organized under the laws of India, (iv) Devgiri Overseas Pvt. Ltd., a private limited company organized under the laws of India, and (v) Annpurna Exports, a partnership organized under the laws of India.

"**ABC Export Group Supply Agreements**" has the meaning specified in Section 4.01(m).

"**Account Control Agreement**" has the meaning specified in Section 6.20(b).

"**Administrative Borrower**" has the meaning specified in Section 10.20.

"**Administrative Questionnaire**" means an Administrative Questionnaire in the form of Exhibit A.

"**Agent**" has the meaning set forth in the introductory paragraph hereto.

"**Agent's Office**" means the Agent's address and, as appropriate, account as set forth on Schedule 10.02, or such other address or account as the Agent may from time to time notify to the Borrowers and the Lenders.

LEGAL_US_E # 72583224.10

"**Agent Parties**" has the meaning specified in Section 10.02(c).

"**Affiliate**" means, with respect to any Person, another Person that directly, or indirectly through one or more intermediaries, Controls or is Controlled by or is under common Control with the Person specified.

"**Aggregate Commitments**" means the Commitments of all the Lenders.

"**Aggregate Credit Exposures**" means, at any time, in respect of (a) the Term Loan A Facility, the aggregate amount of the Term A Loans outstanding at such time, (b) the Term Loan B Facility, the aggregate amount of the Term B Loans outstanding at such time and (c) the Revolving Loan Facility, the sum of (i) the unused portion of the Revolving Loan Facility at such time and (ii) the Outstanding Amount of all Revolving Loans at such time.

"**Agreement**" means this Credit Agreement.

"**Anti-Terrorism Laws**" means any of the following: (a) Executive Order 13224 issued by the President of the United States; (b) the Terrorism Sanctions Regulations (Title 31 Part 595 of the U.S. Code of Federal Regulations); (c) the Terrorism List Governments Sanctions Regulations (Title 31 Part 596 of the U.S. Code of Federal Regulations); (d) the Foreign Terrorist Organizations Sanctions Regulations (Title 31 Part 597 of the U.S. Code of Federal Regulations); (e) the Patriot Act (as it may be subsequently codified); (f) all other present and future legal requirements of any Governmental Authority addressing, relating to, or attempting to eliminate, terrorist acts and acts of war; and (g) any regulations promulgated pursuant thereto or pursuant to any legal requirements of any Governmental Authority governing terrorist acts or acts of war.

"**Applicable Margin**" means, (a) in respect of the Term Loan A Facility and the Revolving Loan Facility, 1.25% per annum for Base Rate Loans and 3.00% per annum for LIBOR Rate Loans and (b) in respect of the Term Loan B Facility, 2.25% per annum for Base Rate Loans and 4.00% per annum for LIBOR Rate Loans.

"**Applicable Percentage**" means (a) in respect of the Term Loan A Facility, with respect to any Term Loan A Lender at any time, the percentage (carried out to the sixth decimal place) of the Term Loan A Facility represented by (i) on or prior to the Closing Date, such Term Loan A Lender's Term Loan A Commitment at such time and (ii) thereafter, the principal amount of such Term Loan A Lender's Term A Loans at such time, (b) in respect of the Term Loan B Facility, with respect to any Term Loan B Lender at any time, the percentage (carried out to the sixth decimal place) of the Term Loan B Facility represented by (i) on or prior to the Closing Date, such Term Loan B Lender's Term Loan B Commitment at such time and (ii) thereafter, the principal amount of such Term Loan B Lender's Term B Loans at such time and (c) in respect of the Revolving Loan Facility, with respect to any Revolving Loan Lender at any time, the percentage (carried out to the sixth decimal place) of the Revolving Loan Facility represented by such Revolving Loan Lender's Revolving Loan Commitment at such time.  If the commitment of each Revolving Loan Lender to make Revolving Loans have been terminated pursuant to Section 8.02, or if the Revolving Loan Commitments have expired, then the Applicable Percentage of each Revolving Loan Lender in respect of the Revolving Loan Facility

shall be determined based on the Applicable Percentage of such Revolving Loan Lender in respect of the Revolving Loan Facility most recently in effect, giving effect to any subsequent assignments. The initial Applicable Percentage of each Lender in respect of each Facility is set forth opposite the name of such Lender on Schedule 2.01 or in the Assignment and Assumption pursuant to which such Lender becomes a party hereto, as applicable.

"**Applicable Revolving Loan Percentage**" means with respect to any Revolving Loan Lender at any time, such Revolving Loan Lender's Applicable Percentage in respect of the Revolving Loan Facility at such time.

"**Appraised Inventory**" means Inventory of Loan Parties subject to the Lien of the Collateral Documents for which Agent has received an appraisal of such Inventory that is in form and subject satisfactory to Agent.

"**Appraised In-Transit Inventory**" means Inventory of Loan Parties that satisfies clauses (a) through (d) of the definition of Eligible In-Transit Inventory and for which Agent has received an appraisal of such Inventory that is in form and subject satisfactory to Agent.

"**Appropriate Lender**" means, at any time, with respect to any of the Term Loan A Facility, Term Loan B Facility or Revolving Loan Facility, a Lender that has a Commitment with respect to such Facility or holds a Term A Loan, Term B Loan or a Revolving Loan, respectively, at such time.

"**Approved Fund**" means any Fund that is administered, advised or managed by (a) a Lender, (b) an Affiliate of a Lender or (c) an entity or an Affiliate of an entity that administers, advises or manages a Lender.

"**Assignee Group**" means two (2) or more Eligible Assignees that are Affiliates of one another or two (2) or more Approved Funds managed by the same investment advisor.

"**Assignment and Assumption**" means an assignment and assumption entered into by a Lender and an Eligible Assignee (with the consent of any party whose consent is required by Section 10.06(b)) and accepted by the Agent, in substantially the form of Exhibit B or any other form approved by the Agent.

"**Assignment of Key-Man Life Insurance**" has the meaning specified in Section 4.01(a)(xx).

"**Attributable Indebtedness**" means, on any date, (a) in respect of any Capitalized Lease of any Person, the capitalized amount thereof that would appear on a balance sheet of such Person prepared as of such date in accordance with GAAP, (b) in respect of any Synthetic Lease Obligation, the capitalized amount of the remaining lease or similar payments under the relevant lease or other applicable agreement or instrument that would appear on a balance sheet of such Person prepared as of such date in accordance with GAAP if such lease or other agreement or instrument were accounted for as a Capitalized Lease and (c) all Synthetic Debt of such Person.

"**Audited Financial Statements**" means the audited consolidated balance sheet of Parent and its Subsidiaries for the Fiscal Year ended December 2005, and the related consolidated statements of income or operations, shareholders' equity and cash flows for such Fiscal Year of Parent and its Subsidiaries, including the notes thereto.

"**Availability**" means, as of any date of determination, the amount that Borrowers are entitled to borrow under the Revolving Loan Facility in accordance with Section 2.01(b) of this Agreement.

"**Availability Period**" means in respect of the Revolving Loan Facility, the period from and including the Closing Date to (but excluding) the earliest of (i) the Maturity Date, (ii) the date of termination of the Revolving Loan Commitments pursuant to Section 2.05, and (iii) the date of termination of the commitment of each Revolving Loan Lender to make Revolving Loans pursuant to Section 8.02.

"**Base Rate**" means for any day a fluctuating rate per annum equal to the higher of (a) the Federal Funds Rate plus 1/2 of 1% and (b) the rate publicly quoted from time to time by The Wall Street Journal as the "base rate on corporate loans posted by at least 75% of nation's 30 largest banks" (or, if The Wall Street Journal ceases quoting a base rate of the type described, the highest per annum rate of interest published by the Federal Reserve Board in Federal Reserve statistical release H.15 (519) entitled "Selected Interest Rates" as the bank prime loan rate or its equivalent).

"**Base Rate Loan**" means a Revolving Loan, a Term A Loan or a Term B Loan that bears interest based on the Base Rate.

"**Borrower**" and "**Borrowers**" have the meanings specified in the introductory paragraph hereto.

"**Borrower Materials**" has the meaning specified in Section 6.02.

"**Borrowing**" means a Revolving Loan Borrowing or a Term Loan Borrowing, as the context may require.

"**Borrowing Base**" means, at any time of determination, the lesser of

(a)    the sum of:

(i)    up to (A) 80% of the value of Eligible Receivables not supported by bankers' acceptances and (B) 90% of the value of Eligible Receivables supported by bankers' acceptances in form and substance acceptable to Agent (in each case, less the amount of the Dilution Reserve then in effect), *plus*

(ii)    the lesser of (A) 60% of Eligible Inventory valued at the lower of cost (FIFO) or market and (B) 80% of the Orderly Liquidation Value of Appraised Inventory, *plus*

(iii)    the least of (A) 60% of Eligible In-Transit Inventory valued at the lower of cost (FIFO) or market, (B) 80% of the Orderly Liquidation Value of Appraised In-Transit Inventory and (C) $2,500,000, *minus*

(iv)    Reserves outstanding as of such date, *minus*

(v)    $11,500,000, or

(b)    an amount equal to Borrowers' Collections with respect to Receivables for the immediately preceding 60-day period.

"**Borrowing Base Certificate**" means a certificate substantially in the form of Exhibit C.

"**Business Day**" means any day other than a Saturday, Sunday or other day on which commercial banks are authorized to close under the Laws of, or are in fact closed in, the state where the Agent's Office is located and, if such day relates to any LIBOR Rate Loan, shall also mean any such day on which dealings in Dollar deposits are conducted by and between banks in the London interbank eurodollar market.

"**Capital Expenditures**" means, with respect to any Person for any period, any expenditure in respect of the purchase or other acquisition of any fixed or capital asset (excluding normal replacements and maintenance which are properly charged to current operations), whether such expenditures are paid in cash or financed.

"**Capitalized Leases**" means all leases that have been or should be, in accordance with GAAP, recorded as capitalized leases.

"**Cash Equivalents**" means any of the following types of Investments, to the extent owned by Parent or any of its Subsidiaries free and clear of all Liens (other than Liens created under the Collateral Documents):

(a)    readily marketable obligations issued or directly and fully guaranteed or insured by the United States or any agency or instrumentality thereof having maturities of not more than three hundred sixty (360) days from the date of acquisition thereof; provided that the full faith and credit of the United States is pledged in support thereof;

(b)    time deposits with, or insured certificates of deposit or bankers' acceptances of, any commercial bank that (i) (A) is a Lender or (B) is organized under the Laws of the United States, any state thereof or the District of Columbia or is the principal banking subsidiary of a bank holding company organized under the Laws of the United States, any state thereof or the District of Columbia, and is a member of the Federal Reserve System, (ii) issues (or the parent of which issues) commercial paper rated as described in clause (c) of this definition and (iii) has combined capital and surplus of at least $1,000,000,000, in each case with maturities of not more than one hundred eighty (180) days from the date of acquisition thereof;

(c)    commercial paper issued by any Person organized under the Laws of any state of the United States and rated at least "Prime-1" (or the then equivalent grade) by

Moody's or at least "A-1" (or the then equivalent grade) by S&P, in each case with maturities of not more than one hundred eighty (180) days from the date of acquisition thereof; and

(d)     Investments, classified in accordance with GAAP as current assets of Parent or any of its Subsidiaries, in money market investment programs registered under the Investment Company Act of 1940, which are administered by financial institutions that have the highest rating obtainable from either Moody's or S&P, and the portfolios of which are limited solely to Investments of the character, quality and maturity described in clauses (a), (b) and (c) of this definition.

"**Cash Management Agreement**" means any agreement to provide cash management services, including treasury, depository, overdraft, credit or debit card, electronic funds transfer and other cash management arrangements.

"**CERCLA**" means the Comprehensive Environmental Response, Compensation and Liability Act of 1980.

"**CERCLIS**" means the Comprehensive Environmental Response, Compensation and Liability Information System maintained by the U.S. Environmental Protection Agency.

"**Change in Law**" means the occurrence, after the Closing Date, of any of the following: (a) the adoption or taking effect of any law, rule, regulation or treaty, (b) any change in any law, rule, regulation or treaty or in the administration, interpretation or application thereof by any Governmental Authority or (c) the making or issuance of any request, guideline or directive (whether or not having the force of law) by any Governmental Authority.

"**Change of Control**" means an event or series of events by which:

(a)     Ashutosh Ladha shall cease to own and control legally and beneficially (free and clear of all Liens), either directly or indirectly, equity securities in Parent representing 85% of the combined voting power of all of equity securities entitled to vote for members of the board of directors or equivalent governing body of Parent on a fully-diluted basis (and taking into account all such securities that Equity Investors have the right to acquire pursuant to any option right); or

(b)     during any period of 12 consecutive months, a majority of the members of the board of directors or other equivalent governing body of Parent cease to be composed of Continuing Directors; or

(c)     Parent shall cease, directly or indirectly, to own and control legally and beneficially all of the Equity Interests in each of its Material Subsidiaries except for such nominal or qualifying Equity Interests owned by another Person as required by Applicable Law with respect to any new Foreign Subsidiary acquired or formed after the date hereof; or

(d)     a "change of control" or any comparable term under, and as defined in, any Stockholder Subordinated Debt Document or other significant debt shall have occurred.

"**Closing Date**" means the first date all the conditions precedent in Section 4.01 are satisfied or waived in accordance with Section 10.01.

"**Code**" means the Internal Revenue Code of 1986 and the regulations promulgated thereunder, as amended from time to time.

"**Collateral**" means all of the "Collateral" and "Mortgaged Property" referred to in the Collateral Documents and all of the other property that is or is intended under the terms of the Collateral Documents to be subject to Liens in favor of the Agent for the benefit of the Secured Parties.

"**Collateral Documents**" means, collectively, the Security Agreement, the Equity Investors Stock Pledge Agreement, the Account Control Agreements, the Assignment of Key-Man Life Insurance, the Security Account Control Agreements (if any), the Intellectual Property Security Agreements, the Mortgages (if any), each of the mortgages, collateral assignments, Security Agreement Supplements, supplements to the IP Security Agreements and the Equity Investors Stock Pledge Agreement, security agreements, pledge agreements or other similar agreements delivered to the Agent pursuant to Section 6.12, and each of the other agreements, instruments or documents that creates or purports to create a Lien in favor of the Agent for the benefit of the Secured Parties.

"**Collections**" means all cash, checks, notes, instruments, and other items of payment.

"**Commitment**" means a Term Loan A Commitment, Term Loan B Commitment or a Revolving Loan Commitment, as the context may require.

"**Committed Loan Notice**" means a notice of (a) a Term Loan Borrowing, (b) a Revolving Loan Borrowing, (c) a conversion of Loans from one Type to the other (to the extent permitted hereunder), or (d) a continuation of LIBOR Rate Loans, pursuant to Section 2.02(a), which, if in writing, shall be substantially in the form of Exhibit D.

"**Compliance Certificate**" means a certificate substantially in the form of Exhibit E.

"**Consolidated EBITDA**" means, at any date of determination and for any fiscal period for any Person, an amount equal to Consolidated Net Income of such Person and its Subsidiaries on a consolidated basis for such fiscal period plus (a) the following to the extent the respective amounts described in subclauses (a)(i) through (a)(vi) reduced such Consolidated Net Income for such fiscal period: (i) Consolidated Interest Charges, (ii) the provision for Federal, state, local and foreign income taxes payable, (iii) depreciation and amortization expense, (iv) management fees paid during such fiscal period, to the extent permitted by this Agreement, (v) the amount of the Structuring Fee actually paid pursuant to the Fee Letter and (vi) other non-recurring expenses reducing such Consolidated Net Income which do not represent a cash item in such fiscal period or any future period (in each case of or by such Person and its Subsidiaries for such fiscal period), and minus (b) the following to the extent the respective amounts in clauses (b)(i) and (b)(ii) increased such Consolidated Net Income for such fiscal period: (i) Federal,

state, local and foreign income tax credits and (ii) all non-cash items increasing Consolidated Net Income (in each case of or by such Person and its Subsidiaries for such fiscal period).

"**Consolidated Interest Charges**" means, for any fiscal period for any Person, the sum of (a) all cash interest, premium payments, debt discount, fees, charges and related expenses in connection with borrowed money (including capitalized interest) or in connection with the deferred purchase price of assets, in each case to the extent treated as interest in accordance with GAAP, (b) all cash interest paid or payable with respect to discontinued operations and (c) the portion of rent expense under Capitalized Leases that is treated as interest in accordance with GAAP, in each case, of or by such Person and its Subsidiaries on a consolidated basis for such fiscal period.

"**Consolidated Interest Coverage Ratio**" means, at any date of determination for any fiscal period, the ratio of (a) (i) Consolidated EBITDA, less (ii) the aggregate amount of all cash Capital Expenditures to (b) the Consolidated Interest Charges, in each case, of or by Parent and its Material Subsidiaries for such fiscal period.

"**Consolidated Net Income**" means, at any date of determination for any fiscal period for any Person, the net income (or loss) of such Person and its Subsidiaries on a consolidated basis for such fiscal period; provided that Consolidated Net Income shall exclude (a) extraordinary gains and extraordinary losses for such fiscal period, (b) the net income of any Subsidiary during such fiscal period to the extent that the declaration or payment of dividends or similar distributions by such Subsidiary of such income is not permitted by operation of the terms of its Organization Documents or any agreement, instrument or Law applicable to such Subsidiary during such fiscal period, except that Parent's equity in any net loss of any such Subsidiary for such fiscal period shall be included in determining Consolidated Net Income, and (c) any income (or loss) for such period of any Person if such Person is not a Subsidiary (a "Non-Subsidiary"), except that such Person's equity in the net income of any such Non-Subsidiary for such fiscal period shall be included in Consolidated Net Income up to the aggregate amount of cash actually distributed by such Non-Subsidiary during such period to such Person or a Subsidiary of such Person as a dividend or other distribution (and in the case of a dividend or other distribution to a Subsidiary, such Subsidiary is not precluded from further distributing such amount to such Person as described in clause (b) of this proviso).

"**Continuing Directors**" means, with respect to board of directors or other equivalent governing body of Parent, individuals (a) who were members of that board or equivalent governing body on the first day of the applicable period, (b) whose election or nomination to that board or equivalent governing body was approved by individuals referred to in clause (a) above constituting at the time of such election or nomination at least a majority of that board or equivalent governing body or (c) whose election or nomination to that board or other equivalent governing body was approved by individuals referred to in clauses (a) and (b) above constituting at the time of such election or nomination at least a majority of that board or equivalent governing body (excluding, in the case of both clause (b) and clause (c), any individual whose initial nomination for, or assumption of office as, a member of that board or equivalent governing body occurs as a result of an actual or threatened solicitation of proxies or consents for the election or removal of one or more directors by any person or group other than a solicitation for the election of one or more directors by or on behalf of the board of directors).

"**Contractual Obligation**" means, as to any Person, any provision of any security issued by such Person or of any agreement, instrument or other undertaking to which such Person is a party or by which it or any of its property is bound.

"**Control**" means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ability to exercise voting power, by contract or otherwise. "Controlling" and "Controlled" have meanings correlative thereto.

"**Credit Risk Event**" means either (a) an Event of Default or (b) the Obligations, in the Agent's reasonable commercial judgment, have a significant risk of declining in credit quality or price unrelated to general market conditions, which decline may lead to a Default.

"**Debtor Relief Laws**" means the Bankruptcy Code of the United States, and all other liquidation, conservatorship, bankruptcy, assignment for the benefit of creditors, moratorium, rearrangement, receivership, insolvency, reorganization, or similar debtor relief Laws of the United States or other applicable jurisdictions from time to time in effect and affecting the rights of creditors generally.

"**Default**" means any event or condition that constitutes an Event of Default or that, with the giving of any notice, the passage of time, or both, would be an Event of Default.

"**Default Rate**" means, with respect to the Term Loan A Facility, the Term Loan B Facility and the Revolving Loan Facility, an interest rate equal to (i) the Base Rate plus (ii) the Applicable Margin, if any, applicable to Base Rate Loans plus (iii) 2% per annum; provided, however, that with respect to a LIBOR Rate Loan, the Default Rate shall be an interest rate equal to the interest rate (including any Applicable Margin) otherwise applicable to such Loan plus 2% per annum.

"**Defaulting Lender**" means any Lender that (a) other than at the direction or request of any regulatory agency or authority, has failed to fund any portion of the Term Loans or Revolving Loans required to be funded by it hereunder within one (1) Business Day of the date required to be funded by it hereunder, (b) has otherwise failed to pay over to the Agent or any other Lender any other amount required to be paid by it hereunder within one (1) Business Day of the date when due, unless the subject of a good faith dispute, or (c) has been deemed insolvent or become the subject of a bankruptcy or insolvency proceeding.

"**Dilution**" means, as of any date of determination, a percentage, based upon the experience of the immediately prior twelve Fiscal Month period, that is the result of dividing the Dollar amount of (a) write-off of bad debt or other dilutive items with respect to the Borrowers' Receivables (other than such items excluded from Eligible Receivables pursuant to clause (r) of the definition of Eligible Receivables) during such period, by (b) the Borrowers' billings with respect to Receivables during such period.

"**Dilution Reserve**" means, as of any date of determination, an amount sufficient to reduce the advance rate against Eligible Receivables by 1 percentage point for each percentage point by which Dilution is in excess of ten percent (10.0%).

**"Disclosed Litigation"** has the meaning set forth in <u>Section 5.06</u>.

**"Disposition"** or **"Dispose"** means the sale, transfer, license, lease or other disposition (including any sale and leaseback transaction) of any property by any Person (or the granting of any option or other right to do any of the foregoing), including any sale, assignment, transfer or other disposal, with or without recourse, of any notes or accounts receivable or any rights and claims associated therewith.

**"Dollar"** and **"$"** mean lawful money of the United States.

**"Domestic Subsidiary"** means any Subsidiary that is organized under the Laws of any political subdivision of the United States.

**"Eligible Assignee"** means any Person that meets the requirements to be an assignee under <u>Section 10.06(b)(ii)</u>, <u>(v)</u> and <u>(vi)</u> (subject to such consents, if any, as may be required under <u>Section 10.06(b)(ii)</u>).

**"Eligible Collateral"** means, collectively, Eligible Inventory, Eligible In-Transit Inventory and Eligible Receivables.

**"Eligible Financial Institution"** means (a) a commercial bank organized under the Laws of the United States, or any state thereof, and having total assets in excess of $250,000,000, (b) a commercial bank organized under the Laws of any other country which is a member of the Organization for Economic Cooperation and Development or a political subdivision of any such country and which has total assets in excess of $250,000,000, <u>provided</u> that such bank is acting through a branch or agency located in the United States, or (c) a finance company, insurance company, financial institution, or fund that is engaged in making, purchasing, or otherwise investing in commercial loans in the ordinary course of its business and having (together with its Affiliates) total assets in excess of $250,000,000.

**"Eligible Inventory"** means, subject to the last sentence of this definition, Inventory of Loan Parties subject to the Lien of the Collateral Documents.  The Agent shall have the right to establish, modify or eliminate Reserves against Eligible Inventory from time to time in its reasonable credit judgment.  In addition, the Agent reserves the right, at any time and from time to time after the Closing Date, to adjust any of the criteria set forth below and to establish new criteria, in its reasonable credit judgment reflecting changes in the collectibility or realization values of such Inventory arising or discovered by the Agent after the Closing Date. None of the following classes of Inventory shall be deemed to be Eligible Inventory with respect to any Loan Party:

        (a)      Inventory consisting of "perishable agricultural commodities" within the meaning of the Perishable Agricultural Commodities Act of 1930, or on which a Lien has arisen or may arise in favor of agricultural producers under any comparable Laws;

        (b)      Inventory that (i) is not located on premises owned, leased or rented by such Loan Party and set forth on <u>Schedule 5.8(c)</u> or <u>5.8(d)(i)</u>, (ii) is stored at a leased location, unless the Agent has given its prior consent thereto and unless either (x) a reasonably satisfactory landlord waiver has been delivered to the Agent, or (y) Reserves reasonably

satisfactory to the Agent have been established with respect thereto, (iii) is stored with a bailee or warehouseman unless a reasonably satisfactory, acknowledged bailee letter has been received by the Agent and Reserves reasonably satisfactory to the Agent have been established with respect thereto, or (iv) is located at an owned location subject to a mortgage in favor of a lender other than the Agent unless a reasonably satisfactory mortgagee waiver has been delivered to the Agent;

(c)    Inventory that is obsolete, slow moving, unusable, seconds or otherwise unfit or unavailable for sale;

(d)    Inventory consisting of promotional, marketing, packaging or shipping materials and supplies;

(e)    Inventory that fails to meet all standards imposed by any Governmental Authority having regulatory authority over such Inventory or its use or sale;

(f)    Inventory that is subject to any licensing, patent, royalty, trademark, trade name or copyright agreement with any third party requiring the payment of royalties or fees or requiring the consent of the licensor for a sale thereof by the Agent; provided, however, this clause (f) shall not apply to any Inventory that is subject to such a licensing, patent, royalty, trademark, trade name or copyright agreement solely because of the packaging or labeling of such Inventory so long as (i) such Inventory can be removed from its packaging or such labeling can be removed from such Inventory without damage to the Inventory, (ii) removal of such Inventory from its packaging or removal of such labeling from such Inventory will not violate such licensing, patent, royalty, trademark, trade name or copyright agreement, (iii) removal of the Inventory from its packaging or removal of such labeling from such Inventory will not result in a decrease in the Inventory's value and (iv) the costs and expenses to remove such Inventory from its packaging and/or to remove such labeling from such Inventory  is nominal;

(g)    Inventory located outside the United States;

(h)    Inventory that is not in the possession of or under the sole control of Parent or any of its Material Subsidiaries;

(i)    Inventory consisting of work in progress;

(j)    Inventory that is placed on consignment or is in transit, except for Inventory in transit between domestic locations of Loan Parties as to which the Agent's Liens have been perfected at origin and destination;

(k)    Inventory that is covered by a negotiable document of title, unless such document has been delivered to the Agent with all necessary endorsements, free and clear of all Liens except those in favor of the Agent and Lenders;

(l)    Inventory consisting of goods which have been returned by the buyer except to the extent such returned goods are in new condition and of a type held for sale by the applicable Loan Party in the ordinary course of its business;

(m)    Inventory that is not of a type held for sale in the ordinary course of such Loan Party's business;

(n)    Inventory consisting of goods which are special or made to order items except to the extent that such special or made to order goods are a type held for sale by the applicable Loan Party in the ordinary course its business;

(o)    Inventory that is not covered by casualty insurance reasonably acceptable to the Agent;

(p)    Inventory with respect to which the representations and warranties set forth in the Security Agreement and Section 5.25 of this Agreement applicable to Inventory are not correct; and

(q)    Inventory in respect of which the Security Agreement, after giving effect to the related filings of financing statements that have then been made, if any, does not or has ceased to create a valid and perfected first priority lien or security interest in favor of the Agent, on behalf of the Secured Parties, securing the Obligations.

"**Eligible In-Transit Inventory**" means all raw materials and finished goods Inventory owned by the Loan Parties, and which Inventory is in transit to one of the Loan Parties' facilities and which Inventory (a) is owned by one of the Loan Parties, (b) is fully insured, (c) is subject to a first priority security interest in and lien upon such goods in favor of the Agent (except for any possessory lien upon such goods in the possession of a freight carrier or shipping company securing only the freight charges for the transportation of such goods to such Loan Parties), (d) is evidenced or deliverable pursuant to documents that have been delivered to the Agent or an agent acting on its behalf or designating the Agent as consignee, and (e) is otherwise deemed to be "Eligible Inventory" hereunder.

"**Eligible Receivables**" means, subject to the last sentence of this definition, Receivables of Loan Parties subject to the Lien of the Collateral Documents, the value of which shall be determined by taking into consideration, among other factors, their book value determined in accordance with GAAP.  The Agent shall have the right to establish, modify or eliminate Reserves against Eligible Receivables from time to time in its reasonable credit judgment.  In addition, the Agent reserves the right, at any time and from time to time after the Closing Date, to adjust any of the criteria set forth below and to establish new criteria, in its reasonable credit judgment reflecting changes in the collectibility or realization values of such Receivables arising or discovered by the Agent after the Closing Date.  None of the following classes of Receivables shall be deemed to be Eligible Receivables with respect to any Loan Party:

(a)    Receivables that do not arise out of sales of goods or rendering of services in the ordinary course of such Loan Party's business;

(b)    Receivables payable other than in Dollars or that are otherwise on terms other than those normal or customary in such Loan Party's business;

(c)    Receivables owing from any Person that is an Affiliate of any Loan Party or from any Person that has any common officer or director with any Loan Party;

(d)    Receivables more than 90 days past original invoice date or more than 60 days past the date due, except with respect to Receivables owing from The Home Depot Inc., Linens 'n Things, Inc., Ashley Furniture Industries, Inc., Bed Bath & Beyond Inc., The Newton Buying Group, Lowe's Companies, Inc, Kohl's Corporation, J. C. Penney Corporation, Inc., Target Corporation, Wal-Mart Stores, Inc. or any other Person approved in writing by the Agent in its sole discretion, in which case such Receivables shall not be more than 120 days past original invoice date or more than 60 days past the date due;

(e)    Receivables from any Person other than The Home Depot Inc., Linens 'n Things, Inc., Ashley Furniture Industries, Inc., Bed Bath & Beyond Inc., The Newton Buying Group, Lowe's Companies, Inc, Kohl's Corporation, J. C. Penney Corporation, Inc., Target Corporation, and Wal-Mart Stores, Inc., to the extent that such Receivables, together with all other Receivables owing from any such Person and its Affiliates as of any date of determination exceed ten percent (10%) of all Eligible Receivables, and (i) in the case of Receivables from The Home Depot Inc., Ashley Furniture Industries, Inc., The Newton Buying Group, Lowe's Companies, Inc, Kohl's Corporation, J. C. Penney Corporation, Inc., Target Corporation, and Wal-Mart Stores, Inc., to the extent that such Receivables, together with all other Receivables owing from any such Person and its Affiliates as of any date of determination exceed fifteen percent (15%) of all Eligible Receivables, (ii) in the case of Receivables from Bed Bath & Beyond Inc, to the extent that such Receivables, together with all other Receivables owing from Bed Bath & Beyond Inc and its Affiliates as of any date of determination exceed twenty percent (20%) of all Eligible Receivables, and (iii) in the case of Receivables from Linens 'n Things, Inc. to the extent that such Receivables, together with all other Receivables owing from Linens 'n Things, Inc. and its Affiliates as of any date of determination exceed thirty percent (30%) of all Eligible Receivables;

(f)    Receivables owing from any Person that (i) has disputed liability for any Receivable owing from such Person or (ii) has otherwise asserted any claim, demand, setoff or liability against Parent or any of its Subsidiaries, whether by action, suit, counterclaim or otherwise; provided, that for purposes of subclause (f)(i), such Receivables shall be excluded only to the extent of the amounts being disputed by such Person at any date of determination;

(g)    Receivables owing from any Person that shall take or be the subject of any action or proceeding of a type described in Section 8.01(f);

(h)    Receivables (i) owing from any Person that is also a supplier to or creditor of Parent or any of its Subsidiaries unless such Person has waived any right of setoff in a manner acceptable to the Agent or (ii) representing any manufacturer's or supplier's credits, discounts, incentive plans or similar arrangements entitling Parent or any of its Subsidiaries to discounts on future purchase therefrom;

(i)    Receivables arising out of sales to account debtors outside the United States unless such Receivables are fully backed by an irrevocable letter of credit on

terms, and issued by a financial institution, acceptable to the Agent and such irrevocable letter of credit is in the possession of the Agent;

               (j)     Receivables arising out of sales on a bill-and-hold, guaranteed sale, sale-or-return, sale on approval or consignment basis or subject to any right of return, setoff or charge back;

               (k)     Receivables owing from an account debtor that is an agency, department or instrumentality of the United States or any state thereof unless the Borrowers or their relevant Subsidiary shall have satisfied the requirements of the Assignment of Claims Act of 1940, and any similar state legislation and the Agent is satisfied as to the absence of setoffs, counterclaims and other defenses on the part of such account debtor;

               (l)     Receivables with respect to which the representations and warranties set forth in the Security Agreement and in <u>Section 5.25</u> of this Agreement applicable to Receivables are not correct;

               (m)     Receivables owing from an account debtor to the extent (i) such Loan Party's right to receive payment is not absolute or is contingent upon the fulfillment of any condition whatsoever, or (ii) as to which such Loan Party is not able to bring suit or otherwise enforce its remedies against the account debtor through judicial process, or (iii) if such Receivables represent a progress billing consisting of an invoice for goods sold or used or services rendered pursuant to a contract under which the account debtor's obligation to pay that invoice is subject to such Loan Parties' completion of further performance under such contract or is subject to the equitable lien of a surety bond issuer;

               (n)     Receivables with respect to which an invoice, reasonably acceptable to the Agent in form and substance, has not been sent to the applicable account debtor;

               (o)     Receivables owing from an account debtor (i) that suspends business, makes a general assignment for the benefit of creditors or fails to pay its debts generally as they come due or (ii) if a petition is filed by or against such account debtor under any bankruptcy Law or any other federal, state or foreign (including any provincial) receivership, insolvency relief or other Law or Laws for the relief of debtors;

               (p)     Receivables owing from an account debtor if fifty percent (50%) or more of the Dollar amount of all Receivables owing by that account debtor are ineligible under the other criteria set forth in this definition of "Eligible Receivables";

               (q)     Receivables in respect of which the Security Agreement, after giving effect to the related filings of financing statements that have then been made, if any, does not or has ceased to create a valid and perfected first priority lien or security interest in favor of the Agent, on behalf of the Secured Parties, securing the Obligations;

               (r)     Receivables owing from any Person that is owed any amounts by Borrowers with respect to chargebacks for discounts, advertising allowances, credits, returns or

other claims; provided, that such Receivables shall be excluded only to the extent of the amount of any such chargeback at any date of determination; and

(s)    Receivables which include prepaid amounts, past due credits, rebates, refunds or other similar items.

**"Environmental Laws"** means any and all Federal, state, local, and foreign statutes, Laws, regulations, ordinances, rules, judgments, orders, decrees, permits, concessions, grants, franchises, licenses, agreements or governmental restrictions relating to pollution and the protection of the environment or the release of any materials into the environment, including those related to hazardous substances or wastes, air emissions and discharges to waste or public systems.

**"Environmental Liability"** means any liability, contingent or otherwise (including any liability for damages, costs of environmental remediation, fines, penalties or indemnities), of the Borrowers, any other Loan Party or any of their respective Subsidiaries directly or indirectly resulting from or based upon (a) violation of any Environmental Law, (b) the generation, use, handling, transportation, storage, treatment or disposal of any Hazardous Materials, (c) exposure to any Hazardous Materials, (d) the release or threatened release of any Hazardous Materials into the environment or (e) any contract, agreement or other consensual arrangement pursuant to which liability is assumed or imposed with respect to any of the foregoing.

**"Environmental Permit"** means any permit, approval, identification number, license or other authorization required under any Environmental Law.

**"Equity Interests"** means, with respect to any Person, all of the shares of capital stock of (or other ownership or profit interests in) such Person, all of the warrants, options or other rights for the purchase or acquisition from such Person of shares of capital stock of (or other ownership or profit interests in) such Person, all of the securities convertible into or exchangeable for shares of capital stock of (or other ownership or profit interests in) such Person or warrants, rights or options for the purchase or acquisition from such Person of such shares (or such other interests), and all of the other ownership or profit interests in such Person (including partnership, member or trust interests therein), whether voting or nonvoting, and whether or not such shares, warrants, options, rights or other interests are outstanding on any date of determination.

**"Equity Investors"** means Ashutosh Ladha, Manjusha Ladha and J. Walker Holland, as trustee for the Individual Retirement Account of J. Walker Holland.

**"Equity Investors Stock Pledge Agreement"** has the meaning specified in Section 4.01(a)(vii).

**"ERISA"** means the Employee Retirement Income Security Act of 1974, amended from time to time.

**"ERISA Affiliate"** means any trade or business (whether or not incorporated) under common control with the Borrowers within the meaning of Section 414(b) or (c) of the

Code (and Sections 414(m) and (o) of the Code for purposes of provisions relating to Section 412 of the Code).

"**ERISA Event**" means (a) a Reportable Event with respect to a Pension Plan; (b) a withdrawal by the Borrowers or any ERISA Affiliate from a Pension Plan subject to Section 4063 of ERISA during a plan year in which it was a substantial employer (as defined in Section 4001(a)(2) of ERISA) or a cessation of operations that is treated as such a withdrawal under Section 4062(e) of ERISA; (c) a complete or partial withdrawal by the Borrowers or any ERISA Affiliate from a Multiemployer Plan or notification that a Multiemployer Plan is in reorganization; (d) the filing of a notice of intent to terminate, the treatment of a Plan amendment as a termination under Section 4041 or 4041A of ERISA, or the commencement of proceedings by the PBGC to terminate a Pension Plan or Multiemployer Plan; (e) an event or condition which constitutes grounds under Section 4042 of ERISA for the termination of, or the appointment of a trustee to administer, any Pension Plan or Multiemployer Plan; or (f) the imposition of any liability under Title IV of ERISA, other than for PBGC premiums due but not delinquent under Section 4007 of ERISA, upon the Borrowers or any ERISA Affiliate.

"**Event of Default**" has the meaning specified in Section 8.01.

"**Excess Availability**" means, as of any date of determination, the amount equal to Availability *minus* the aggregate amount, if any, of all trade payables of Loan Parties aged in excess of their historical levels (or such longer period on agreed to and documented terms acceptable to Agent) with respect thereto and all book overdrafts of Loan Parties in excess of their historical practices with respect thereto, in each case as determined by the Agent.

"**Excluded Taxes**" means, with respect to the Agent, any Lender or any other recipient of any payment to be made by or on account of any obligation of the Borrowers hereunder, (a) taxes imposed on or measured by its overall net income (however denominated), and franchise taxes imposed on it (in lieu of net income taxes), by the jurisdiction (or any political subdivision thereof) under the Laws of which such recipient is organized or in which its principal office is located or, in the case of any Lender, in which its applicable Lending Office is located, (b) any branch profits taxes imposed by the United States or any similar tax imposed by any other jurisdiction in which any Borrower is located and (c) in the case of a Foreign Lender (other than an assignee pursuant to a request by Parent under Section 10.13), any withholding tax that is imposed on amounts payable to such Foreign Lender at the time such Foreign Lender becomes a party hereto (or designates a new Lending Office) or is attributable to such Foreign Lender's failure or inability (other than as a result of a Change in Law) to comply with Section 3.01(e), except to the extent that such Foreign Lender (or its assignor, if any) was entitled, at the time of designation of a new Lending Office (or assignment), to receive additional amounts from the Borrowers with respect to such withholding tax pursuant to Section 3.01(a).

"**Existing Credit Agreement**" means that certain Revolving Credit, Term Loan and Security Agreement, dated as of September 29, 1999, between GMAC Commercial Finance LLC and Parent, as amended, restated, supplemented or otherwise modified prior to the date hereof.

"**Extraordinary Receipt**" means any cash received by or paid to or for the account of any Person not in the ordinary course of business, including tax refunds, pension plan reversions, judgments, proceeds of settlements or other consideration of any kind in connection with any cause of action, proceeds of insurance, condemnation awards (and payments in lieu thereof), indemnity payments and any purchase price adjustments.

"**Facility**" means the Term Loan A Facility, Term Loan B Facility or the Revolving Loan Facility, as the context may require.

"**Federal Funds Rate**" means, for any day, the rate per annum equal to the weighted average (rounded upward, if necessary, to the next 1/100 of 1%) of the rates on overnight Federal funds transactions with members of the Federal Reserve System arranged by Federal funds brokers on such day, as published by the Federal Reserve Bank of New York on the next succeeding Business Day; provided that (a) if such day is not a Business Day, the Federal Funds Rate for such day shall be such rate on such transactions on the next succeeding Business Day as so published, and (b) if no such rate is so published on such next succeeding Business Day, the Federal Funds Rate for such day shall be the average rate (rounded upward, if necessary, to the next 1/100 of 1%) charged to any commercial bank designated by the Agent on such day on such transactions as determined by the Agent.

"**Fee Letter**" means the letter agreement, dated as of the Closing Date, between the Borrowers and the Agent.

"**Fiscal Month**" means each of the 12 consecutive four- or five-week periods beginning on the first day of the Fiscal Year, in the pattern 4,4,5 within a Fiscal Quarter (or in the pattern 5,5,4 or 4,5,5 or 5,4,5 within any one Fiscal Quarter of any 53-week Fiscal Year).

"**Fiscal Quarter**" means each of the four consecutive periods of 13 weeks (or 14 weeks in any one Fiscal Quarter of any 53-week Fiscal Year), beginning on the first day of the Fiscal Year.

"**Fiscal Week**" means each seven day period beginning on Thursday and ending on the following Wednesday.

"**Fiscal Year**" means the period of 52 or 53 consecutive weeks beginning on the Thursday immediately following the first Wednesday following December 31 in one calendar year and ending on the first Wednesday immediately following December 31 of the following calendar year (or, in the case of any period of 53 consecutive weeks, of the second calendar year ending thereafter) and when followed or preceded by the designation of a calendar year, means such period ending on the Wednesday immediately following December 31 of such designated calendar year.

"**Foreign Lender**" means any Lender that is organized under the Laws of a jurisdiction other than that in which the Borrowers are resident for tax purposes. For purposes of this definition, the United States, each State thereof and the District of Columbia shall be deemed to constitute a single jurisdiction.

"**Foreign Subsidiary**" means any Subsidiary that is not a Domestic Subsidiary.

"**FRB**" means the Board of Governors of the Federal Reserve System of the United States.

"**Fund**" means any Person (other than a natural person) that is (or will be) engaged in making, purchasing, holding or otherwise investing in commercial loans and similar extensions of credit in the ordinary course of its business.

"**GAAP**" means (i) generally accepted accounting principles in the United States set forth in the opinions and pronouncements of the Accounting Principles Board and the American Institute of Certified Public Accountants and statements and pronouncements of the Financial Accounting Standards Board or such other principles as may be approved by a significant segment of the accounting profession in the United States, that are applicable to the circumstances as of the date of determination, consistently applied or (ii) solely with respect to the members of ABC Export Group, the International Accounting Standards as in effect from time to time.

"**Governmental Authority**" means the government of the United States or any other nation, or of any political subdivision thereof, whether state or local, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government (including any supra-national bodies such as the European Union or the European Central Bank).

"**Granting Lender**" has the meaning specified in Section 10.06(h).

"**Guarantee**" means, as to any Person, any (a) any obligation, contingent or otherwise, of such Person guaranteeing or having the economic effect of guaranteeing any Indebtedness or other obligation payable or performable by another Person (the "primary obligor") in any manner, whether directly or indirectly, and including any obligation of such Person, direct or indirect, (i) to purchase or pay (or advance or supply funds for the purchase or payment of) such Indebtedness or other obligation, (ii) to purchase or lease property, securities or services for the purpose of assuring the obligee in respect of such Indebtedness or other obligation of the payment or performance of such Indebtedness or other obligation, (iii) to maintain working capital, equity capital or any other financial statement condition or liquidity or level of income or cash flow of the primary obligor so as to enable the primary obligor to pay such Indebtedness or other obligation, or (iv) entered into for the purpose of assuring in any other manner the obligee in respect of such Indebtedness or other obligation of the payment or performance thereof or to protect such obligee against loss in respect thereof (in whole or in part), or (b) any Lien on any assets of such Person securing any Indebtedness or other obligation of any other Person, whether or not such Indebtedness or other obligation is assumed by such Person (or any right, contingent or otherwise, of any holder of such Indebtedness to obtain any such Lien). The amount of any Guarantee shall be deemed to be an amount equal to the stated or determinable amount of the related primary obligation, or portion thereof, in respect of which such Guarantee is made or, if not stated or determinable, the maximum reasonably anticipated liability in respect thereof as determined by the guaranteeing Person in good faith. The term "Guarantee" as a verb has a corresponding meaning.

"**Guarantors**" means, collectively, each Material Subsidiary of Parent, if any, that shall be required to execute and deliver a guaranty or guaranty supplement pursuant to Section 6.12 after the Closing Date.

"**Guaranty**" means a guaranty made by the Guarantors in favor of the Secured Parties, in form and substance satisfactory to the Agent.

"**Hazardous Materials**" means all explosive or radioactive substances or wastes and all hazardous or toxic substances, wastes or other pollutants, including petroleum or petroleum distillates, asbestos or asbestos-containing materials, polychlorinated biphenyls, radon gas, infectious or medical wastes and all other substances or wastes of any nature regulated pursuant to any Environmental Law.

"**Immaterial Subsidiary**" means any Subsidiary of Parent that is not a Material Subsidiary.

"**Indebtedness**" means, as to any Person at a particular time, without duplication, all of the following, whether or not included as indebtedness or liabilities in accordance with GAAP:

(a)    all indebtedness, obligations and liabilities of such Person for borrowed money and all indebtedness and obligations of such Person evidenced by bonds, debentures, notes, loan agreements or other similar instruments;

(b)    the maximum amount of all direct or contingent obligations of such Person arising under letters of credit (including standby and commercial), bankers' acceptances, bank guaranties, surety bonds and similar instruments;

(c)    net obligations of such Person under any Swap Contract;

(d)    all obligations of such Person to pay the deferred purchase price of property or services (other than trade accounts payable in the ordinary course of business and not past due for more than sixty (60) days after the date on which such trade account was created);

(e)    indebtedness (excluding prepaid interest thereon) secured by a Lien on property owned or being purchased by such Person (including indebtedness arising under conditional sales or other title retention agreements), whether or not such indebtedness shall have been assumed by such Person or is limited in recourse;

(f)    all Attributable Indebtedness in respect of Capitalized Leases and Synthetic Lease Obligations of such Person and all Synthetic Debt of such Person;

(g)    all obligations of such Person to purchase, redeem, retire, defease or otherwise make any payment in respect of any Equity Interest in such Person or any other Person or any warrant, right or option to acquire such Equity Interest, valued, in the case of a redeemable preferred interest, at the greater of its voluntary or involuntary liquidation preference plus accrued and unpaid dividends; and

(h)     all Guarantees of such Person in respect of any of the foregoing.

For all purposes hereof, the Indebtedness of any Person shall include the Indebtedness of any partnership or joint venture (other than a joint venture that is itself a corporation or limited liability company) in which such Person is a general partner or a joint venturer, unless such Indebtedness is expressly made non-recourse to such Person.  The amount of any net obligation under any Swap Contract on any date shall be deemed to be the Swap Termination Value thereof as of such date.

"**Indemnified Taxes**" means Taxes other than Excluded Taxes.

"**Indemnitee**" has the meaning specified in Section 10.04(b).

"**Information**" has the meaning specified in Section 10.07.

"**Intellectual Property Security Agreements**" has the meaning specified in Section 4.01(a)(viii).

"**Interest Payment Date**" means, (a) as to any LIBOR Rate Loan, the last day of each Interest Period applicable to such LIBOR Rate Loan and the Maturity Date; and (b) as to any Base Rate Loan, the first day of each calendar month and the Maturity Date.

"**Interest Period**" means, as to each LIBOR Rate Loan, the period commencing on the date such LIBOR Rate Loan is disbursed or converted to or continued as a LIBOR Rate Loan and ending on the date one (1), two (2) or three (3) months thereafter, as selected by the Borrowers in their Committed Loan Notice; provided that:

(a)     any Interest Period that would otherwise end on a day that is not a Business Day shall be extended to the next succeeding Business Day unless such Business Day falls in another calendar month, in which case such Interest Period shall end on the next preceding Business Day;

(b)     any Interest Period that begins on the last Business Day of a calendar month (or on a day for which there is no numerically corresponding day in the calendar month at the end of such Interest Period) shall end on the last Business Day of the calendar month at the end of such Interest Period; and

(c)     no Interest Period shall extend beyond the Maturity Date.

"**Internal Control Event**" means a material weakness in, or fraud that involves management or other employees who have a significant role in, Parent's internal controls over financial reporting.

"**Inventory**" means all "inventory," as such term is defined in the UCC, of each Borrower, whether now existing or hereafter acquired, wherever located, and in any event including inventory, merchandise, goods and other personal property that are held by or on behalf of a Borrower for sale or lease or are furnished or are to be furnished under a contract of service, goods that are leased by a Borrower as lessor, or that constitute raw materials, samples,

work-in-process, finished goods, returned goods, promotional materials or materials or supplies of any kind, nature or description used or consumed or to be used or consumed in such Borrower's business or in the processing, production, packaging, promotion, delivery or shipping of the same, including all supplies and embedded software.

"**Investment**" means, as to any Person, any direct or indirect acquisition or investment by such Person, whether by means of (a) the purchase or other acquisition of Equity Interests of another Person, (b) a loan, advance or capital contribution to, Guarantee or assumption of debt of, or purchase or other acquisition of any other debt or interest in, another Person, or (c) the purchase or other acquisition (in one transaction or a series of transactions) of assets of another Person that constitute a business unit or all or a substantial part of the business of, such Person.  For purposes of covenant compliance, the amount of any Investment shall be the amount actually invested, without adjustment for subsequent increases or decreases in the value of such Investment.

"**IP Rights**" has the meaning specified in Section 5.17.

"**IRS**" means the United States Internal Revenue Service.

"**Laws**" means, collectively, all international, foreign, Federal, state and local statutes, treaties, rules, guidelines, regulations, ordinances, codes and administrative or judicial precedents or authorities, including the interpretation or administration thereof by any Governmental Authority charged with the enforcement, interpretation or administration thereof, and all applicable administrative orders, directed duties, requests, licenses, authorizations and permits of, and agreements with, any Governmental Authority, in each case whether or not having the force of law.

"**Lender**" has the meaning specified in the introductory paragraph hereto.

"**Lending Office**" means, as to any Lender, the office or offices of such Lender described as such in such Lender's Administrative Questionnaire, or such other office or offices as a Lender may from time to time notify the Borrowers and the Agent.

"**LIBOR Rate**" means, for any Interest Period with respect to a LIBOR Rate Loan, the rate per annum (rounded upward, if necessary, to the next 1/100 of 1%) equal to the LIBOR published by Bloomberg (or other commercially available source providing quotations of LIBOR as designated by the Agent from time to time) at approximately 11:00 a.m., London time, two (2) Business Days prior to the commencement of such Interest Period, for Dollar deposits (for delivery on the first day of such Interest Period) with a term equivalent to such Interest Period.

"**LIBOR Rate Loan**" means a Revolving Loan, a Term A Loan or a Term B Loan that bears interest at a rate based on the LIBOR Rate.

"**Lien**" means any mortgage, pledge, hypothecation, assignment, deposit arrangement, encumbrance, lien (statutory or other), charge, or preference, priority or other security interest or preferential arrangement in the nature of a security interest of any kind or nature whatsoever (including any conditional sale or other title retention agreement, any

easement, right of way or other encumbrance on title to real property, and any financing lease having substantially the same economic effect as any of the foregoing).

"**Loan**" means an extension of credit by a Lender to the Borrowers under <u>Article II</u> in the form of a Term Loan or a Revolving Loan.

"**Loan Account**" has the meaning set forth in <u>Section 2.11(g)</u>.

"**Loan Documents**" means, collectively, (a) this Agreement, (b) the Notes, (c) the Collateral Documents, (d) the Fee Letter, (e) each Stockholder Subordination Agreement, (f) the Validity Guaranty, (g) all Committed Loan Notices, (h) all Compliance Certificates and (i) and all other documents, lockbox agreements, instruments, certificates and agreements executed or delivered in connection with or contemplated by this Agreement, including any security agreements or guaranty agreements from any Equity Investor or any Subsidiary of a Borrower to the Agent.

"**Loan Parties**" means, collectively, each Borrower and each Guarantor.

"**Material Adverse Effect**" means (a) a material adverse change in, or a material adverse effect upon, the operations, business, properties, assets, liabilities (actual or contingent), condition (financial or otherwise) or prospects of Parent and its Subsidiaries taken as a whole; (b) a material impairment of the rights and remedies of the Agent or any Lender under any Loan Document, or of the ability of any Loan Party to perform its obligations under any Loan Document to which it is a party; or (c) a material adverse effect upon the legality, validity, binding effect or enforceability against any Loan Party of any Loan Document to which it is a party.

"**Material Contract**" means, with respect to any Person, (i) each ABC Export Group Supply Agreement and (ii) each other contract to which such Person is a party involving aggregate consideration payable to or by such Person of $25,000 or more in any Fiscal Year or otherwise material to the business, condition (financial or otherwise), operations, performance, properties or prospects of such Person.

"**Material Subsidiary**" means any direct or indirect Subsidiary of Parent that, as a result of any acquisition, Investment, merger, reorganization, transfer of assets, or other change in circumstances, meets any of the following conditions:

(a)    Parent's and its other Subsidiaries' proportionate share of the total assets, in the aggregate (after intercompany eliminations), of such Subsidiary (and its Subsidiaries) exceeds five percent (5%) of the total assets of Parent and its Subsidiaries, on a consolidated basis, as of the end of the most recently completed Fiscal Month; or

(b)    Parent's and its other Subsidiaries' proportionate share of the Consolidated EBITDA of such Subsidiary (and its Subsidiaries) exceeds five percent (5%) of the Consolidated EBITDA of Parent and its Subsidiaries for the most recently completed Fiscal Month.

"**Maturity Date**" means December 26, 2011; provided, however, that, in each case, if such date is not a Business Day, the Maturity Date shall be the immediately preceding Business Day.

"**Moody's**" means Moody's Investors Service, Inc. and any successor thereto.

"**Mortgage**" means a mortgage on real property Collateral, in form and substance satisfactory to the Agent.

"**Multiemployer Plan**" means any employee benefit plan of the type described in Section 4001(a)(3) of ERISA, to which the Borrowers or any ERISA Affiliate makes or is obligated to make contributions, or during the preceding five plan years, has made or been obligated to make contributions.

"**Negotiable Collateral**" has the meaning ascribed to it in the Security Agreement.

"**Net Cash Proceeds**" means:

　　　　(a)　　with respect to any Disposition by any Loan Party, or any Extraordinary Receipts received or paid to the account of any Loan Party, an amount equal to (i) the sum of cash and Cash Equivalents received in connection with such transaction (including any cash or Cash Equivalents received by way of deferred payment pursuant to, or by monetization of, a note receivable or otherwise, but only as and when so received) minus (ii) the sum of (A) the principal amount of any Indebtedness that is secured by the applicable asset and that is required to be repaid in connection with such transaction (other than Indebtedness under the Loan Documents), (B) the reasonable and customary out-of-pocket expenses incurred by such Loan Party in connection with such transaction, (C) any unpaid obligation or liability for which any such Extraordinary Receipts from the proceeds of insurance or indemnity payments is intended to pay, and (D) income taxes reasonably estimated to be actually payable within two (2) years of the date of the relevant transaction as a result of any gain recognized in connection therewith; provided that, if the amount of any estimated taxes pursuant to subclause (D) exceeds the amount of taxes actually required to be paid in cash in respect of such Disposition, the aggregate amount of such excess shall constitute Net Cash Proceeds; and

　　　　(b)　　with respect to the sale or issuance of any Equity Interest by any Loan Party, or the incurrence or issuance of any Indebtedness by any Loan Party, an amount equal to (i) the sum of the cash and Cash Equivalents received in connection with such transaction minus (ii) the underwriting discounts and commissions, and other reasonable and customary out-of-pocket expenses, incurred by such Loan Party in connection therewith.

"**Note**" means a Term Loan A Note, Term Loan B Note or a Revolving Loan Note, as the context may require.

"**NPL**" means the National Priorities List under CERCLA.

"**Obligations**" means all advances to, and debts, liabilities, obligations, covenants and duties of, any Loan Party arising under any Loan Document or otherwise with respect to any

Loan, whether direct or indirect (including those acquired by assumption), absolute or contingent, due or to become due, now existing or hereafter arising and including interest and fees that accrue after the commencement by or against any Loan Party or any Affiliate thereof of any proceeding under any Debtor Relief Laws naming such Person as the debtor in such proceeding, regardless of whether such interest and fees are allowed claims in such proceeding.

"**Orderly Liquidation Value**" means, as to any particular asset, the value that is estimated to be recoverable in an orderly liquidation thereof, as determined from time to time by a qualified appraiser selected by the Agent, net of all liquidation costs and expenses.

"**Organization Documents**" means, (a) with respect to any corporation, the certificate or articles of incorporation and the bylaws (or equivalent or comparable constitutive documents with respect to any non-U.S. jurisdiction); (b) with respect to any limited liability company, the certificate or articles of formation or organization and operating agreement; and (c) with respect to any partnership, joint venture, trust or other form of business entity, the partnership, joint venture or other applicable agreement of formation or organization and any agreement, instrument, filing or notice with respect thereto filed in connection with its formation or organization with the applicable Governmental Authority in the jurisdiction of its formation or organization and, if applicable, any certificate or articles of formation or organization of such entity.

"**Other Taxes**" means all present or future stamp or documentary taxes or any other excise or property taxes, charges or similar levies arising from any payment made hereunder or under any other Loan Document or from the execution, delivery or enforcement of, or otherwise with respect to, this Agreement or any other Loan Document.

"**Outstanding Amount**" means with respect to Term Loans and Revolving Loans on any date, the aggregate outstanding principal amount thereof after giving effect to any borrowings and prepayments or repayments of Term Loans and Revolving Loans, as the case may be, occurring on such date.

"**Overadvance**" has the meaning specified in Section 2.01(b).

"**Parent**" has the meaning specified in the introductory paragraph hereto.

"**Participant**" has the meaning specified in Section 10.06(d).

"**Patriot Act**" has the meaning set forth in Section 10.17.

"**PBGC**" means the Pension Benefit Guaranty Corporation.

"**PCAOB**" means the Public Company Accounting Oversight Board.

"**Pension Plan**" means any "employee pension benefit plan" (as such term is defined in Section 3(2) of ERISA), other than a Multiemployer Plan, that is subject to Title IV of ERISA and is sponsored or maintained by the Borrowers or any ERISA Affiliate or to which the Borrowers or any ERISA Affiliate contributes or has an obligation to contribute, or in the case of

a multiple employer or other plan described in Section 4064(a) of ERISA, has made contributions at any time during the immediately preceding five plan years.

"**Person**" means any natural person, corporation, limited liability company, trust, joint venture, association, company, partnership, Governmental Authority or other entity.

"**Plan**" means any "employee benefit plan" (as such term is defined in Section 3(3) of ERISA) established by the Borrowers or, with respect to any such plan that is subject to Section 412 of the Code or Title IV of ERISA, any ERISA Affiliate.

"**Platform**" has the meaning specified in Section 6.02.

"**Prepayment Date**" has the meaning specified in Section 2.04(c).

"**Receivables**" means all "accounts," as such term is defined in the UCC, of each Borrower whether now existing or hereafter created or arising, including, without limitation, (a) all accounts receivable, other receivables, book debts and other forms of obligations (other than forms of obligations evidenced by chattel paper (as defined in the UCC) or instruments (as defined in the UCC)) (including any such obligations that may be characterized as an account or contract right under the UCC), (b) all of each Borrower's rights in, to and under all purchase orders or receipts for goods or services, (c) all of each Borrower's rights to any goods represented by any of the foregoing (including unpaid sellers' rights of rescission, replevin, reclamation and stoppage in transit and rights to returned, reclaimed or repossessed goods), (d) all rights to payment due to a Borrower for property sold, leased, licensed, assigned or otherwise disposed of, for a policy of insurance issued or to be issued, for a secondary obligation incurred or to be incurred, , arising out of the use of a credit card or charge card, or for services rendered or to be rendered by such Borrower or in connection with any other transaction (whether or not yet earned by performance on the part of such Borrower) and (e) all collateral security of any kind, given by any account debtor or any other Person with respect to any of the foregoing.

"**Reduction Amount**" has the meaning set forth in Section 2.04(b)(vii).

"**Register**" has the meaning specified in Section 10.06(c).

"**Related Parties**" means, with respect to any Person, such Person's Affiliates and the partners, directors, officers, employees, agents and advisors of such Person and of such Person's Affiliates.

"**Reportable Event**" means any of the events set forth in Section 4043(c) of ERISA, other than events for which the thirty (30) day notice period has been waived.

"**Request for Borrowing**" means a conversion or continuation of Term A Loans, Term B Loans or Revolving Loans or a Committed Loan Notice.

"**Required Lenders**" means, as of any date of determination, the Lenders holding more than 50.1% of the sum of the (a) Total Outstandings and (b) aggregate unused Revolving Loan Commitments; provided that the unused Revolving Loan Commitment of, and the portion

of the Total Outstandings held or deemed held by, any Defaulting Lender shall be excluded for purposes of making a determination of Required Lenders.

**"Required Revolving Lenders"** means, as of any date of determination, Revolving Loan Lenders holding more than 50.1% of the sum of the (a) Outstanding Amount of all Revolving Loans and (b) aggregate unused Revolving Loan Commitments; provided that the unused Revolving Loan Commitment of, and the portion of the Outstanding Amount of all Revolving Loans held or deemed held by, any Defaulting Lender shall be excluded for purposes of making a determination of Required Revolving Lenders.

**"Required Term Loan A Lenders"** means, as of any date of determination, Term Loan A Lenders holding more than 50.1% of the Term Loan A Facility on such date; provided that the portion of the Term Loan A Facility held by any Defaulting Lender shall be excluded for purposes of making a determination of Required Term Loan A Lenders.

**"Required Term Loan B Lenders"** means, as of any date of determination, Term Loan B Lenders holding more than 50.1% of the Term Loan B Facility on such date; provided that the portion of the Term Loan B Facility held by any Defaulting Lender shall be excluded for purposes of making a determination of Required Term Loan B Lenders.

**"Reserves"** means such reserves established by the Agent in accordance with Section 2.01(c).

**"Responsible Officer"** means the chief executive officer, president, chief financial officer, treasurer, assistant treasurer or chief operating officer of a Loan Party and any other officer of the applicable Loan Party so designated by any of the foregoing officers in a notice to the Agent. Any document delivered hereunder that is signed by a Responsible Officer of a Loan Party shall be conclusively presumed to have been authorized by all necessary corporate, partnership and/or other action on the part of such Loan Party and such Responsible Officer shall be conclusively presumed to have acted on behalf of such Loan Party.

**"Restricted Payment"** means any dividend or other distribution (whether in cash, securities or other property) with respect to any capital stock or other Equity Interest of any Person or any of its Subsidiaries, or any payment (whether in cash, securities or other property), including any sinking fund or similar deposit, on account of the purchase, redemption, retirement, defeasance, acquisition, cancellation or termination of any such capital stock or other Equity Interest, or on account of any return of capital to any Person's stockholders, partners or members (or the equivalent of any thereof), or any option, warrant or other right to acquire any such dividend or other distribution or payment or any payment of management fees.

**"Revolving Loan Borrowing"** means a borrowing consisting of simultaneous Revolving Loans of the same Type and, in the case of LIBOR Rate Loans, having the same Interest Period made by each of the Revolving Loan Lenders pursuant to Section 2.01(b).

**"Revolving Loan Commitment"** means, as to each Revolving Loan Lender, its obligation to make Revolving Loans to the Borrowers pursuant to Section 2.01(b) in an aggregate principal amount at any one time outstanding not to exceed the amount set forth opposite such Lender's name on Schedule 2.01 under the caption "Revolving Loan

Commitment" or opposite such caption in the Assignment and Assumption pursuant to which such Lender becomes a party hereto, as applicable, as such amount may be adjusted from time to time in accordance with this Agreement.

"**Revolving Loan Facility**" means, at any time, the aggregate amount of the Revolving Loan Lenders' Revolving Loan Commitments at such time.

"**Revolving Loan Lender**" means, at any time, any Lender that has a Revolving Loan Commitment at such time.

"**Revolving Loan**" has the meaning specified in Section 2.01(b).

"**Revolving Loan Note**" means a promissory note made by the Borrowers in favor of a Revolving Loan Lender evidencing Revolving Loans made by such Revolving Loan Lender, substantially in the form of Exhibit F-1.

"**S&P**" means Standard & Poor's Ratings Services, a division of The McGraw-Hill Companies, Inc., and any successor thereto.

"**SEC**" means the Securities and Exchange Commission, or any Governmental Authority succeeding to any of its principal functions.

"**Secured Parties**" means, collectively, the Agent, the Lenders, each co-agent or sub-agent appointed by the Agent from time to time pursuant to Section 9.05, and the other Persons the Obligations owing to which are or are purported to be secured by the Collateral under the terms of the Collateral Documents.

"**Securities Account Control Agreement**" has the meaning specified in Section 6.20(c).

"**Securities Laws**" means the Securities Act of 1933, the Securities Exchange Act of 1934, and the applicable accounting and auditing principles, rules, standards and practices promulgated, approved or incorporated by the SEC or the PCAOB.

"**Security Agreement**" has the meaning specified in Section 4.01(a)(vi).

"**Security Agreement Supplement**" means each Supplement to the Security Agreement in the form of Annex I thereto.

"**Solvent**" and "**Solvency**" mean, with respect to any Person on any date of determination, that on such date (a) the fair value of the property of such Person is greater than the total amount of liabilities, including contingent liabilities, of such Person, (b) the present fair salable value of the assets of such Person is not less than the amount that will be required to pay the probable liability of such Person on its debts as they become absolute and matured, (c) such Person does not intend to, and does not believe that it will, incur debts or liabilities beyond such Person's ability to pay such debts and liabilities as they mature, (d) such Person is not engaged in business or a transaction, and is not about to engage in business or a transaction, for which such Person's property would constitute an unreasonably small capital, and (e) such Person is able to

LEGAL_US_E # 72583224.10                    27

pay its debts and liabilities, contingent obligations and other commitments as they mature in the ordinary course of business. The amount of contingent liabilities at any time shall be computed as the amount that, in the light of all the facts and circumstances existing at such time, represents the amount that can reasonably be expected to become an actual or matured liability.

"**SPC**" has the meaning specified in Section 10.06(h).

"**Spot Rate**" has the meaning specified in Section 1.07.

"**Stockholder Subordinated Debt Documents**" means (i) that certain Amended and Restated Subordinated Promissory Note, dated as of the date hereof, executed by Parent in favor of Ashutosh Ladha in the aggregate original principal amount of $1,500,000, (ii) that certain Amended and Restated Subordinated Promissory Note, dated as of the date hereof, executed by Parent in favor of Ashutosh Ladha in the aggregate original principal amount of $2,400,000, (iii) that certain Amended and Restated Subordinated Promissory Note, dated as of the date hereof, executed by Parent in favor of Manjusha Ladha in the aggregate original principal amount of $200,000, and (iv) that certain Amended and Restated Subordinated Promissory Note, dated as of the date hereof, executed by Parent in favor of J. Walker Holland, as trustee for the Individual Retirement Account of J. Walker Holland, in the aggregate original principal amount of $250,000, together with the other documents, agreements, instruments and certificates executed in connection therewith.

"**Stockholder Subordinated Lenders**" means each of Ashutosh Ladha, Manjusha Ladha and J. Walker Holland, as trustee for the Individual Retirement Account of J. Walker Holland.

"**Stockholder Subordination Agreement**" means each Subordination and Intercreditor Agreement, dated as of the date hereof, duly executed by the Agent and each of the Stockholder Subordinated Lenders, and acknowledged by the Loan Parties, in the form and substance satisfactory to the Agent.

"**Structuring Fee**" has the meaning specified in the Fee Letter.

"**Subordinated Indebtedness**" means the obligations outstanding under the Stockholder Subordinated Debt Documents.

"**Subordinated Provisions**" has the meaning specified in Section 8.01(m).

"**Subsidiary**" of a Person means a corporation, partnership, joint venture, limited liability company or other business entity of which a majority of the shares of securities or other interests having ordinary voting power for the election of directors or other governing body (other than securities or interests having such power only by reason of the happening of a contingency) are at the time beneficially owned, or the management of which is otherwise controlled, directly, or indirectly through one or more intermediaries, or both, by such Person. Unless otherwise specified, all references herein to a "Subsidiary" or to "Subsidiaries" shall refer to a Subsidiary or Subsidiaries of Parent.

"**Swap Contract**" means (a) any and all rate swap transactions, basis swaps, credit derivative transactions, forward rate transactions, commodity swaps, commodity options, forward commodity contracts, equity or equity index swaps or options, bond or bond price or bond index swaps or options or forward bond or forward bond price or forward bond index transactions, interest rate options, forward foreign exchange transactions, cap transactions, floor transactions, collar transactions, currency swap transactions, cross-currency rate swap transactions, currency options, spot contracts, or any other similar transactions or any combination of any of the foregoing (including any options to enter into any of the foregoing), whether or not any such transaction is governed by or subject to any master agreement, and (b) any and all transactions of any kind, and the related confirmations, which are subject to the terms and conditions of, or governed by, any form of master agreement published by the International Swaps and Derivatives Association, Inc., any International Foreign Exchange Master Agreement, or any other master agreement, including any such obligations or liabilities under any such agreement.

"**Swap Termination Value**" means, in respect of any one or more Swap Contracts, after taking into account the effect of any legally enforceable netting agreement relating to such Swap Contracts, (a) for any date on or after the date such Swap Contracts have been closed out and termination value(s) determined in accordance therewith, such termination value(s), and (b) for any date prior to the date referenced in clause (a), the amount(s) determined as the mark-to-market value(s) for such Swap Contracts, as determined based upon one or more mid-market or other readily available quotations provided by any recognized dealer in such Swap Contracts (which may include a Lender or any Affiliate of a Lender).

"**Synthetic Debt**" means, with respect to any Person as of any date of determination thereof, all obligations of such Person in respect of transactions entered into by such Person that are intended to function primarily as a borrowing of funds (including any minority interest transactions that function primarily as a borrowing) but are not otherwise included in the definition of "Indebtedness" or as a liability on the consolidated balance sheet of such Person and its Subsidiaries in accordance with GAAP.

"**Synthetic Lease Obligation**" means the monetary obligation of a Person under (a) a so-called synthetic, off-balance sheet or tax retention lease, or (b) an agreement for the use or possession of property (including sale and leaseback transactions), in each case, that creates obligations that do not appear on the balance sheet of such Person but which, upon the application of any Debtor Relief Laws to such Person, would be characterized as the indebtedness of such Person (without regard to accounting treatment).

"**Taxes**" means all present or future taxes, levies, imposts, duties, deductions, withholdings, assessments, fees or other charges imposed by any Governmental Authority, including any interest, additions to tax or penalties applicable thereto.

"**Term A Loan**" an advance made by any Term Loan A Lender under the Term Loan A Facility.

"**Term B Loan**" an advance made by any Term Loan B Lender under the Term Loan B Facility.

"**Term Loan**" means a Term A Loan and/or a Term B Loan, as the context may require.

"**Term Loan A Borrowing**" means a borrowing consisting of simultaneous Term A Loans of the same Type and, in the case of LIBOR Rate Loans, having the same Interest Period made by each of the Term Loan A Lenders pursuant to Section 2.01(a)(i).

"**Term Loan A Commitment**" means, as to each Term Loan A Lender, its obligation to make Term A Loans to the Borrowers pursuant to Section 2.01(a)(i) in an aggregate principal amount at any one time outstanding not to exceed the amount set forth opposite such Term Loan A Lender's name on Schedule 2.01 under the caption "Term Loan A Commitment" or opposite such caption in the Assignment and Assumption pursuant to which such Term Loan A Lender becomes a party hereto, as applicable, as such amount may be adjusted from time to time in accordance with this Agreement.

"**Term Loan A Facility**" means, at any time, (a) on or prior to the Closing Date, the aggregate amount of the Term Loan A Commitments at such time and (b) thereafter, the aggregate principal amount of the Term A Loans of all Term Loan A Lenders outstanding at such time.

"**Term Loan A Lender**" means (a) at any time on or prior to the Closing Date, any Lender that has a Term Loan A Commitment at such time and (b) at any time after the Closing Date, any Lender that holds Term A Loans at such time.

"**Term Loan A Note**" means a promissory note made by the Borrowers in favor of a Term Loan A Lender evidencing Term A Loans made by such Term Loan A Lender, substantially in the form of Exhibit F-2.

"**Term Loan B Borrowing**" means a borrowing consisting of simultaneous Term B Loans made by each of the Term Loan B Lenders pursuant to Section 2.01(a)(ii).

"**Term Loan B Commitment**" means, as to each Term Loan B Lender, its obligation to make Term B Loans to the Borrowers pursuant to Section 2.01(a)(ii) in an aggregate principal amount at any one time outstanding not to exceed the amount set forth opposite such Term Loan B Lender's name on Schedule 2.01 under the caption "Term Loan B Commitment" or opposite such caption in the Assignment and Assumption pursuant to which such Term Loan B Lender becomes a party hereto, as applicable, as such amount may be adjusted from time to time in accordance with this Agreement.

"**Term Loan B Facility**" means, at any time, (a) on or prior to the Closing Date, the aggregate amount of the Term Loan B Commitments at such time and (b) thereafter, the aggregate principal amount of the Term B Loans of all Term Loan B Lenders outstanding at such time.

"**Term Loan B Lender**" means (a) at any time on or prior to the Closing Date, any Lender that has a Term Loan B Commitment at such time and (b) at any time after the Closing Date, any Lender that holds Term B Loans at such time.

"**Term Loan B Note**" means a promissory note made by the Borrowers in favor of a Term Loan B Lender evidencing Term B Loans made by such Term Loan B Lender, substantially in the form of Exhibit F-3.

"**Term Loan Borrowing**" means a Term Loan A Borrowing and/or a Term Loan B Borrowing, as the context may require.

"**Term Loan Commitment**" means the Term Loan A Commitment and/or the Term Loan B Commitment, as the context may require.

"**Term Loan Lender**" means a Term Loan A Lender and/or Term Loan B Lender, as the context may require.

"**Term Loan Note**" means a Term Loan A Note and/or a Term Loan B Note, as the context may require.

"**Threshold Amount**" means $50,000.

"**Total Outstandings**" means the aggregate Outstanding Amount of all Loans.

"**Total Term Loan A Outstandings**" means the aggregate Outstanding Amount of all Term A Loans.

"**Total Term Loan B Outstandings**" means the aggregate Outstanding mount of all Term B Loans.

"**Total Term Loan Outstandings**" means the aggregate Outstanding Amount of all Term Loans.

"**Transaction**" means, collectively, (a) the entering into by the Loan Parties, their applicable Subsidiaries and the Equity Investors of the Loan Documents and the Stockholder Subordinated Debt Documents to which they are or are intended to be a party, (b) the refinancing of certain outstanding Indebtedness of Parent and its Subsidiaries and the termination of all commitments with respect thereto and (c) the payment of the fees and expenses incurred in connection with the consummation of the foregoing.

"**Type**" means, with respect to a Loan, its character as a Base Rate Loan or a LIBOR Rate Loan.

"**UCC**" means the Uniform Commercial Code as in effect in the State of Georgia; provided that, if perfection or the effect of perfection or non-perfection or the priority of any security interest in any Collateral is governed by the Uniform Commercial Code as in effect in a jurisdiction other than the State of Georgia, "UCC" means the Uniform Commercial Code as in effect from time to time in such other jurisdiction for purposes of the provisions hereof relating to such perfection, effect of perfection or non-perfection or priority.

"**Unfunded Pension Liability**" means the excess of a Pension Plan's benefit liabilities under Section 4001(a)(16) of ERISA, over the current value of that Pension Plan's

assets, determined in accordance with the assumptions used for funding the Pension Plan pursuant to Section 412 of the Code for the applicable plan year.

"**United States**" and "**U.S.**" mean the United States of America.

"**Validity Guaranty**" means that certain validity guaranty made by Ashutosh Ladha in favor of the Secured Parties, in form and substance satisfactory to the Agent.

"**Waivable Prepayment**" has the meaning specified in <u>Section 2.04(c)</u>.

Section 1.02    **Other Interpretive Provisions**.  With reference to this Agreement and each other Loan Document, unless otherwise specified herein or in such other Loan Document:

(a)    The definitions of terms herein shall apply equally to the singular and plural forms of the terms defined.  Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms.  The words "<u>include</u>," "<u>includes</u>" and "<u>including</u>" shall be deemed to be followed by the phrase "without limitation."  The word "<u>will</u>" shall be construed to have the same meaning and effect as the word "<u>shall</u>."  Unless the context requires otherwise, (i) any definition of or reference to any agreement, instrument or other document (including any Organization Document) shall be construed as referring to such agreement, instrument or other document as from time to time amended, supplemented or otherwise modified (subject to any restrictions on such amendments, supplements or modifications set forth herein or in any other Loan Document), (ii) any reference herein to any Person shall be construed to include such Person's successors and assigns, (iii) the words "<u>herein</u>," "<u>hereof</u>" and "<u>hereunder</u>," and words of similar import when used in any Loan Document, shall be construed to refer to such Loan Document in its entirety and not to any particular provision thereof, (iv) all references in a Loan Document to Articles, Sections, Preliminary Statements, Exhibits and Schedules shall be construed to refer to Articles and Sections of, and Preliminary Statements, Exhibits and Schedules to, the Loan Document in which such references appear, (v) any reference to any Law shall include all statutory and regulatory provisions consolidating, amending, replacing or interpreting such Law and any reference to any Law or regulation shall, unless otherwise specified, refer to such Law or regulation as amended, modified or supplemented from time to time, and (vi) the words "<u>asset</u>" and "<u>property</u>" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, securities, accounts and contract rights.

(b)    In the computation of periods of time from a specified date to a later specified date, the word "from" means "from and including;" the words "to" and "until" each mean "to but excluding;" and the word "through" means "to and including."

(c)    Headings used herein and in the other Loan Documents are included for convenience of reference only and shall not affect the interpretation of this Agreement or any other Loan Document.

**Section 1.03    Accounting Terms**.

(a)    <u>Generally</u>.  All accounting terms not specifically or completely defined herein shall be construed in conformity with, and all financial data (including financial ratios and other financial calculations) required to be submitted pursuant to this Agreement shall be prepared in conformity with, GAAP applied on a consistent basis, as in effect from time to time, applied in a manner consistent with that used in preparing the Audited Financial Statements, <u>except</u> as otherwise specifically prescribed herein.

(b)    <u>Changes in GAAP</u>.  If at any time any change in GAAP would affect the computation of any financial ratio or requirement set forth in any Loan Document, and either the Borrowers or the Required Lenders shall so request, the Agent, the Lenders and the Borrowers shall negotiate in good faith to amend such ratio or requirement to preserve the original intent thereof in light of such change in GAAP (subject to the approval of the Required Lenders); <u>provided</u> that, until so amended, (i) such ratio or requirement shall continue to be computed in accordance with GAAP prior to such change therein and (ii) the Borrowers shall provide to the Agent and the Lenders financial statements and other documents required under this Agreement or as reasonably requested hereunder setting forth a reconciliation between calculations of such ratio or requirement made before and after giving effect to such change in GAAP.

**Section 1.04    Rounding**.  Any financial ratios required to be maintained by the Borrowers pursuant to this Agreement shall be calculated by dividing the appropriate component by the other component, carrying the result to one place more than the number of places by which such ratio is expressed herein and rounding the result up or down to the nearest number (with a rounding-up if there is no nearest number).

**Section 1.05    Times of Day**.  Unless otherwise specified, all references herein to times of day shall be references to Eastern time (daylight or standard, as applicable).

**Section 1.06    Intentionally Omitted.**

**Section 1.07    Currency Equivalents Generally**.  Any amount specified in this Agreement (other than in <u>Articles II</u>, and <u>IX</u>) or any of the other Loan Documents to be in Dollars shall also include the equivalent of such amount in any currency other than Dollars, such equivalent amount thereof in the applicable currency to be determined by the Agent at such time on the basis of the Spot Rate (as defined below) for the purchase of such currency with Dollars. For purposes of this <u>Section 1.07</u>, the "<u>Spot Rate</u>" for a currency means the rate determined by the Agent to be the rate quoted by the Person acting in such capacity as the spot rate for the purchase by such Person of such currency with another currency through its principal foreign exchange trading office at approximately 11:00 a.m. on the date two (2) Business Days prior to the date of such determination; <u>provided</u> that the Agent may obtain such spot rate from another financial institution designated by the Agent if the Person acting in such capacity does not have as of the date of determination a spot buying rate for any such currency.

## ARTICLE II.
## THE COMMITMENTS AND BORROWINGS

**Section 2.01    The Loans**.

    (a)    <u>The Term Loan Borrowings</u>.

        (i)    Subject to the terms and conditions set forth herein, each Term Loan A Lender severally agrees to make a single loan to the Borrowers on the Closing Date in an amount not to exceed such Term Loan A Lender's Term Loan A Commitment Percentage of the Term Loan A Facility.  The Term Loan A Borrowing shall consist of Term A Loans made simultaneously by the Term Loan A Lenders in accordance with their respective Applicable Percentage of the Term Loan A Facility.  Amounts borrowed under this <u>Section 2.01(a)(i)</u> and repaid or prepaid may not be reborrowed.  Term A Loans may be Base Rate Loans or LIBOR Rate Loans, as further provided herein.

        (ii)    Subject to the terms and conditions set forth herein, each Term Loan B Lender severally agrees to make a single loan to the Borrowers on the Closing Date in an amount not to exceed such Term Loan B Lender's Term Loan B Commitment Percentage of the Term Loan B Facility.  The Term Loan B Borrowing shall consist of Term B Loans made simultaneously by the Term Loan B Lenders in accordance with their respective Applicable Percentage of the Term Loan B Facility.  Amounts borrowed under this <u>Section 2.01(a)(ii)</u> and repaid or prepaid may not be reborrowed.

    (b)    <u>The Revolving Loan Borrowings</u>.  Subject to the terms and conditions set forth herein, each Revolving Loan Lender severally agrees to make loans (each such loan, a "<u>Revolving Loan</u>") to the Borrowers from time to time, on any Business Day during the Availability Period, in an aggregate amount not to exceed at any time outstanding the amount of such Lender's Revolving Loan Commitment; <u>provided</u>, <u>however</u>, that after giving effect to any Revolving Loan Borrowing, (i) the Outstanding Amount of all Revolving Loans shall not exceed the lesser of (A) the Revolving Loan Facility and (B) the Borrowing Base at that time, and (ii) the aggregate Outstanding Amount of the Revolving Loans of any Lender shall not exceed such Revolving Loan Lender's Revolving Loan Commitment.  Within the limits of each Revolving Loan Lender's Revolving Loan Commitment, and subject to the other terms and conditions hereof, the Borrowers may borrow under this <u>Section 2.01(b)</u>, prepay under <u>Section 2.04</u>, and reborrow under this <u>Section 2.01(b)</u>.  Revolving Loans may be Base Rate Loans or LIBOR Rate Loans, as further provided herein.  Other than pursuant to <u>Section 2.01(d)</u>, if at any time the Outstanding Amount of all Revolving Loans exceeds the Borrowing Base (any such excess is herein referred to as an "<u>Overadvance</u>"), Revolving Loan Lenders shall not be obligated to make Revolving Loans, and, except as provided in <u>Section 2.01(d)</u> below, and the Revolving Loans must be repaid immediately in an amount sufficient to eliminate any such Overadvance.

    (c)    The Agent shall have the right to establish Reserves against the Borrowing Base in such amounts with respect to such matters as the Agent in its reasonable

discretion shall deem necessary, including Reserves with respect to (i) sums that Loan Parties are required to pay under any Section of this Agreement or any other Loan Document (such as taxes, assessments, insurance premiums, or, in the case of leased assets, rents or other amounts payable under such leases) and have failed to pay, (ii) amounts owing by Loan Parties to any Person to the extent secured by a Lien on, or trust over, any of the Collateral (including, without duplication, any custom agent fees, common carrier fees or similar fees and charges with respect to Inventory, but excluding any Lien not prohibited under Section 7.01), which Lien or trust, in the reasonable business judgment of the Agent, likely would have a priority superior to the Liens created pursuant to the Loan Documents in and to such item of the Collateral, (iii) events, conditions, contingencies or risks which, as determined by the Agent in its reasonable business judgment, adversely affect, or have a reasonable likelihood of adversely affecting, either (A) the Collateral or any other property which is security for the Obligations, or (B) the assets or business of any Loan Party, and (iv) the Agent's reasonable belief that any collateral report or financial information furnished by or on behalf of any Borrower to the Agent is incomplete, inaccurate or misleading in any material respect.

(d)    If Administrative Borrower on behalf of Borrowers requests that Revolving Loan Lenders make, or permit to remain outstanding an Overadvance, the Agent may, in its sole discretion, elect to make, or permit to remain outstanding such Overadvance; provided, however, that the Agent may not cause Revolving Loan Lenders to make, or permit to remain outstanding, (a) Revolving Loans to the extent that the Outstanding Amount of all Revolving Loans exceed the Revolving Loan Facility or (b) an Overadvance in an aggregate amount in excess of $500,000. If an Overadvance is made, or permitted to remain outstanding, pursuant to the preceding sentence, then all Revolving Loan Lenders shall be bound to make, or permit to remain outstanding, such Overadvance based upon their Applicable Percentages of the Revolving Loan Commitment in accordance with the terms of this Agreement. If an Overadvance remains outstanding for more than ninety (90) days during any one hundred eighty (180) day period, the Revolving Loans must be repaid immediately in an amount sufficient to eliminate all of such Overadvance. Furthermore, the Required Revolving Lenders may prospectively revoke the Agent's ability to make or permit Overadvances by written notice to the Agent.

**Section 2.02    Borrowings, Conversions and Continuations of Loans.**

(a)    Each Term Loan Borrowing, each Revolving Loan Borrowing, each conversion of Term Loans or Revolving Loans from one Type to the other, and each continuation of LIBOR Rate Loans shall be made upon the Borrowers' irrevocable notice to the Agent, which may be given by telephone. Each such notice must be received by the Agent not later than (i) 11:00 a.m. three (3) Business Days prior to the requested date of any Borrowing of, conversion to or continuation of LIBOR Rate Loans or of any conversion of LIBOR Rate Loans to Base Rate Loans, and (ii) 10:00 a.m. on the requested date of any Borrowing of Base Rate Loans. Each telephonic notice by the Borrowers pursuant to this Section 2.02(a) must be confirmed promptly by delivery to the Agent of a written Committed Loan Notice, appropriately completed and signed by a Responsible Officer of the Borrowers. Each Borrowing of, conversion to or continuation of LIBOR Rate Loans shall be in a principal amount of $500,000 or a whole multiple of $250,000 in excess thereof. Each

Borrowing of or conversion to Base Rate Loans shall be in a principal amount of $250,000 or a whole multiple of $50,000 in excess thereof. Each Committed Loan Notice (whether telephonic or written) shall specify (i) whether the Borrowers are requesting a Term Loan A Borrowing, a Term Loan B Borrowing, a Revolving Loan Borrowing, a conversion of Term A Loans, Term B Loans or Revolving Loans from one Type to the other, or a continuation of LIBOR Rate Loans, (ii) the requested date of the Borrowing, conversion or continuation, as the case may be (which shall be a Business Day), (iii) the principal amount of Loans to be borrowed, converted or continued, (iv) the Type of Loans to be borrowed or to which existing Term A Loans, Term B Loans or Revolving Loans are to be converted, and (v) if applicable, the duration of the Interest Period with respect thereto. If the Borrowers fail to specify a Type of Loan in a Committed Loan Notice or if the Borrowers fail to give a timely notice requesting a conversion or continuation, then the applicable Term A Loans, Term B Loans or Revolving Loans shall be made as, or converted to, LIBOR Rate Loans with an Interest Period of one month. Any such automatic conversion to LIBOR Rate Loans shall be effective as of the last day of the Interest Period then in effect with respect to the applicable LIBOR Rate Loans. If the Borrowers request a Borrowing of, conversion to, or continuation of LIBOR Rate Loans in any such Committed Loan Notice, but fails to specify an Interest Period, it will be deemed to have specified an Interest Period of one (1) month.

(b)      Following receipt of a Committed Loan Notice, the Agent shall promptly notify each Lender of the amount of its Applicable Percentage under the applicable Facility of the applicable Term Loans or Revolving Loans, and if no timely notice of a conversion or continuation is provided by the Borrowers, the Agent shall notify each Lender of the details of any automatic conversion to Base Rate Loans described in Section 2.02(a). In the case of a Term Loan Borrowing or a Revolving Loan Borrowing, each Appropriate Lender shall make the amount of its Loan available to the Agent in immediately available funds at the Agent's Office not later than 1:00 p.m. on the Business Day specified in the applicable Committed Loan Notice. Upon satisfaction of the applicable conditions set forth in Section 4.02 (and, if such Borrowing is the initial Borrowing, Section 4.01), the Agent shall make all funds so received available to the Borrowers in like funds as received by the Agent either by (i) crediting the loan account of the Borrowers with the amount of such funds or (ii) wire transfer of such funds, in each case in accordance with instructions provided to (and reasonably acceptable to the Agent by the Borrowers.

(c)      Except as otherwise provided herein, a LIBOR Rate Loan may be continued or converted only on the last day of an Interest Period for such LIBOR Rate Loan. During the existence of a Default, no Loans may be requested as, converted to or continued as LIBOR Rate Loans without the consent of the Required Lenders.

(d)      The Agent shall promptly notify the Borrowers and the Lenders of the interest rate applicable to any Interest Period for LIBOR Rate Loans upon determination of such interest rate.

(e)      After giving effect to all Borrowings, all conversions of Loans from one Type to the other, and all continuations of Loans as the same Type, there shall not be more than five (5) Interest Periods in effect in respect of the Term Loan A Facility, Term Loan B Facility and the Revolving Loan Facility.

LEGAL_US_E # 72583224.10                        36

**Section 2.03    Intentionally Omitted**.

**Section 2.04    Prepayments**.

(a)    <u>Optional</u>.  Subject to the payment of any applicable prepayment premium set forth in <u>Section 2.04(c)</u>, the Borrowers may, upon notice to the Agent, at any time or from time to time voluntarily prepay Term Loans and Revolving Loans in whole or in part without premium or penalty; <u>provided</u> that (i) such notice must be received by the Agent not later than 11:00 a.m. (A) two (2) Business Days prior to any date of prepayment of LIBOR Rate Loans and (B) on the date of prepayment of Base Rate Loans; (ii) any prepayment of LIBOR Rate Loans shall be in a principal amount of $500,000 or a whole multiple of $100,000 in excess thereof; and (iii) any prepayment of Base Rate Loans shall be in a principal amount of $100,000 or a whole multiple of $50,000 in excess thereof or, in each case, if less, the entire principal amount thereof then outstanding.  Each such notice shall specify the date and amount of such prepayment and the Type(s) of Loans to be prepaid and, if LIBOR Rate Loans are to be prepaid, the Interest Period(s) of such LIBOR Rate Loans.  The Agent will promptly notify each Lender of its receipt of each such notice, and of the amount of such Lender's ratable portion of such prepayment (based on such Lender's Applicable Percentage in respect of the relevant Facility).  If such notice is given by the Borrowers, the Borrowers shall make such prepayment and the payment amount specified in such notice shall be due and payable on the date specified therein.  Any prepayment of a LIBOR Rate Loan shall be accompanied by all accrued interest on the amount prepaid, together with any additional amounts required pursuant to <u>Section 3.05</u>.  Each prepayment of the outstanding Term Loans pursuant to this <u>Section 2.04(a)</u> shall be paid to the Lenders in accordance with their respective Applicable Percentages in respect of each of the relevant Facilities.

(b)    <u>Mandatory</u>.

(i)    If any Loan Party Disposes of any property (other than any Disposition of any property permitted by <u>Section 7.05(b), (c) or (d)</u>) which results in the realization by such Person of Net Cash Proceeds, the Borrowers shall immediately prepay an aggregate principal amount of Loans equal to 100% of such Net Cash Proceeds immediately upon receipt thereof by such Person (such prepayments to be applied as set forth in clauses (v) and (vii) below); <u>provided</u>, <u>however</u>, that, with respect to any Net Cash Proceeds realized under a Disposition described in this <u>Section 2.04(b)(i)</u>, at the election of the Borrowers (as notified by the Borrowers to the Agent on or prior to the date of such Disposition), and so long as (A) no Default shall have occurred and be continuing and (B) the aggregate Net Cash Proceeds from such Dispositions do not exceed $250,000 in any Fiscal Year, such Loan Party may reinvest all or any portion of such Net Cash Proceeds in operating assets so long such reinvestment shall have been consummated within 180 days after the receipt of such Net Cash Proceeds (as certified by the Borrowers in writing to the Agent); and provided further, however, that any Net Cash Proceeds not so reinvested shall be immediately applied to the prepayment of the Loans as set forth in this <u>Section 2.04(b)(i)</u>.

(ii)    Upon the sale or issuance by any Loan Party of any of its Equity Interests other than any sales or issuance of Equity Interest to another Loan Party, the Borrowers shall immediately prepay an aggregate principal amount of Loans equal to 100% of all Net Cash Proceeds received therefrom immediately upon receipt thereof by such Loan Party (such prepayments to be applied as set forth in clauses (v) and (vii) below).

(iii)    Upon the incurrence or issuance by any Loan Party of any Indebtedness (other than Indebtedness expressly permitted to be incurred or issued pursuant to Section 7.02), the Borrowers shall immediately prepay an aggregate principal amount of Loans equal to 100% of all Net Cash Proceeds received therefrom immediately upon receipt thereof by such Loan Party or such Subsidiary (such prepayments to be applied as set forth in clauses (v) and (vii) below).

(iv)    Upon any Extraordinary Receipt received by or paid to or for the account of any Loan Party or any of its Subsidiaries, and not otherwise included in clause (i), (ii) or (iii) of this Section 2.04(b), the Borrowers shall immediately prepay an aggregate principal amount of Loans equal to 100% of all Net Cash Proceeds received therefrom immediately upon receipt thereof by such Loan Party (such prepayments to be applied as set forth in clauses (v) and (vii) below); provided, however, that with respect to any proceeds of insurance or condemnation awards (or payments in lieu thereof), at the election of the Borrowers (as notified by the Borrowers to the Agent on or prior to the date of receipt of such insurance proceeds, condemnation awards or indemnity payments), and so long as (A) no Default shall have occurred and be continuing and (B) the aggregate Net Cash Proceeds of such casualty proceeds and condemnation awards do not exceed $250,000 in any Fiscal Year, such Loan Party may apply within 180 days after the receipt of such cash proceeds to replace or repair the equipment, fixed assets or real property in respect of which such cash proceeds were received; and provided, further, however, that any cash proceeds not so applied shall be immediately applied to the prepayment of the Loans as set forth in this Section 2.04(b)(iv).

(v)    Each prepayment of Loans pursuant to the foregoing provisions of this Section 2.04(b) shall be applied, first, to the Term Loan B Facility and to the principal repayment installments thereof (in the inverse order of maturity), second, to the Term Loan A Facility and to the principal repayment installments thereof (in the inverse order of maturity),and, third, to the Revolving Loan Facility in the manner set forth in Section 2.04(b)(vii); provided, that any prepayment required in connection with any Extraordinary Receipt related to the proceeds of insurance or indemnification payments for the loss of Inventory will be applied to the Revolving Loan Facility.

(vi)    If for any reason the Outstanding Amount of all Revolving Loans at any time exceed the lesser of the Borrowing Base at such time and the

Revolving Loan Facility at such time, then the Borrowers shall immediately prepay the Loans in an aggregate amount equal to such excess.

(vii)    Prepayments of the Revolving Loan Facility made pursuant to this Section 2.04(b), shall be applied ratably to the outstanding Revolving Loans; and, in the case of prepayments of the Revolving Loan Facility required pursuant to clause (i), (ii), (iii) or (iv) of this Section 2.04(b), the amount remaining, if any, after the prepayment in full of all Revolving Loans outstanding at such time (the sum of such prepayment amounts and remaining amount being, collectively, the "Reduction Amount") may be retained by the Borrowers for use in the ordinary course of its business, and the Revolving Loan Facility shall be automatically and permanently reduced by the Reduction Amount as set forth in Section 2.05(b)(ii).

(c)    Waiver of Certain Prepayments.  Anything contained herein to the contrary notwithstanding, in the event Borrowers are required to make any mandatory prepayment (a "Waivable Prepayment") of the Loans, not less than three (3) Business Days prior to the date (the "Prepayment Date") on which Borrowers are required to make such Waivable Prepayment, Administrative Borrower shall notify the Agent of the amount of such prepayment, and the Agent will promptly thereafter notify each Lender of the amount of such Lender's Applicable Percentage of such Waivable Prepayment and such Lender's option to refuse such amount.  Each such Lender may exercise such option by giving written notice to the Agent of its election to do so on or before the first Business Day prior to the Prepayment Date (it being understood that any Lender which does not notify the Agent of its election to exercise such option on or before the first Business Day prior to the Prepayment Date shall be deemed to have elected, as of such date, not to exercise such option).  On the Prepayment Date, Borrowers shall pay to the Agent the amount of the Waivable Prepayment, which amount shall be applied (i) ratably, in an amount equal to that portion of the Waivable Prepayment payable to those Lenders that have elected not to exercise such option, to prepay the Loans of such Lenders (which prepayment shall be applied in accordance with Sections 2.04(b)(v) and (vii)), and (ii) to the extent of any excess, to Borrowers for working capital and general corporate purposes.

(d)    Prepayment Premium.  If the Revolving Loan Facility has been terminated and the Total Outstandings have been reduced to zero before the Maturity Date, the Borrowers shall pay the Agent, for the ratable benefit of the Lenders, a prepayment premium in an amount equal to (i) 3.00% of the Commitments if such prepayment occurs during the period commencing on the Closing Date through and including the day prior to the first anniversary of the Closing Date; (ii) 2.00% of the Commitments if such prepayment occurs during the period commencing on the first anniversary of the Closing Date through and including the day prior to the second anniversary of the Closing Date; and (iii) 1.00% of the Commitments if such prepayment occurs during the period commencing on the second anniversary of the Closing Date through and including the day prior to the third anniversary of the Closing Date.

**Section 2.05    Termination or Reduction of Commitments**.

(a)    Optional.  The Borrowers may, upon notice to the Agent, terminate the Revolving Loan Facility, or from time to time permanently reduce the Revolving Loan Facility; provided that (i) any such notice shall be received by the Agent not later than 11:00 a.m. five (5) Business Days prior to the date of termination or reduction, (ii) any such partial reduction shall be in an aggregate amount of $500,000 or any whole multiple of $100,000 in excess thereof and (iii) the Borrowers shall not terminate or reduce the Revolving Loan Facility if, after giving effect thereto and to any concurrent prepayments hereunder, the Outstanding Amount of all Revolving Loans would exceed the Revolving Loan Facility.

(b)    Mandatory.

(i)    The aggregate Term Loan A Commitments shall be automatically and permanently reduced to zero on the date of the Term Loan A Borrowing and the aggregate Term Loan B Commitments shall be automatically and permanently reduced to zero on the date of the Term Loan B Borrowing.

(ii)    The Revolving Loan Facility shall be automatically and permanently reduced on each date on which the prepayment of Revolving Loans outstanding thereunder is required to be made pursuant to Section 2.04(b)(i), (ii), (iii), or (iv) by an amount equal to the applicable Reduction Amount except in connection with any Extraordinary Receipt related to the proceeds of insurance or indemnification payments for the loss of Inventory.

(c)    Application of Commitment Reductions; Payment of Fees.  The Agent will promptly notify the Lenders of any termination or reduction of the Revolving Loan Commitment under this Section 2.05.  Upon any reduction of the Revolving Loan Commitments, the Revolving Loan Commitment of each Revolving Loan Lender shall be reduced by such Lender's Applicable Revolving Loan Percentage of such reduction amount. All fees in respect of the Revolving Loan Facility accrued until the effective date of any termination of the Revolving Loan Facility shall be paid on the effective date of such termination.

**Section 2.06    Repayment of Loans**.

(a)    Term Loans.

(i)    The Borrowers shall repay to the Agent, for the benefit of the Term Loan A Lenders, the principal amount of all Term A Loans in quarterly installments equal to $28,750, payable on the first day of each calendar quarter commencing on April 1, 2007; provided, however, that the final principal repayment installment of the Term A Loans shall be repaid on the Maturity Date and in any event shall be in an amount equal to the aggregate principal amount of all Term A Loans outstanding on such date.

(ii)    The Borrowers shall repay to the Agent, for the benefit of the Term Loan B Lenders, the principal amount of all Term B Loans in monthly

installments equal to $100,000, payable on the first day of each calendar month commencing on February 1, 2007 until paid in full; provided, however, that the final principal repayment installment of the Term B Loans shall be repaid on the Maturity Date and in any event shall be in an amount equal to the aggregate principal amount of all Term B Loans outstanding on such date.

(b)      Revolving Loans.  The Borrowers shall repay to the Revolving Loan Lenders on the Maturity Date the aggregate principal amount of all Revolving Loans outstanding on such date.

**Section 2.07    Interest.**

(a)      Subject to the provisions of Section 2.07(b), (i) each LIBOR Rate Loan under a Facility shall bear interest on the outstanding principal amount thereof for each Interest Period at a rate per annum equal to the LIBOR Rate for such Interest Period plus the Applicable Margin for such Facility; and (ii) each Base Rate Loan under a Facility shall bear interest on the outstanding principal amount thereof from the applicable borrowing date at a rate per annum equal to the Base Rate plus the Applicable Margin for such Facility.

(b)      (i)      If any amount of principal of any Loan is not paid when due (without regard to any applicable grace periods), whether at stated maturity, by acceleration or otherwise, such amount shall thereafter bear interest at a fluctuating interest rate per annum at all times equal to the Default Rate to the fullest extent permitted by applicable Laws.

(ii)      If any amount (other than principal of any Loan) payable by the Borrowers under any Loan Document is not paid when due (without regard to any applicable grace periods), whether at stated maturity, by acceleration or otherwise, then upon the request of the Required Lenders such amount shall thereafter bear interest at a fluctuating interest rate per annum at all times equal to the Default Rate to the fullest extent permitted by applicable Laws.

(iii)      At the Agent's election or upon the request of the Required Lenders, while any Event of Default exists, the Borrowers shall pay interest on the principal amount of all outstanding Obligations hereunder at a fluctuating interest rate per annum at all times equal to the Default Rate to the fullest extent permitted by applicable Laws.

(iv)      Accrued and unpaid interest on past due amounts (including interest on past due interest) shall be due and payable upon demand.

(v)      Interest on each Loan shall be due and payable in arrears on each Interest Payment Date applicable thereto and at such other times as may be specified herein.  Interest hereunder shall be due and payable in accordance with the terms hereof before and after judgment, and before and after the commencement of any proceeding under any Debtor Relief Law.

**Section 2.08   Unused Line Fee.**  In addition to the fees specified in the Fee Letter, from and after the Closing Date, Borrowers shall pay to the Agent an unused commitment fee payable monthly in arrears, equal to (a) 0.50% per annum times (b) the result of (i) the aggregate Revolving Loan Commitments less (ii) the average Outstanding Amount of all Revolving Loans on each day of the immediately preceding month.

**Section 2.09   Computation of Interest and Fees**.  All computations of fees and interest shall be made on the basis of a 360-day year and actual days elapsed (which results in more fees or interest, as applicable, being paid than if computed on the basis of a 365-day year).  For purposes of computing interest and other charges hereunder, all payment items and other forms of payment received by the Agent shall be deemed applied by the Agent on account of the Obligations (subject to final payment of such items) on the first Business Day after the Agent receives such funds.  Each determination by the Agent of an interest rate or fee hereunder shall be conclusive and binding for all purposes, absent manifest error.

**Section 2.10   Evidence of Debt**.  The Borrowings made available by each Lender shall be evidenced by one or more accounts or records maintained by such Lender and by the Agent in the ordinary course of business.  The accounts or records maintained by the Agent and each Lender shall be conclusive absent manifest error of the amount of the Borrowings made by the Lenders to the Borrowers and the interest and payments thereon.  Any failure to so record or any error in doing so shall not, however, limit or otherwise affect the obligation of the Borrowers hereunder to pay any amount owing with respect to the Obligations.  In the event of any conflict between the accounts and records maintained by any Lender and the accounts and records of the Agent in respect of such matters, the accounts and records of the Agent shall control in the absence of manifest error.  Upon the request of any Lender made through the Agent, the Borrowers shall execute and deliver to such Lender (through the Agent) a Note, which shall evidence such Lender's Loans in addition to such accounts or records.  Each Lender may attach schedules to its Note and endorse thereon the date, Type (if applicable), amount and maturity of its Loans and payments with respect thereto.

**Section 2.11   Payments Generally; Agent's Clawback.**

(a)   General.  All payments to be made by the Borrowers shall be made without condition or deduction for any counterclaim, defense, recoupment or setoff.  Except as otherwise expressly provided herein, all payments by the Borrowers hereunder shall be made to the Agent, for the account of the respective Lenders to which such payment is owed, at the Agent's Office in Dollars and in immediately available funds not later than 2:00 p.m. on the date specified herein.  The Agent will promptly distribute to each Lender its Applicable Percentage in respect of the relevant Facility (or other applicable share as provided herein) of such payment in like funds as received by wire transfer to such Lender's Lending Office.  All payments received by the Agent after 2:00 p.m. shall be deemed received on the next succeeding Business Day and any applicable interest or fee shall continue to accrue.  If any payment to be made by the Borrowers shall come due on a day other than a Business Day, payment shall be made on the next following Business Day, and such extension of time shall be reflected on computing interest or fees, as the case may be.

(b)    (i)    <u>Funding by Lenders; Presumption by the Agent</u>.  Unless the Agent shall have received notice from a Lender prior to the proposed date of any Borrowing of LIBOR Rate Loans (or, in the case of any Borrowing of Base Rate Loans, prior to 12:00 noon on the date of such Borrowing) that such Lender will not make available to the Agent such Lender's share of such Borrowing, the Agent may assume that such Lender has made such share available on such date in accordance with Section 2.02 (or, in the case of a Borrowing of Base Rate Loans, that such Lender has made such share available in accordance with and at the time required by Section 2.02) and may, in reliance upon such assumption, make available to the Borrowers a corresponding amount.  In such event, if a Lender has not in fact made its share of the applicable Borrowing available to the Agent, then the applicable Lender and the Borrowers severally agree to pay to the Agent forthwith on demand such corresponding amount in immediately available funds with interest thereon, for each day from and including the date such amount is made available to the Borrowers to but excluding the date of payment to the Agent, at (A) in the case of a payment to be made by such Lender, the greater of the Federal Funds Rate and a rate determined by the Agent in accordance with banking industry rules on interbank compensation, plus any administrative, processing or similar fees customarily charged by the Agent in connection with the foregoing, and (B) in the case of a payment to be made by the Borrowers, the interest rate applicable to Base Rate Loans.  If the Borrowers and such Lender shall pay such interest to the Agent for the same or an overlapping period, the Agent shall promptly remit to the Borrowers the amount of such interest paid by the Borrowers for such period.  If such Lender pays its share of the applicable Borrowing to the Agent, then the amount so paid shall constitute such Lender's Loan included in such Borrowing.  Any payment by the Borrowers shall be without prejudice to any claim the Borrowers may have against a Lender that shall have failed to make such payment to the Agent.

(ii)    <u>Payments by Borrower; Presumptions by the Agent</u>.  Unless the Agent shall have received notice from the Administrative Borrower prior to the time at which any payment is due to the Agent for the account of the Lenders hereunder that the Borrowers will not make such payment, the Agent may assume that the Borrowers have made such payment on such date in accordance herewith and may, in reliance upon such assumption, distribute to the Appropriate Lenders the amount due.  In such event, if the Borrowers have not in fact made such payment, then each of the Appropriate Lenders severally agrees to repay to the Agent forthwith on demand the amount so distributed to such Lender, in immediately available funds with interest thereon, for each day from and including the date such amount is distributed to it to but excluding the date of payment to the Agent, at the greater of the Federal Funds Rate and a rate determined by the Agent in accordance with banking industry rules on interbank compensation.

A notice of the Agent to any Lender or the Borrowers with respect to any amount owing under this subsection (b) shall be conclusive, absent manifest error.

(c)    <u>Failure to Satisfy Conditions Precedent</u>.  If any Lender makes available to the Agent funds for any Loan to be made by such Lender as provided in the foregoing provisions of this Article II, and such funds are not made available to the

Borrowers by the Agent because the conditions to the applicable Borrowing set forth in Article IV are not satisfied or waived in accordance with the terms hereof, the Agent shall return such funds (in like funds as received from such Lender) to such Lender, without interest.

(d)     Obligations of Lenders Several.  The obligations of the Lenders hereunder to make Term Loans and Revolving Loans and to make payments pursuant to Section 10.04(c) are several and not joint.  The failure of any Lender to make any Loan, to fund any such participation or to make any payment under Section 10.04(c) on any date required hereunder shall not relieve any other Lender of its corresponding obligation to do so on such date, and no Lender shall be responsible for the failure of any other Lender to so make its Loan, to purchase its participation or to make its payment under Section 10.04(c).

(e)     Funding Source.  Nothing herein shall be deemed to obligate any Lender to obtain the funds for any Loan in any particular place or manner or to constitute a representation by any Lender that it has obtained or will obtain the funds for any Loan in any particular place or manner.

(f)     Insufficient Funds.  If at any time insufficient funds are received by and available to the Agent to pay fully all amounts of principal, interest and fees then due hereunder, such funds shall be applied (i) first, toward payment of interest and fees then due hereunder, ratably among the parties entitled thereto in accordance with the amounts of interest and fees then due to such parties, and (ii) second, toward payment of principal then due hereunder, ratably among the parties entitled thereto in accordance with the amounts of principal then due to such parties.

(g)     Maintenance of Loan Account; Statements of Obligations.  The Agent shall maintain an account on its books in the name of Borrowers (the "Loan Account") on which Borrowers will be charged with the Term Loans and Revolving Loans made by the Agent or the Lenders to Borrowers or for Borrowers' account, and with all other payment Obligations hereunder or under the other Loan Documents, including, accrued interest, fees and expenses.  In accordance with Section 2.11(a), the Loan Account will be credited with all payments received by the Agent from Borrowers or for Borrowers' account.  The Agent shall render statements regarding the Loan Account to Parent, including principal, interest, fees, and including an itemization of all charges and expenses owing, and such statements, absent manifest error, shall be conclusively presumed to be correct and accurate and constitute an account stated between Borrowers and the Lenders unless, within thirty (30) days after receipt thereof by Parent, Parent shall deliver to the Agent written objection thereto describing the error or errors contained in any such statements.

(h)     Charges to Loan Account.  Except as provided to the contrary herein (or in the Fee Letter), interest, and all other fees payable hereunder (and pursuant to the Fee Letter) shall be due and payable, in arrears, on the first day of each month at any time that Obligations or Commitments are outstanding.  In the event that Borrowers do not make a payment of interest, principal, fees, expenses or other payments due hereunder on a timely basis, Borrowers authorize the Agent, without prior notice to Borrowers, to charge all principal and fees (when due and payable), interest (on second Business Day of each month),

all expenses under Section 10.04(a) (on the fifth Business Day after such expenses are due and payable), and all other payments (on the fifth Business Day after such payments are due and payable) under any Loan Document to the Loan Account, which amounts thereafter shall constitute Revolving Loans hereunder and shall accrue interest at the rate then applicable to Revolving Loans that are Base Rate Loans.  Any interest not paid when due shall be compounded by being charged to the Loan Account and shall thereafter constitute Revolving Loans hereunder and shall accrue interest at the rate then applicable to Revolving Loans that are Base Rate Loans.

Section 2.12  **Sharing of Payments by Lenders.**  If any Lender shall, by exercising any right of setoff or counterclaim or otherwise, obtain payment in respect of (a) Obligations in respect of any the Facilities due and payable to such Lender hereunder and under the other Loan Documents at such time in excess of its ratable share (according to the proportion of (i) the amount of such Obligations due and payable to such Lender at such time to (ii) the aggregate amount of the Obligations in respect of the Facilities due and payable to all Lenders hereunder and under the other Loan Documents at such time) of payments on account of the Obligations in respect of the Facilities due and payable to all Lenders hereunder and under the other Loan Documents at such time obtained by all the Lenders at such time or (b) Obligations in respect of any of the Facilities owing (but not due and payable) to such Lender hereunder and under the other Loan Documents at such time in excess of its ratable share (according to the proportion of (i) the amount of such Obligations owing (but not due and payable) to such Lender at such time to (ii) the aggregate amount of the Obligations in respect of the Facilities owing (but not due and payable) to all Lenders hereunder and under the other Loan Parties at such time) of payment on account of the Obligations in respect of the Facilities owing (but not due and payable) to all Lenders hereunder and under the other Loan Documents at such time obtained by all of the Lenders at such time then the Lender receiving such greater proportion shall (a) notify the Agent of such fact, and (b) purchase (for cash at face value) participations in the Loans of the other Lenders, or make such other adjustments as shall be equitable, so that the benefit of all such payments shall be shared by the Lenders ratably in accordance with the aggregate amount of Obligations in respect of the Facilities then due and payable to the Lenders or owing (but not due and payable) to the Lenders, as the case may be, provided that:

(i)      if any such participations are purchased and all or any portion of the payment giving rise thereto is recovered, such participations shall be rescinded and the purchase price restored to the extent of such recovery, without interest; and

(ii)      the provisions of this Section 2.12 shall not be construed to apply to (A) any payment made by the Borrowers pursuant to and in accordance with the express terms of this Agreement or (B) any payment obtained by a Lender as consideration for the assignment of or sale of a participation in any of its Loans to any assignee or participant, other than to the Borrowers or any Subsidiary thereof (as to which the provisions of this Section 2.12 shall apply).

Each Loan Party consents to the foregoing and agrees, to the extent it may effectively do so under applicable Law, that any Lender acquiring a participation pursuant to the foregoing arrangements may exercise against such Loan Party rights of setoff and counterclaim

with respect to such participation as fully as if such Lender were a direct creditor of such Loan Party in the amount of such participation.

### Section 2.13    Joint and Several Liability of Borrowers.

(a)     Each Borrower is accepting joint and several liability hereunder and under the other Loan Documents in consideration of the financial accommodations to be provided by the Lenders under this Agreement, for the mutual benefit, directly and indirectly, of each Borrower and in consideration of the undertakings of the other Borrowers to accept joint and several liability for the Obligations.

(b)     Each Borrower, jointly and severally, hereby irrevocably and unconditionally accepts, not merely as a surety but also as a co-debtor, joint and several liability with the other Borrowers, with respect to the payment and performance of all of the Obligations (including, without limitation, any Obligations arising under this Section 2.13), it being the intention of the parties hereto that all the Obligations shall be the joint and several obligations of each Borrower without preferences or distinction among them.

(c)     If and to the extent that any Borrower shall fail to make any payment with respect to any of the Obligations as and when due or to perform any of the Obligations in accordance with the terms thereof, then in each such event the other Borrowers will make such payment with respect to, or perform, such Obligation.

(d)     The Obligations of each Borrower under the provisions of this Section 2.13 constitute the absolute and unconditional, full recourse Obligations of each Borrower enforceable against each Borrower to the full extent of its properties and assets, irrespective of the validity, regularity or enforceability of this Agreement or any other circumstances whatsoever.

(e)     Except as otherwise expressly provided in this Agreement, each Borrower hereby waives notice of acceptance of its joint and several liability, notice of any Advances issued under or pursuant to this Agreement, notice of the occurrence of any Default, Event of Default, or of any demand for any payment under this Agreement, notice of any action at any time taken or omitted by the Agent or Lenders under or in respect of any of the Obligations, any requirement of diligence or to mitigate damages and, generally, to the extent permitted by applicable Law, all demands, notices and other formalities of every kind in connection with this Agreement (except as otherwise provided in this Agreement). Each Borrower hereby assents to, and waives notice of, any extension or postponement of the time for the payment of any of the Obligations, the acceptance of any payment of any of the Obligations, the acceptance of any partial payment thereon, any waiver, consent or other action or acquiescence by the Agent or Lenders at any time or times in respect of any default by any Borrower in the performance or satisfaction of any term, covenant, condition or provision of this Agreement, any and all other indulgences whatsoever by the Agent or Lenders in respect of any of the Obligations, and the taking, addition, substitution or release, in whole or in part, at any time or times, of any security for any of the Obligations or the addition, substitution or release, in whole or in part, of any Borrower. Without limiting the generality of the foregoing, each Borrower assents to any other action or delay in acting or

failure to act on the part of the Agent or any Lender with respect to the failure by any Borrower to comply with any of its respective Obligations, including, without limitation, any failure strictly or diligently to assert any right or to pursue any remedy or to comply fully with applicable Laws or regulations thereunder, which might, but for the provisions of this <u>Section 2.13</u> afford grounds for terminating, discharging or relieving any Borrower, in whole or in part, from any of its Obligations under this <u>Section 2.13</u>, it being the intention of each Borrower that, so long as any of the Obligations hereunder remain unsatisfied, the Obligations of each Borrower under this <u>Section 2.13</u> shall not be discharged except by performance and then only to the extent of such performance. The Obligations of each Borrower under this <u>Section 2.13</u> shall not be diminished or rendered unenforceable by any winding up, reorganization, arrangement, liquidation, reconstruction or similar proceeding with respect to any Borrower or the Agent or any Lender.

(f)     Each Borrower represents and warrants to the Agent and Lenders that such Borrower is currently informed of the financial condition of Borrowers and of all other circumstances which a diligent inquiry would reveal and which bear upon the risk of nonpayment of the Obligations. Each Borrower further represents and warrants to the Agent and Lenders that such Borrower has read and understands the terms and conditions of the Loan Documents. Each Borrower hereby covenants that such Borrower will continue to keep informed of Borrowers' financial condition, the financial condition of other guarantors, if any, and of all other circumstances which bear upon the risk of nonpayment or nonperformance of the Obligations.

(g)     The provisions of this <u>Section 2.13</u> are made for the benefit of the Agent, Lenders and their respective successors and assigns, and may be enforced by it or them from time to time against any or all Borrowers as often as occasion therefor may arise and without requirement on the part of the Agent, Lenders and their respective successors and assigns, or any of them, first to marshal any of its or their claims or to exercise any of its or their rights against any Borrower or to exhaust any remedies available to it or them against any Borrower or to resort to any other source or means of obtaining payment of any of the Obligations hereunder or to elect any other remedy. The provisions of this <u>Section 2.13</u> shall remain in effect until all of the Obligations shall have been paid in full or otherwise fully satisfied. If at any time, any payment, or any part thereof, made in respect of any of the Obligations, is rescinded or must otherwise be restored or returned by the Agent or any Lender upon the insolvency, bankruptcy or reorganization of any Borrower, or otherwise, the provisions of this <u>Section 2.13</u> will forthwith be reinstated in effect, as though such payment had not been made.

(h)     Each Borrower hereby agrees that it will not enforce any of its rights of contribution or subrogation against any other Borrower with respect to any liability incurred by it hereunder or under any of the other Loan Documents, any payments made by it to the Agent or Lenders with respect to any of the Obligations or any collateral security therefor until such time as all of the Obligations have been paid in full in cash. Any claim which any Borrower may have against any other Borrower with respect to any payments to the Agent or any Lender hereunder or under any other Loan Documents are hereby expressly made subordinate and junior in right of payment, without limitation as to any increases in the Obligations arising hereunder or thereunder, to the prior payment in full in cash of the

Obligations and, in the event of any insolvency, bankruptcy, receivership, liquidation, reorganization or other similar proceeding under the Laws of any jurisdiction relating to any Borrower, its debts or its assets, whether voluntary or involuntary, all such Obligations shall be paid in full in cash before any payment or distribution of any character, whether in cash, securities or other property, shall be made to any other Borrower therefor.

(i)    Each Borrower hereby agrees that, after the occurrence and during the continuance of any Default or Event of Default, the payment of any amounts due with respect to the indebtedness owing by any Borrower to any other Borrower is hereby subordinated to the prior payment in full in cash of the Obligations. Each Borrower hereby agrees that after the occurrence and during the continuance of any Default or Event of Default, such Borrower will not demand, sue for or otherwise attempt to collect any indebtedness of any other Borrower owing to such Borrower until the Obligations shall have been paid in full in cash. If, notwithstanding the foregoing sentence, such Borrower shall collect, enforce or receive any amounts in respect of such indebtedness, such amounts shall be collected, enforced and received by such Borrower as trustee for the Agent, and such Borrower shall deliver any such amounts to the Agent for application to the Obligations in accordance with the Loan Documents.

## ARTICLE III.
## TAXES, YIELD PROTECTION AND ILLEGALITY

**Section 3.01    Taxes.**

(a)    Payments Free of Taxes. Any and all payments by or on account of any obligation of the Loan Parties hereunder or under any other Loan Document shall be made free and clear of and without reduction or withholding for any Indemnified Taxes or Other Taxes, provided that if the Loan Parties shall be required by applicable Law to deduct any Indemnified Taxes (including any Other Taxes) from such payments, then (i) the sum payable shall be increased as necessary so that after making all required deductions (including deductions applicable to additional sums payable under this Section) the Agent or any Lender, as the case may be, receives an amount equal to the sum it would have received had no such deductions been made, (ii) the Loan Parties shall make such deductions and (iii) the Loan Parties shall timely pay the full amount deducted to the relevant Governmental Authority in accordance with applicable Law.

(b)    Payment of Other Taxes by the Loan Parties. Without limiting the provisions of subsection (a) above, the Loan Parties shall timely pay any Other Taxes to the relevant Governmental Authority in accordance with applicable Law.

(c)    Indemnification by the Loan Parties. The Loan Parties shall, jointly and severally, indemnify the Agent and each Lender, within ten (10) days after demand therefor, for the full amount of any Indemnified Taxes or Other Taxes (including Indemnified Taxes or Other Taxes imposed or asserted on or attributable to amounts payable under this Section 3.01) paid by the Agent or such Lender, as the case may be, and any penalties, interest and reasonable expenses arising therefrom or with respect thereto, whether or not such Indemnified Taxes or Other Taxes were correctly or legally imposed or asserted by the

relevant Governmental Authority. A certificate as to the amount of such payment or liability delivered to the Loan Parties by a Lender (with a copy to the Agent), or by the Agent on its own behalf or on behalf of a Lender, shall be conclusive absent manifest error.

(d)     Evidence of Payments.  Borrowers shall maintain adequate records of all payments of Indemnified Taxes or Other Taxes by the Loan Parties to a Governmental Authority, and, upon the reasonable request of the Agent, the Loan Parties shall make available to the Agent a copy of a receipt issued by such Governmental Authority evidencing such payment, a copy of the return reporting such payment or other evidence of such payment reasonably satisfactory to the Agent.

(e)     Status of Lenders.  Any Foreign Lender that is entitled to an exemption from or reduction of withholding tax under the Law of the jurisdiction in which the Loan Parties are residents for tax purposes, or any treaty to which such jurisdiction is a party, with respect to payments hereunder or under any other Loan Document shall deliver to the Loan Parties (with a copy to the Agent), at the time or times prescribed by applicable Law or reasonably requested by the Loan Parties or the Agent, such properly completed and executed documentation prescribed by applicable Law as will permit such payments to be made without withholding or at a reduced rate of withholding. In addition, any Lender, if requested by the Loan Parties or the Agent, shall deliver such other documentation prescribed by applicable Law or reasonably requested by the Loan Parties or the Agent as will enable the Loan Parties or the Agent to determine whether or not such Lender is subject to backup withholding or information reporting requirements.

Without limiting the generality of the foregoing, if the Loan Parties are residents for tax purposes in the United States, any Foreign Lender shall deliver to the Loan Parties and the Agent (in such number of copies as shall be requested by the recipient) on or prior to the date on which such Foreign Lender becomes a Lender under this Agreement (and from time to time thereafter upon the request of the Loan Parties or the Agent, but only if such Foreign Lender is legally entitled to do so), whichever of the following is applicable:

(i)     duly completed copies of Internal Revenue Service Form W-8BEN claiming eligibility for benefits of an income tax treaty to which the United States is a party,

(ii)     duly completed copies of Internal Revenue Service Form W-8ECI,

(iii)     in the case of a Foreign Lender claiming the benefits of the exemption for portfolio interest under Section 881(c) of the Code, (A) a certificate to the effect that such Foreign Lender is not (1) a "bank" within the meaning of Section 881(c)(3)(A) of the Code, (2) a "10 percent shareholder" of the Borrowers or Parent within the meaning of Section 881(c)(3)(B) of the Code, or (3) a "controlled foreign corporation" described in Section 881(c)(3)(C) of the Code and (B) duly completed copies of  Internal Revenue Service Form W-8BEN, or

          (iv)     any other form prescribed by applicable Law as a basis for claiming exemption from or a reduction in United States Federal withholding tax duly completed together with such supplementary documentation as may be prescribed by applicable Law to permit the Borrowers to determine the withholding or deduction required to be made.

          (f)     <u>Treatment of Certain Refunds</u>.  If the Agent or any Lender determines, in its sole discretion, that it has received a refund of any Taxes or Other Taxes as to which it has been indemnified by the Loan Parties or with respect to which the Loan Parties have paid additional amounts pursuant to this <u>Section 3.01</u>, it shall pay to the Loan Parties an amount equal to such refund (but only to the extent of indemnity payments made, or additional amounts paid, by the Loan Parties under this Section with respect to the Taxes or Other Taxes giving rise to such refund), net of all out-of-pocket expenses of the Agent or such Lender, as the case may be, and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund), <u>provided</u> that the Loan Parties, upon the request of the Agent or such Lender, agree to repay the amount paid over to the Loan Parties (<u>plus</u> any penalties, interest or other charges imposed by the relevant Governmental Authority) to the Agent or such Lender if the Agent or such Lender is required to repay such refund to such Governmental Authority.  This subsection (f) shall not be construed to require the Agent or any Lender to make available its tax returns (or any other information relating to its taxes that it deems confidential) to the Loan Parties or any other Person.

        **Section 3.02    Illegality**.  If any Lender determines that any Law has made it unlawful, or that any Governmental Authority has asserted that it is unlawful, for any Lender or its applicable Lending Office to make, maintain or fund LIBOR Rate Loans, or to determine or charge interest rates based upon the LIBOR Rate, or any Governmental Authority has imposed material restrictions on the authority of such Lender to purchase or sell, or to take deposits of, Dollars in the London interbank market, then, on notice thereof by such Lender to the Borrowers through the Agent, any obligation of such Lender to make or continue LIBOR Rate Loans or to convert Base Rate Loans to LIBOR Rate Loans shall be suspended until such Lender notifies the Agent and the Borrowers that the circumstances giving rise to such determination no longer exist.  Upon receipt of such notice, the Borrowers shall, upon demand from such Lender (with a copy to the Agent), prepay or, if applicable, convert all LIBOR Rate Loans of such Lender to Base Rate Loans, either on the last day of the Interest Period therefor, if such Lender may lawfully continue to maintain such LIBOR Rate Loans to such day, or immediately, if such Lender may not lawfully continue to maintain such LIBOR Rate Loans.  Upon any such prepayment or conversion, the Borrowers shall also pay accrued interest on the amount so prepaid or converted.

        **Section 3.03    Inability to Determine Rates**.  If the Required Lenders determine that for any reason in connection with any request for a LIBOR Rate Loan or a conversion to or continuation thereof that (a) Dollar deposits are not being offered to banks in the London interbank eurodollar market for the applicable amount and Interest Period of such LIBOR Rate Loan, (b) adequate and reasonable means do not exist for determining the LIBOR Rate for any requested Interest Period with respect to a proposed LIBOR Rate Loan, or (c) the LIBOR Rate for any requested Interest Period with respect to a proposed LIBOR Rate Loan does not adequately and fairly reflect the cost to such Lenders of funding such LIBOR Rate Loan, the

Agent will promptly so notify the Borrowers and each Lender. Thereafter, the obligation of the Lenders to make or maintain LIBOR Rate Loans shall be suspended until the Agent (upon the instruction of the Required Lenders) revokes such notice. Upon receipt of such notice, the Borrowers may revoke any pending request for a Borrowing of, conversion to or continuation of LIBOR Rate Loans or, failing that, will be deemed to have converted such request into a request for a Borrowing of Base Rate Loans in the amount specified therein.

**Section 3.04    Increased Costs; Reserves on LIBOR Rate Loans**. (a) Increased Costs Generally. If any Change in Law shall:

(i)    impose, modify or deem applicable any reserve, special deposit, compulsory loan, insurance charge or similar requirement against assets of, deposits with or for the account of, or credit extended or participated in by, any Lender (except any reserve requirement contemplated by Section 3.04(e));

(ii)    subject any Lender to any tax of any kind whatsoever with respect to this Agreement or any LIBOR Rate Loan made by it, or change the basis of taxation of payments to such Lender in respect thereof (except for Indemnified Taxes or Other Taxes covered by Section 3.01 and the imposition of, or any change in the rate of, any Excluded Tax payable by such Lender); or

(iii)    impose on any Lender or the London interbank market any other condition, cost or expense affecting this Agreement or LIBOR Rate Loans made by such Lender;

and the result of any of the foregoing shall be to increase the cost to such Lender of making or maintaining any LIBOR Rate Loan (or of maintaining its obligation to make any such LIBOR Rate Loan), or to increase the cost to such Lender, or to reduce the amount of any sum received or receivable by such Lender hereunder (whether of principal, interest or any other amount) then, upon the written request of such Lender, the Borrowers will pay to such Lender such additional amount or amounts as will compensate such Lender for such additional costs incurred or reduction suffered.

(b)    Capital Requirements. If any Lender determines that any Change in Law affecting such Lender or any Lending Office of such Lender or such Lender's holding company, if any, regarding capital requirements has or would have the effect of reducing the rate of return on such Lender's capital or on the capital of such Lender's holding company, if any, as a consequence of this Agreement, the Commitments of such Lender or the Loans made by such Lender to a level below that which such Lender or such Lender's holding company could have achieved but for such Change in Law (taking into consideration such Lender's policies and the policies of such Lender's holding company with respect to capital adequacy), then from time to time the Borrowers will pay to such Lender, as the case may be, such additional amount or amounts as will compensate such Lender or such Lender's holding company for any such reduction suffered.

(c)    Certificates for Reimbursement. A certificate of a Lender setting forth the amount or amounts necessary to compensate such Lender or its holding company, as the

case may be, as specified in subsection (a) or (b) of this Section 3.04 and delivered to the Borrowers shall be conclusive absent manifest error.  The Borrowers shall pay such Lender the amount shown as due on any such certificate within ten (10) days after receipt thereof.

(d)    Delay in Requests.  Failure or delay on the part of any Lender to demand compensation pursuant to the foregoing provisions of this Section 3.04 shall not constitute a waiver of such Lender's right to demand such compensation, provided that the Borrowers shall not be required to compensate a Lender pursuant to the foregoing provisions of this Section 3.04 for any increased costs incurred or reductions suffered more than nine months prior to the date that such Lender notifies the Borrowers of the Change in Law giving rise to such increased costs or reductions and of such Lender's intention to claim compensation therefor (except that, if the Change in Law giving rise to such increased costs or reductions is retroactive, then the nine-month period referred to above shall be extended to include the period of retroactive effect thereof).

(e)    Reserves on LIBOR Rate Loans.  The Borrowers shall pay to each Lender, as long as such Lender shall be required to maintain reserves with respect to liabilities or assets consisting of or including Eurocurrency funds or deposits (currently known as "Eurocurrency liabilities"), additional interest on the unpaid principal amount of each LIBOR Rate Loan equal to the actual costs of such reserves allocated to such LIBOR Rate Loan by such Lender (as determined by such Lender in good faith, which determination shall be conclusive), which shall be due and payable on each date on which interest is payable on such LIBOR Rate Loan, provided the Borrowers shall have received at least ten (10) days' prior notice (with a copy to the Agent) of such additional interest from such Lender.  If a Lender fails to give notice ten (10) days prior to the relevant Interest Payment Date, such additional interest shall be due and payable ten (10) days from receipt of such notice.

**Section 3.05    Compensation for Losses.**  Upon written demand of any Lender (with a copy to the Agent) from time to time, the Borrowers shall promptly compensate such Lender for and hold such Lender harmless from any loss, cost or expense incurred by it as a result of:

(a)    any continuation, conversion, payment or prepayment of any Loan other than a Base Rate Loan on a day other than the last day of the Interest Period for such Loan (whether voluntary, mandatory, automatic, by reason of acceleration, or otherwise);

(b)    any failure by the Borrowers (for a reason other than the failure of such Lender to make a Loan) to prepay, borrow, continue or convert any Loan other than a Base Rate Loan on the date or in the amount notified by the Borrowers; or

(c)    any assignment of a LIBOR Rate Loan on a day other than the last day of the Interest Period therefor as a result of a request by the Borrowers pursuant to Section 10.13;

including any loss of anticipated profits and any loss or expense arising from the liquidation or reemployment of funds obtained by it to maintain such LIBOR Rate Loan or from fees payable

to terminate the deposits from which such funds were obtained. The Borrowers shall also pay any customary administrative fees charged by such Lender in connection with the foregoing.

For purposes of calculating amounts payable by the Borrowers to the Lenders under this Section 3.05, each Lender shall be deemed to have funded each LIBOR Rate Loan made by it at the LIBOR Rate for such LIBOR Rate Loan by a matching deposit or other borrowing in the London interbank eurodollar market for a comparable amount and for a comparable period, whether or not such LIBOR Rate Loan was in fact so funded.

     **Section 3.06   Survival.** All of the Borrowers' obligations under this Article III shall survive termination of the Aggregate Commitments and repayment of all other Obligations hereunder.

<div align="center">

**ARTICLE IV.**
**CONDITIONS PRECEDENT TO BORROWINGS**

</div>

     **Section 4.01   Conditions of Initial Borrowing.** The obligation of each Lender to make its portion of the initial Borrowing hereunder is subject to satisfaction of the conditions precedent set forth below.

     (a)    **Deliverables.** The Agent's receipt of the following, each of which shall be originals or telecopies (followed promptly by originals) unless otherwise specified, each properly executed by a Responsible Officer of the signing Loan Party, each dated the Closing Date (or, in the case of certificates of governmental officials, a recent date before the Closing Date) and each in form and substance satisfactory to the Agent and each of the Lenders:

        (i)    **Credit Agreement:** executed counterparts of this Agreement, sufficient in number for distribution to the Agent, each Lender and the Borrowers;

        (ii)    **[Intentionally Omitted];**

        (iii)    **Validity Guaranty:** executed counterparts of the Validity Guaranty from Ashutosh Ladha, in sufficient number for distribution to the Agent, each Lender and the Borrowers;

        (iv)    **Notes:** Notes executed by the Borrowers in favor of each Lender requesting such Notes;

        (v)    **Control Agreements:** the Account Control Agreements and the Securities Account Control Agreement, in each case as required by Section 6.20 and duly executed by the appropriate parties;

        (vi)    **Security Agreement:** a security agreement, in substantially the form of Exhibit G (together with each other security agreement and security agreement supplement delivered pursuant to Section 6.12, in each

case as amended, the "Security Agreement"), duly executed by each Loan Party, together with:

(A)    **UCC-1 Financing Statements**: acknowledgment copies or stamped receipt copies of proper financing statements, duly filed on or before the day of the initial Borrowing under the Uniform Commercial Code of all jurisdictions that the Agent may deem necessary or desirable in order to perfect the Liens created under the Security Agreement and the Equity Investors Stock Pledge Agreement, covering the Collateral described in the Security Agreement and the Equity Investors Stock Pledge Agreement,

(B)    **UCC Searches**: completed UCC search requests, dated on or before the date of the initial Borrowing, listing the financing statements referred to in clause (A) above and all other effective financing statements filed in the jurisdictions referred to in clause (A) above that name any Loan Party as debtor, together with copies of such other financing statements,

(C)    **Negotiable Collateral**: instruments evidencing the Negotiable Collateral pledged to the Agent pursuant to the Security Agreement, indorsed in blank,

(D)    **Other Filings**: evidence of the completion of all other actions, recordings and filings of or with respect to the Security Agreement and the Equity Investors Stock Pledge Agreement that the Agent may deem necessary or desirable in order to perfect the Liens created thereby, and

(E)    **Other Actions**: evidence that all other action that the Agent may deem necessary or desirable in order to perfect the Liens created under the Security Agreement has been taken (including receipt of duly executed payoff letters, UCC-3 termination statements and landlords' and bailees' waiver and consent agreements);

(vii)    **Equity Investors Stock Pledge Agreement**: a stock pledge agreement, in substantially the form of Exhibit H (the "Equity Investors Stock Pledge Agreement"), duly executed by Ashutosh Ladha, together with certificates representing the Equity Interests referred to therein, accompanied by undated stock powers executed in blank registered in the name of such nominee or nominees as the Agent shall specify;

(viii)    **IP Security Agreements**: a trademark collateral security and pledge agreement, in the form of Exhibit A to the Security Agreement, a patent collateral assignment and security agreement, in the form of Exhibit B to the Security Agreement, and a copyright memorandum in the form of Exhibit C to the Security Agreement (collectively, the "Intellectual Property Security

Agreements"), duly executed by each Loan Party, together with evidence that all action that the Agent may deem necessary or desirable in order to perfect the Liens created under each Intellectual Property Security Agreement has been taken;

(ix)    **Resolutions and Organization Documents**:  certified copies of (A) the resolutions or other action of the board of directors (or similar governing body) of each Loan Party approving each Loan Document to which such Loan Party is or is to be a party, (B) all documents evidencing other necessary corporate (or limited liability company) action, and (C) each Organization Document of each Loan Party;

(x)    **Good Standing Certificates**:  such documents and certifications as the Agent may reasonably require to evidence that each Loan Party is duly organized or formed, and that each Loan Party is validly existing, in good standing and qualified to engage in business in each jurisdiction where its ownership, lease or operation of properties or the conduct of its business requires such qualification, except to the extent that failure to do so could not reasonably be expected to have a Material Adverse Effect;

(xi)    **Opinions**:  favorable opinions of (A) Holland, Johns, Schwartz & Penny, L.L.P., Texas counsel to the Loan Parties, and (B) Powell Goldstein LLP, Georgia counsel to the Loan Parties, each addressed to the Agent and each Lender, in form and substance satisfactory to the Agent and its counsel;

(xii)    **Consents, Approvals, Etc.**:  a certificate of a Responsible Officer of each Loan Party either (A) attaching copies of all consents, licenses and approvals required in connection with the execution, delivery and performance by such Loan Party and the validity against such Loan Party of the Loan Documents to which it is a party, and such consents, licenses and approvals shall be in full force and effect, or (B) stating that no such consents, licenses or approvals are so required;

(xiii)    **Solvency Certificates**: certificates attesting to the Solvency of each Loan Party before and after giving effect to the Transaction, from its chief financial officer;

(xiv)    **Evidence of Insurance**:  evidence that all insurance required to be maintained pursuant to the Loan Documents has been obtained and is in effect, together with the certificates of insurance, naming the Agent, on behalf of the Lenders, as an additional insured or loss payee, as the case may be, under all insurance policies maintained with respect to the assets and properties of the Loan Parties that constitutes Collateral;

(xv)    **Borrowing Base Certificate**:  a Borrowing Base Certificate duly certified by the chief executive officer, chief financial officer, treasurer or chief operating officer of Parent relating to the initial Borrowing;

(xvi)    **Payoff Letters**: evidence that the Existing Credit Agreement has been, or concurrently with the Closing Date is being, terminated and all Liens securing obligations under the Existing Credit Agreement have been, or concurrently with the Closing Date are being, released;

(xvii)    **[Intentionally Omitted]**;

(xviii)    **Subordination Agreements**: each Stockholder Subordination Agreement duly executed by the applicable Stockholder Subordinated Lender, each in form and substance satisfactory to the Agent;

(xix)    **Subordinated Debt Documents**: certified copies of the Stockholder Subordinated Debt Documents, each in form and substance satisfactory to the Agent;

(xx)    **Key Man Life Insurance**:  The Agent shall have received the original copy of a key-man life insurance policy on the life of Ashutosh Ladha in an amount of at least $2,000,000, together with a duly executed assignment thereof to the Agent (the "Assignment of Key-Man Life Insurance"), in form and substance satisfactory to the Agent and its counsel; and

(xxi)    **Other Assurances**: such other assurances, certificates, documents, consents or opinions as the Agent or any Lender reasonably may require.

(b)    **Payment of Fees**:  (i) All fees required to be paid to the Agent on or before the Closing Date shall have been paid and (ii) all fees required to be paid to the Lenders on or before the Closing Date shall have been paid.

(c)    **Payment of Expenses**:  The Borrowers shall have paid all fees, charges and disbursements of counsel to the Agent (directly to such counsel if requested by the Agent) to the extent invoiced prior to or on the Closing Date, plus such additional amounts of such fees, charges and disbursements as shall constitute its reasonable estimate of such fees, charges and disbursements incurred or to be incurred by it through the closing proceedings (provided that such estimate shall not thereafter preclude a final settling of accounts between the Borrowers and the Agent).

(d)    **Closing Date**:  The Closing Date shall have occurred on or before December 31, 2006.

(e)    **Due Diligence Investigation**:  The Lenders shall have completed a due diligence investigation of Loan Parties and their respective Subsidiaries in scope, and with results, satisfactory to the Lenders (including a satisfactory review of all material agreements and all litigation matters), and shall have been given such access to the management records, books of account, contract and properties of Loan Parties and their respective Subsidiaries and shall have received such financial, business and other information regarding each of the foregoing Persons and businesses as they shall have requested, in form and substance satisfactory to the Agent, including, without limitation, the following:

(i)      environmental reports, asset appraisals, field audits (including a takeover audit as of a recent date prior to the Closing Date) and such other reports, audits, certifications or other documentation as the Agent may reasonably request;

(ii)      audited consolidated and consolidating balance sheet of the members of the ABC Export Group and their respective Subsidiaries for the fiscal year ended March 31, 2006, and the related consolidated statements of income or operations, shareholders' equity and cash flows for such fiscal year of the members of the ABC Export Group and their respective Subsidiaries, including the notes thereto;

(iii)      unaudited consolidated and consolidating balance sheet of the members of the ABC Export Group and their respective Subsidiaries for the 6-month period ended September 30, 2006, and the related consolidated statements of income or operations, shareholders' equity and cash flows for such 6-month period of the members of the ABC Export Group and their respective Subsidiaries; and

(iv)      a satisfactory appraisal of inventory by an independent appraiser engaged by the Agent.

(f)      **Required Availability**: After giving effect to the Transaction, including all Borrowings made in connection therewith, the amount by which the sum of Excess Availability exceeds the Outstanding Amount of Revolving Loans shall be no less than $1,000,000.

(g)      **No Material Adverse Effect**: The Agent shall have received evidence satisfactory to it that no change in the business, assets, properties, liabilities (actual or contingent), operations, conditions (financial or otherwise) or prospects of the Loan Parties, taken as a whole, shall have occurred since July 31, 2006, which change has had or is reasonably likely to have a Material Adverse Effect, and the Agent shall have received a certificate of Responsible Officer of Parent so stating.

(h)      **No Material Litigation**: The Agent shall have received evidence satisfactory to it that there shall not have occurred or exist any material action, suit, investigation or proceeding pending or, to the knowledge of the Loan Parties, threatened that is reasonably likely to have a Material Adverse Effect.

(i)      **UCC Search Results**: The Lenders shall have received the results of a search of the UCC filings (or equivalent filings) made with respect to each Loan Party, together with copies of the financing statements (or similar documents) disclosed by such search, and accompanied by evidence satisfactory to the Lenders that the Liens indicated in any such financing statement (or similar document) are Permitted Liens or have been released.

(j)      **Representations and Warranties**: The representations and warranties of Borrowers and each other Loan Party contained in this Agreement or any other Loan Document,

or which are contained in any document furnished at any time under or in connection herewith or therewith, shall be true and correct on and as of the Closing Date, except to the extent that such representations and warranties specifically refer to an earlier date, in which case they shall be true and correct as of such earlier date.

(k)    **No Default**:  No Default shall exist, or would result from the Borrowing or from the application of the proceeds thereof.

(l)    **Committed Loan Notice**:  The Agent shall have received a Committed Loan Notice in accordance with the requirements hereof.

(m)    **ABC Export Group Supply Agreements**:  The Agent shall have received evidence satisfactory to it that the Parent has entered into a sales and distribution agreement with each member of the ABC Export Group (the "ABC Export Group Supply Agreements"), which each such agreement shall be in form and substance satisfactory to the Agent and shall be in full force and effect on the Closing Date, and the Agent shall have received a certificate of an Responsible Officer of Parent certifying that a true, correct and complete copy of each such agreement is attached to such certificate.

(n)    **New Customer Payment Instructions**.  The Agent shall have received evidence satisfactory to the Agent that Parent has notified each of its top twenty (20) customers (based on current years sales) that all payments regarding Receivables or otherwise should be directed to Parent's lockbox account at Wachovia Bank, N.A. effective immediately upon the Closing Date.

(o)    **Patriot Act Compliance; Management**:  The Agent shall be satisfied with Borrowers' management, and shall have received satisfactory results of reference checks and any Patriot Act compliance requirements.

Without limiting the generality of the provisions of Section 9.04, for purposes of determining compliance with the conditions specified in this Section 4.01, each Lender that has signed this Agreement shall be deemed to have consented to, approved or accepted or to be satisfied with, each document or other matter required thereunder to be consented to or approved by or acceptable or satisfactory to a Lender unless the Agent shall have received notice from such Lender prior to the proposed Closing Date specifying its objection thereto.

**Section 4.02   Conditions to all Borrowings**.  The obligation of each Lender to honor any Request for Borrowing (other than a Committed Loan Notice requesting only a conversion of Loans to the other Type, or a continuation of LIBOR Rate Loans) is subject to the following conditions precedent:

(a)    The representations and warranties of the Borrowers and each other Loan Party contained in Article V or any other Loan Document, or which are contained in any document furnished at any time under or in connection herewith or therewith, shall be true and correct on and as of the date of such Borrowing, except to the extent that such representations and warranties specifically refer to an earlier date, in which case they shall be true and correct as of such earlier date, and except that for purposes of this Section 4.02, the

representations and warranties contained in Sections 5.05(a) and (b) shall be deemed to refer to the most recent statements furnished pursuant to Sections 6.01(a) and (b), respectively.

(b)    No Default shall exist, or would result from such proposed Borrowing or from the application of the proceeds thereof.

(c)    The Agent and shall have received a Request for Borrowing in accordance with the requirements hereof.

(d)    The Agent shall have received such other approvals, opinions or documents as any Lender through the Agent may reasonably request.

Each Request for Borrowing (other than a Committed Loan Notice requesting only a conversion of Loans to the other Type or a continuation of LIBOR Rate Loans) submitted by the Borrowers shall be deemed to be a representation and warranty that the conditions specified in Sections 4.02(a) and (b) have been satisfied on and as of the date of the applicable Borrowing.

## ARTICLE V.
## REPRESENTATIONS AND WARRANTIES

Each Loan Party represents and warrants to the Agent and the Lender, as of the Closing Date and as of the date of the making of any Borrowing hereunder, that:

**Section 5.01    Existence, Qualification and Power**.  Each Loan Party and each of its Subsidiaries (a) is duly organized or formed, validly existing and, as applicable, in good standing under the Laws of the jurisdiction of its incorporation or organization, (b) has all requisite power and authority and all requisite governmental licenses, authorizations, consents and approvals to (i) own or lease its assets and carry on its business and (ii) execute, deliver and perform its obligations under the Loan Documents to which it is a party and consummate the Transaction, and (c) is duly qualified and is licensed and, as applicable, in good standing under the Laws of each jurisdiction where its ownership, lease or operation of properties or the conduct of its business requires such qualification or license; except, in each case referred to in clause (b)(i) or (c), to the extent that failure to do so could not reasonably be expected to have a Material Adverse Effect.

**Section 5.02    Authorization; No Contravention**.  The execution, delivery and performance by each Loan Party of each Loan Document to which such Person is or is to be a party have been duly authorized by all necessary corporate or other organizational action, and do not and will not (a) contravene the terms of any of such Person's Organization Documents; (b) conflict with or result in any breach or contravention of, or the creation of any Lien under, or require any payment to be made under (i) any Contractual Obligation to which such Person is a party or affecting such Person or the properties of such Person or any of its Subsidiaries or (ii) any order, injunction, writ or decree of any Governmental Authority or any arbitral award to which such Person or its property is subject; or (c) violate any Law.

**Section 5.03    Governmental Authorization; Other Consents**.  No approval, consent, exemption, authorization, or other action by, or notice to, or filing with, any Governmental Authority or any other Person is necessary or required in connection with (a) the execution,

delivery or performance by, or enforcement against, any Loan Party of this Agreement or any other Loan Document, or for the consummation of the Transaction, (b) the grant by any Loan Party of the Liens granted by it pursuant to the Collateral Documents, (c) the perfection or maintenance of the Liens created under the Collateral Documents (including the first priority nature thereof) or (d) the exercise by the Agent or any Lender of its rights under the Loan Documents or the remedies in respect of the Collateral pursuant to the Collateral Documents, except for the authorizations, approvals, actions, notices and filings listed on Schedule 5.03, all of which have been duly obtained, taken, given or made and are in full force and effect.  All applicable waiting periods in connection with the Transaction have expired without any action having been taken by any Governmental Authority restraining, preventing or imposing materially adverse conditions upon the Transaction or the rights of the Loan Parties or their Subsidiaries freely to transfer or otherwise dispose of, or to create any Lien on, any properties now owned or hereafter acquired by any of them.

Section 5.04    **Binding Effect**.  This Agreement has been, and each other Loan Document, when delivered hereunder, will have been, duly executed and delivered by each Loan Party that is party thereto.  This Agreement constitutes, and each other Loan Document when so delivered will constitute, a legal, valid and binding obligation of such Loan Party, enforceable against each Loan Party that is party thereto in accordance with its terms.

Section 5.05    **Financial Statements; No Material Adverse Effect; No Internal Control Event**.

(a)    The Audited Financial Statements (i) were prepared in accordance with GAAP consistently applied throughout the period covered thereby, except as otherwise expressly noted therein; (ii) fairly present the financial condition of Parent and its Subsidiaries as of the date thereof and their results of operations for the period covered thereby in accordance with GAAP consistently applied throughout the period covered thereby, except as otherwise expressly noted therein; and (iii) show all material indebtedness and other liabilities, direct or contingent, of Parent and its Subsidiaries as of the date thereof, including liabilities for taxes, material commitments and Indebtedness.

(b)    The unaudited consolidated and consolidating balance sheets of Parent and its Subsidiaries dated October 2006, and the related consolidated and consolidating statements of income or operations, shareholders' equity and cash flows for the 10 Fiscal Months ended on that date (i) were prepared in accordance with GAAP consistently applied throughout the period covered thereby, except as otherwise expressly noted therein, and (ii) fairly present the financial condition of Parent and its Subsidiaries as of the date thereof and their results of operations for the period covered thereby, subject, in the case of clauses (i) and (ii), to the absence of footnotes and to normal year-end audit adjustments.

(c)    Since the date of the Audited Financial Statements, there has been no event or circumstance, either individually or in the aggregate, that has had or could reasonably be expected to have a Material Adverse Effect.

(d)    To the best knowledge of each Borrower, no Internal Control Event exists or has occurred since the date of the Audited Financial Statements that has resulted in

or could reasonably be expected to result in a misstatement in any material respect, in any financial information delivered or to be delivered to the Agent or the Lenders, of (i) covenant compliance calculations provided hereunder or (ii) the assets, liabilities, financial condition or results of operations of Parent and its Subsidiaries on a consolidated basis.

(e)     The consolidated pro forma balance sheet of Parent and its Subsidiaries as at October 2006, and the related consolidated  pro forma statements of income and cash flows of Parent and its Subsidiaries for the 10 Fiscal Months then ended, certified by the chief financial officer or treasurer of Parent, copies of which have been furnished to each Lender, fairly present the consolidated pro forma financial condition of Parent and its Subsidiaries as at such date and the consolidated pro forma results of operations of Parent and its Subsidiaries for the period ended on such date, in each case giving effect to the Transaction, all in accordance with GAAP.

(f)     The consolidated forecasted balance sheet, statements of income and cash flows of Parent and its Subsidiaries delivered pursuant to Section 4.01 or Section 6.01(d) were prepared in good faith on the basis of the assumptions stated therein, which assumptions were fair in light of the conditions existing at the time of delivery of such forecasts, and represented, at the time of delivery, the Borrowers' best estimate of its future financial condition and performance.

**Section 5.06    Litigation.**  There are no actions, suits, proceedings, claims or disputes pending or, to the knowledge of the Loan Parties after due and diligent investigation, threatened or contemplated, at law, in equity, in arbitration or before any Governmental Authority, by or against Parent or any of its Subsidiaries or against any of their properties or revenues that (a) purport to affect or pertain to this Agreement, any other Loan Document, or the consummation of the Transaction, or (b) except as specifically disclosed in Schedule 5.06 (the "Disclosed Litigation"), either individually or in the aggregate, if determined adversely, could reasonably be expected to have a Material Adverse Effect, and there has been no adverse change in the status, or financial effect on any Loan Party or any Subsidiary thereof, of the matters described in Schedule 5.06.

**Section 5.07    No Default.**  Neither any Loan Party nor any Subsidiary thereof is in default under or with respect to, or a party to, any Contractual Obligation that could, either individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.  No Default has occurred and is continuing or would result from the consummation of the transactions contemplated by this Agreement or any other Loan Document.

**Section 5.08    Ownership of Property; Liens; Investments.**

(a)     Each Loan Party and each of its Subsidiaries has good record and marketable title in fee simple to, or valid leasehold interests in, all real property necessary or used in the ordinary conduct of its business, except for such defects in title as could not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

(b)     Schedule 5.08(b) sets forth a complete and accurate list of all Liens on the property or assets of each Loan Party and each of its Subsidiaries, showing as of the date

hereof the lienholder thereof, the principal amount of the obligations secured thereby and the property or assets of such Loan Party or such Subsidiary subject thereto.  The property of each Loan Party and each of its Subsidiaries is subject to no Liens, other than Liens set forth on Schedule 5.08(b), and as otherwise permitted by Section 7.01.

(c)    Schedule 5.08(c) sets forth a complete and accurate list of all real property owned by each Loan Party and each of its Subsidiaries, showing as of the date hereof the street address, county or other relevant jurisdiction, state, record owner and book and estimated fair value thereof.  Each Loan Party and each of its Subsidiaries has good, marketable and insurable fee simple title to the real property owned by such Loan Party or such Subsidiary, free and clear of all Liens, other than Liens created or permitted by the Loan Documents.

(d)    (i)    Schedule 5.08(d)(i) sets forth a complete and accurate list of all leases of real property under which any Loan Party or any Subsidiary of a Loan Party is the lessee, showing as of the date hereof the street address, county or other relevant jurisdiction, state, lessor, lessee, expiration date and annual rental cost thereof.  Each such lease is the legal, valid and binding obligation of the lessor thereof, enforceable in accordance with its terms.

(ii)    Schedule 5.08(d)(ii) sets forth a complete and accurate list of all leases of real property under which any Loan Party or any Subsidiary of a Loan Party is the lessor, showing as of the date hereof the street address, county or other relevant jurisdiction, state, lessor, lessee, expiration date and annual rental cost thereof.  Each such lease is the legal, valid and binding obligation of the lessee thereof, enforceable in accordance with its terms.

(e)    Schedule 5.08(e) sets forth a complete and accurate list of all Investments held by any Loan Party or any Subsidiary of a Loan Party on the date hereof, showing as of the date hereof the amount, obligor or issuer and maturity, if any, thereof.

**Section 5.09    Environmental Compliance**.

(a)    The Loan Parties and their respective Subsidiaries conduct in the ordinary course of business a review of the effect of existing Environmental Laws and claims alleging potential liability or responsibility for violation of any Environmental Law on their respective businesses, operations and properties, and as a result thereof the Borrowers have reasonably concluded that, except as specifically disclosed in Schedule 5.09, such Environmental Laws and claims could not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

(b)    Except as otherwise set forth in Schedule 5.09, none of the properties currently or formerly owned or operated by any Loan Party or any of its Subsidiaries is listed or proposed for listing on the NPL or on the CERCLIS or any analogous foreign, state or local list or is adjacent to any such property; there are no and never have been any underground or above-ground storage tanks or any surface impoundments, septic tanks, pits, sumps or lagoons in which Hazardous Materials are being or have been treated, stored or

disposed on any property currently owned or operated by any Loan Party or any of its Subsidiaries or, to the best of the knowledge of the Loan Parties, on any property formerly owned or operated by any Loan Party or any of its Subsidiaries; there is no asbestos or asbestos-containing material on any property currently owned or operated by any Loan Party or any of its Subsidiaries; and Hazardous Materials have not been released, discharged or disposed of on any property currently or formerly owned or operated by any Loan Party or any of its Subsidiaries.

(c)    Except as otherwise set forth on Schedule 5.09, neither any Loan Party nor any of its Subsidiaries is undertaking, and has not completed, either individually or together with other potentially responsible parties, any investigation or assessment or remedial or response action relating to any actual or threatened release, discharge or disposal of Hazardous Materials at any site, location or operation, either voluntarily or pursuant to the order of any Governmental Authority or the requirements of any Environmental Law; and all Hazardous Materials generated, used, treated, handled or stored at, or transported to or from, any property currently or formerly owned or operated by any Loan Party or any of its Subsidiaries have been disposed of in a manner not reasonably expected to result in material liability to any Loan Party or any of its Subsidiaries.

**Section 5.10  Insurance**.  The properties of Parent and its Subsidiaries are insured with financially sound and reputable insurance companies not Affiliates of any Borrower, in such amounts, with such deductibles and covering such risks as are customarily carried by companies engaged in similar businesses and owning similar properties in localities where the Borrowers or the applicable Subsidiary operates.  Schedule 5.10 sets forth a list of all insurance maintained by each Loan Party on the Closing Date.

**Section 5.11  Taxes**.  Parent and its Subsidiaries have filed all Federal, state and other material tax returns and reports required to be filed, and have paid all Federal, state and other material taxes, assessments, fees and other governmental charges levied or imposed upon them or their properties, income or assets otherwise due and payable, except those which are being contested in good faith by appropriate proceedings diligently conducted and for which adequate reserves have been provided in accordance with GAAP.  There is no proposed tax assessment against the Loan Parties that would, if made, have a Material Adverse Effect.  No Loan Party is party to any tax sharing agreement.

**Section 5.12  ERISA Compliance**.

(a)    Each Plan is in compliance in all material respects with the applicable provisions of ERISA, the Code and other Federal or state Laws.  Each Plan that is intended to qualify under Section 401(a) of the Code has received a favorable determination letter from the IRS or an application for such a letter is currently being processed by the IRS with respect thereto and, to the best knowledge of the Borrowers, nothing has occurred which would prevent, or cause the loss of, such qualification.  The Borrowers and each ERISA Affiliate have made all required contributions to each Plan subject to Section 412 of the Code, and no application for a funding waiver or an extension of any amortization period pursuant to Section 412 of the Code has been made with respect to any Plan.

(b)     There are no pending or, to the best knowledge of the Borrowers, threatened claims, actions or lawsuits, or action by any Governmental Authority, with respect to any Plan that could reasonably be expected to have a Material Adverse Effect.  There has been no prohibited transaction or violation of the fiduciary responsibility rules with respect to any Plan that has resulted or could reasonably be expected to result in a Material Adverse Effect.

(c)     (i) No ERISA Event has occurred or is reasonably expected to occur; (ii) no Pension Plan has any Unfunded Pension Liability; (iii) neither the Borrowers nor any ERISA Affiliate has incurred, or reasonably expects to incur, any liability under Title IV of ERISA with respect to any Pension Plan (other than premiums due and not delinquent under Section 4007 of ERISA); (iv) neither the Borrowers nor any ERISA Affiliate has incurred, or reasonably expects to incur, any liability (and no event has occurred which, with the giving of notice under Section 4219 of ERISA, would result in such liability) under Section 4201 or 4243 of ERISA with respect to a Multiemployer Plan; and (v) neither the Borrowers nor any ERISA Affiliate has engaged in a transaction that could be subject to Section 4069 or 4212(c) of ERISA.

**Section 5.13    Subsidiaries; Equity Interests; Loan Parties**.  No Loan Party has any Subsidiaries other than those specifically disclosed in Part (a) of Schedule 5.13, and all of the outstanding Equity Interests in such Subsidiaries have been validly issued, are fully paid and non-assessable and are owned by a Loan Party in the amounts specified on Part (a) of Schedule 5.13 free and clear of all Liens except those created under the Collateral Documents.  No Loan Party has any equity investments in any other corporation or entity other than those specifically disclosed in Part (b) of Schedule 5.13.  All of the outstanding Equity Interests in the Borrowers have been validly issued, are fully paid and non-assessable and are owned by the Persons and in the amounts specified on Part (c) of Schedule 5.13 free and clear of all Liens except those created under the Collateral Documents.  Set forth on Part (d) of Schedule 5.13 is a complete and accurate list of all Loan Parties, showing as of the Closing Date (as to each Loan Party) the jurisdiction of its incorporation, the address of its principal place of business and its U.S. taxpayer identification number.  The copy of the charter of each Loan Party and each amendment thereto provided pursuant to Section 4.01(a)(ix) is a true and correct copy of each such document, each of which is valid and in full force and effect.

**Section 5.14    Margin Regulations; Investment Company Act; Public Utility Holding Company Act**.

(a)     No Borrower is engaged and will not engage, principally or as one of its important activities, in the business of purchasing or carrying margin stock (within the meaning of Regulation U issued by the FRB), or extending credit for the purpose of purchasing or carrying margin stock.  No part of the proceeds of the Borrowings made hereunder will be used to purchase or carry any such margin stock or to extend credit to others for the purpose of purchasing or carrying any such margin stock or for any purpose that violates the provisions of Regulation T, U or X of the FRB.

(b)     No Borrower, Person Controlling a Borrower, nor any Subsidiary (i) is a "holding company," or a "subsidiary company" of a "holding company," or an "affiliate" of

a "holding company" or of a "subsidiary company" of a "holding company," within the meaning of the Public Utility Holding Company Act of 2005, or (ii) is or is required to be registered as an "investment company" under the Investment Company Act of 1940.

Section 5.15    Disclosure.  Such Borrower has disclosed to the Agent and the Lenders all agreements, instruments and corporate or other restrictions to which it or any of its Subsidiaries or any other Loan Party is subject, and all other matters known to it, that, individually or in the aggregate, could reasonably be expected to result in a Material Adverse Effect.  No report, financial statement, certificate or other information furnished (whether in writing or orally) by or on behalf of any Loan Party to the Agent or any Lender in connection with the transactions contemplated hereby and the negotiation of this Agreement or delivered hereunder or under any other Loan Document (in each case as modified or supplemented by other information so furnished) contains any material misstatement of fact or omits to state any material fact necessary to make the statements therein, in the light of the circumstances under which they were made, not misleading; provided that, with respect to projected financial information, each Borrower represents only that such information was prepared in good faith based upon assumptions believed to be reasonable at the time.

Section 5.16    Compliance with Laws.  Each Loan Party and each Subsidiary thereof is in compliance in all material respects with the requirements of all Laws and all orders, writs, injunctions and decrees applicable to it or to its properties, except in such instances in which (a) such requirement of Law or order, writ, injunction or decree is being contested in good faith by appropriate proceedings diligently conducted or (b) the failure to comply therewith, either individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect.

Section 5.17    Intellectual Property; Licenses, Etc.  Each Loan Party and each of its Subsidiaries own, or possess the right to use, all of the trademarks, service marks, trade names, copyrights, patents, patent rights, franchises, licenses and other intellectual property rights (collectively, "IP Rights") that are reasonably necessary for the operation of their respective businesses, without conflict with the rights of any other Person, and Schedule 5.17 sets forth a complete and accurate list of all such IP Rights owned or used by each Loan Party and each of its Subsidiaries.  To the best knowledge of the Borrowers, no slogan or other advertising device, product, process, method, substance, part or other material now employed, or now contemplated to be employed, by any Loan Party or any of its Subsidiaries infringes upon any rights held by any other Person.  Except as specifically disclosed in Schedule 5.17, no claim or litigation regarding any of the foregoing is pending or, to the best knowledge of the Borrowers, threatened, which, either individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect.

Section 5.18    Solvency.  Each Loan Party is, individually and together with its Subsidiaries on a consolidated basis, Solvent.

Section 5.19    Casualty, Etc.  Neither the businesses nor the properties of any Loan Party or any of its Subsidiaries are affected by any fire, explosion, accident, strike, lockout or other labor dispute, drought, storm, hail, earthquake, embargo, act of God or of the public enemy

or other casualty (whether or not covered by insurance) that, either individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect.

**Section 5.20    Labor Matters**.  There are no collective bargaining agreements or Multiemployer Plans covering the employees of Parent or any of its Subsidiaries as of the Closing Date and neither the Borrowers nor any Subsidiary has suffered any strikes, walkouts, work stoppages or other material labor difficulty within the last five (5) years.

**Section 5.21    Collateral Documents**.  The provisions of the Collateral Documents are effective to create in favor of the Agent for the benefit of the Secured Parties a legal, valid and enforceable first priority Lien (subject to Liens permitted by Section 7.01) on all right, title and interest of the respective Loan Parties in the Collateral described therein.  Except for filings completed prior to the Closing Date and as contemplated hereby and by the Collateral Documents, no filing or other action will be necessary to perfect or protect such Liens.

**Section 5.22    Deposit Accounts, Securities Accounts**.  Schedule 5.22(a) provides a true and accurate list of all deposit accounts maintained by Loan Parties, including with respect to each such account (a) the name and address of the applicable depositary bank and (b) the account number of such account.  Schedule 5.22(b) provides a true and accurate list of all securities accounts maintained by Loan Parties, including with respect to each such account (a) the name and address of the applicable securities intermediary and (b) the account number of such account.

**Section 5.23    Anti-Terrorism Laws**.  Each Loan Party is in compliance, in all material respects, with the Anti-Terrorism Laws.  No part of the proceeds of the Borrowings will be used, directly or indirectly, for any payments to any governmental official or employee, political party, official of a political party, candidate for political office, or anyone else acting in an official capacity in violation of the United States Foreign Corrupt Practices Act of 1977, as amended.

**Section 5.24    Broker's, Finder's or Similar Fees**.  Other than the fees payable under the Fee Letter, there are no brokerage commissions, finder's fees or similar fees or commissions payable in connection with the transactions contemplated hereby based on any agreement, arrangement or understanding with any Loan Party or any action taken by Loan Party.

**Section 5.25    Collateral**.

(a)    Each Loan Party has good and indefeasible title to, or a valid leasehold interest in, its personal property assets, free and clear of Liens except to the extent expressly permitted hereunder.

(b)    With respect to Loan Parties' Eligible Receivables, except as specifically disclosed in the most recent Borrowing Base Certificate delivered to the Agent (i) they represent bona fide sales of Inventory or rendering of services to account debtors in the ordinary course of Loan Parties' business and are not evidenced by a judgment, instrument or chattel paper; (ii) there are no setoffs, claims or disputes existing or asserted with respect thereto and no Loan Party has made any agreement with any account debtor for any extension of time for the payment thereof, any compromise or settlement for less than the full amount thereof, any release of any account debtor from liability therefor, or any

deduction therefrom except a discount or allowance allowed by such Loan Party in the ordinary course of its business for prompt payment and disclosed to the Agent; and (iii) such Receivables are not excluded as ineligible by virtue of one or more of the excluding criteria set forth in the definition of Eligible Receivables.

       (c)    With respect to Loan Parties' Eligible Inventory, except as specifically disclosed in the most recent Borrowing Base Certificate delivered to the Agent, such Inventory is (i) of good and merchantable quality, free from known defects, and (ii) not excluded as ineligible by virtue of one or more of the excluding criteria set forth in the definition of Eligible Inventory.

       (d)    All tangible items of Collateral, are kept by Loan Parties at (or are in transit between) one or more of the business locations set forth on Schedule 5.08(c) or 5.8(d)(i) hereto.

## ARTICLE VI.
## AFFIRMATIVE COVENANTS

So long as any Lender shall have any Commitment hereunder, any Loan or other Obligation hereunder shall remain unpaid or unsatisfied, each of Parent and the Borrowers shall, and shall (except in the case of the covenants set forth in Sections 6.01, 6.02, 6.03 and 6.11) cause each Subsidiary to:

**Section 6.01  Financial Statements**. Deliver to the Agent and each Lender, in form and detail satisfactory to the Agent and the Required Lenders:

       (a)    as soon as available, but in any event within one hundred fifty (150) days after the end of each Fiscal Year of Parent (commencing with the Fiscal Year ended December 2006), a consolidated and consolidating balance sheet of Parent and its Subsidiaries as at the end of such Fiscal Year, and the related consolidated and consolidating statements of income or operations, shareholders' equity and cash flows for such Fiscal Year, setting forth in each case in comparative form the figures for the previous Fiscal Year, all in reasonable detail and prepared in accordance with GAAP, such consolidated statements to be audited and accompanied by a report and opinion of an independent accounting firm of nationally recognized standing reasonably acceptable to the Required Lenders, which report and opinion shall be prepared in accordance with generally accepted auditing standards and applicable Securities Laws and shall not be subject to any "going concern" or like qualification or exception or any qualification or exception as to the scope of such audit or with respect to the absence of any material misstatement, and such consolidating statements to be certified by the chief executive officer, chief financial officer, treasurer or chief operating officer of Parent to the effect that such statements are fairly stated in all material respects when considered in relation to the consolidated financial statements of Parent and its Subsidiaries;

       (b)    as soon as available, but in any event within forty-five (45) days after the end of each of the first three (3) Fiscal Quarters of each Fiscal Year of Parent

(commencing with the Fiscal Quarter ended December 2006), a consolidated and consolidating balance sheet of Parent and its Subsidiaries as at the end of such Fiscal Quarter, and the related consolidated and consolidating statements of income or operations, shareholders' equity and cash flows for such Fiscal Quarter and for the portion of Parent's Fiscal Year then ended, setting forth in each case in comparative form (i) the figures for the corresponding Fiscal Quarter of the previous Fiscal Year, (ii) the corresponding portion of the previous Fiscal Year and (iii) the figures from the annual business plan delivered in accordance with Section 6.01(d), all in reasonable detail, such consolidated statements to be certified by the chief executive officer, chief financial officer, treasurer or chief operating officer of Parent as fairly presenting the financial condition, results of operations, shareholders' equity and cash flows of Parent and its Subsidiaries in accordance with GAAP, subject only to normal year-end audit adjustments and the absence of footnotes and such consolidating statements to be certified by the chief executive officer, chief financial officer, treasurer or chief operating officer of Parent to the effect that such statements are fairly stated in all material respects when considered in relation to the consolidated financial statements of Parent and its Subsidiaries;

(c)    as soon as available, but in any event within thirty (30) days after the end of each Fiscal Month of each Fiscal Year of Parent (commencing with the Fiscal Month ended December 2006), a consolidated and consolidating balance sheet of Parent and its Subsidiaries as of the end of such Fiscal Month, and the related consolidated and consolidating statements of income or operations, shareholders' equity and cash flows for such Fiscal Month and for the portion of Parent's Fiscal Year than ended setting forth in each case in comparative form (i) for the corresponding Fiscal Month of the previous Fiscal Year, (ii) the corresponding portion of the previous Fiscal Year and (iii) the figures from the annual business plan delivered in accordance with Section 6.01(d), all in reasonable detail and duly certified by the chief executive officer, chief financial officer, treasurer or chief operating officer of Parent; and

(d)    as soon as available, but in any event at least thirty (30) days before the end of each Fiscal Year of Parent, an annual business plan and budget of Parent and its Subsidiaries on a consolidated basis, including forecasts prepared by management of the Borrowers, in form satisfactory to the Agent and the Required Lenders, of consolidated balance sheets and statements of income or operations and cash flows of Parent and its Subsidiaries on a (i) monthly basis for the immediately following Fiscal Year and (ii) annual basis for the three (3) Fiscal Years thereafter; and

(e)    [Intentionally omitted];

(f)    as soon as available, but in any event within forty-five (45) days after the end of each Fiscal Quarter of each Fiscal Year of Parent, a certificate from the chief financial officer, treasurer or chief operating officer certifying that all taxes are paid and are current; and

(g)    as soon as available, but in any event within one hundred twenty (120) days after the end of each fiscal year of the members of the ABC Export Group (commencing with the fiscal year ended March 31, 2007),  consolidated and consolidating balance sheets of

each member of the ABC Export Group and their respective Subsidiaries as at the end of such fiscal year, and the related consolidated and consolidating statements of income or operations, shareholders' equity and cash flows for such fiscal year, setting forth in each case in comparative form the figures for the previous fiscal year, all in reasonable detail and prepared in accordance with GAAP, such consolidated statements to be audited and accompanied by a report and opinion of an independent accounting firm reasonably acceptable to the Agent, which report and opinion shall be prepared in accordance with generally accepted auditing standards and shall not be subject to any "going concern" or like qualification or exception or any qualification or exception as to the scope of such audit or with respect to the absence of any material misstatement.

As to any information contained in materials furnished pursuant to Section 6.02(d), the Loan Parties shall not be separately required to furnish such information under Section 6.01(a) or (b) above, but the foregoing shall not be in derogation of the obligation of the Loan Parties to furnish the information and materials described in Sections 6.01(a) and (b) above at the times specified therein.

      **Section 6.02    Certificates; Other Information.**  Deliver to the Agent and each Lender, in form and detail satisfactory to the Agent and the Required Lenders:

      (a)    concurrently with the delivery of the financial statements referred to in Section 6.01(a) (commencing with the delivery of the financial statements for the Fiscal Year ended December 2006, a certificate of its independent certified public accountants certifying such financial statements and stating that in making the examination necessary therefor no knowledge was obtained of any Default or, if any such Default shall exist, stating the nature and status of such event;

      (b)    concurrently with the delivery of the financial statements referred to in Sections 6.01(a), (b) and (c) (commencing with the delivery of the financial statements for the Fiscal Month ended December 2006, a duly completed Compliance Certificate signed by the chief executive officer, chief financial officer, treasurer or chief operating officer of Parent;

      (c)    promptly after any request by the Agent or any Lender, copies of any detailed audit reports, management letters or recommendations submitted to the board of directors (or the audit committee of the board of directors) of any Loan Party by independent accountants in connection with the accounts or books of any Loan Party or any of its Subsidiaries, or any audit of any of them;

      (d)    promptly after the same are available, copies of each annual report, proxy or financial statement or other report or communication sent to the stockholders of the Borrowers, and copies of all annual, regular, periodic and special reports and registration statements which the Borrowers may file or be required to file with the SEC under Section 13 or 15(d) of the Securities Exchange Act of 1934, or with any national securities exchange, and in any case not otherwise required to be delivered to the Agent pursuant hereto;

(e)    promptly after the furnishing thereof, copies of any statement or report furnished to any holder of debt securities of any Loan Party or of any of its Subsidiaries pursuant to the terms of any indenture, loan or credit or similar agreement and not otherwise required to be furnished to the Lenders pursuant to Section 6.01 or any other clause of this Section 6.02;

(f)    as soon as available, but in any event within thirty (30) days after the end of each Fiscal Year of Parent, a report summarizing the insurance coverage (specifying type, amount and carrier) in effect for each Loan Party and its Subsidiaries and containing such additional information as the Agent, or any Lender through the Agent, may reasonably specify;

(g)    promptly, and in any event within five (5) Business Days after receipt thereof by any Loan Party or any Subsidiary thereof, copies of each notice or other correspondence received from the SEC (or comparable agency in any applicable non-U.S. jurisdiction) concerning any investigation or possible investigation or other inquiry by such agency regarding financial or other operational results of any Loan Party or any Subsidiary thereof;

(h)    not later than five (5) Business Days after receipt thereof by any Loan Party or any Subsidiary thereof, copies of all notices, requests and other documents (including amendments, waivers and other modifications) so received under or pursuant to any instrument, indenture, loan or credit or similar agreement and, from time to time upon request by the Agent, such information and reports regarding such instruments, indentures and loan and credit and similar agreements as the Agent may reasonably request;

(i)    promptly after the assertion or occurrence thereof, notice of any action or proceeding against or of any noncompliance by any Loan Party or any of its Subsidiaries with any Environmental Law or Environmental Permit that could (i) reasonably be expected to have a Material Adverse Effect or (ii) cause any property described in any Mortgages to be subject to any restrictions on ownership, occupancy, use or transferability under any Environmental Law;

(j)    as soon as available, but in any event within thirty (30) days after the end of each Fiscal Year of Parent, (i) a report supplementing Schedules 5.08(c), 5.08(d)(i) and 5.08(d)(ii), including an identification of all owned and leased real property disposed of by any Loan Party or any Subsidiary thereof during such Fiscal Year, a list and description (including the street address, county or other relevant jurisdiction, state, record owner, book value thereof and, in the case of leases of property, lessor, lessee, expiration date and annual rental cost thereof) of all real property acquired or leased during such Fiscal Year and a description of such other changes in the information included in such Schedules as may be necessary for such Schedules to be accurate and complete; (ii) a report supplementing Schedule 5.17, setting forth (A) a list of registration numbers for all patents, trademarks, service marks, trade names and copyrights awarded to any Loan Party or any Subsidiary thereof during such Fiscal Year and (B) a list of all patent applications, trademark applications, service mark applications, trade name applications and copyright applications submitted by any Loan Party or any Subsidiary thereof during such Fiscal Year and the status

of each such application; and (iii) a report supplementing Schedules 5.08(e) and 5.13 containing a description of all changes in the information included in such Schedules as may be necessary for such Schedules to be accurate and complete, each such report to be signed by a Responsible Officer of Parent and to be in a form reasonably satisfactory to the Agent; provided that no such supplement to any such Schedules or representation shall be deemed a waiver of any Default resulting from the matters disclosed therein, except as consented to by the Required Lenders in writing;

(k)    no later than fifteen (15) Business Days after the end of each Fiscal Month, a Borrowing Base Certificate, as at the end of such Fiscal Month, duly certified by the chief executive officer, chief financial officer, treasurer or chief operating officer of Parent, together with back-up documentation in form and substance reasonably satisfactory to the Agent;

(l)    concurrently with the delivery of the financial statements referred to in Section 6.01(c), a detailed report regarding Loan Parties' cash and Cash Equivalents, together with back-up documentation in the form of bank statements;

(m)    concurrently with the delivery of the financial statements referred to in Section 6.01(c), a detailed perpetual inventory report, together with back-up documentation in form and substance satisfactory to the Agent, including a reconciliation to (i) the general ledger accounts and financial statements and (ii) the Borrowing Base Certificate as of the end of such Fiscal Month;

(n)    no later than fifteen (15) Business Days after the end of each Fiscal Month (or on such other periodic basis as the Agent shall otherwise request), a sales and collections report for the preceding period, in form satisfactory to the Agent, which shall include, without limitation, a schedule of all open orders and returns;

(o)    no later than three (3) Business Days after the last day of each Fiscal Week, (i) a Receivables and Inventory roll-forward report from the preceding period, together with an updated Borrowing Base Certificate giving effect to the roll-forward of Receivables and Inventory, and (ii) a schedule of required payments of drafts with respect to purchased Inventory, each in form satisfactory to the Agent;

(p)    concurrently with the delivery of the financial statements referred to in Section 6.01(c) (or at such more frequent intervals as the Agent may request), a detailed aged trial balance of all Receivables existing as of the last day of the preceding Fiscal Month, specifying the names, addresses, face value, dates of invoices and due dates for each account debtor obligated on a Receivable so listed ("Schedule of Receivables"), together with (i) a reconciliation of the Schedule of Receivables submitted the prior Fiscal Month (in particular noting if Borrowers have granted any discounts, allowances or credits that are not shown on the face of the invoice for any Receivables that were scheduled in the prior Fiscal Month's Schedule of Receivables), (ii) a reconciliation of the Schedule of Receivables to (A) the general ledger accounts and financial statements for such Fiscal Month and (B) the Borrowing Base Certificate as of the end of such Fiscal Month and (iii) a Receivables roll-

forward report from the preceding Fiscal Month, in each case in form satisfactory to the Agent;

(q)    concurrently with the delivery of the financial statements referred to in Section 6.01(c) (or at such more frequent intervals as the Agent may request), (i) an accounts payable aging, specifying the names, amounts owed and due dates for each account payable of Borrowers as listed, together with a reconciliation to the general ledger accounts and financial statements for such Fiscal Month, and (ii) a detail listing of all accrued expenses, together with a reconciliation to the general ledger accounts and financial statements for such Fiscal Month;

(r)    no later than fifteen (15) Business Days after the end of each Fiscal Month, a detailed report as to value and amounts of Inventory by location and category (including (i) Inventory at any leased location or held by warehouse operators, processors or other bailees and (ii) Inventory in-transit);

(s)    no later than fifteen (15) Business Days after the end of each Fiscal Month of Borrowers (or more frequently as the Agent may request), an inventory report, including (i) a reconciliation to weekly inventory reports, (ii) a schedule of returns of any Inventory of Borrowers in the prior Fiscal Month to suppliers and vendors thereof, or any other Person, whether for cash, credit against future purchases or then existing payables, or otherwise;

(t)    not later than the 30 days after the close of any applicable annual period in which any inventory audits were conducted, a report based on each such physical inventory together with such supporting information as the Agent shall request;

(u)    upon the Agent's request therefor, (i) copies of proof of delivery or rendition of services and the original copy of all documents, including repayment histories and present status reports relating to the Receivables listed on any Schedule of Receivables and such other matters and information relating to the status of then existing Receivables as the Agent shall reasonably request; and (ii) and such reports in respect of Inventory in form and detail satisfactory to the Agent at such times as the Agent or may request; and

(v)    promptly, such additional information regarding the business, financial, legal or corporate affairs of any Loan Party or any Subsidiary thereof, or compliance with the terms of the Loan Documents, as the Agent or any Lender may from time to time reasonably request.

Documents required to be delivered pursuant to Section 6.01(a) or (b) or Section 6.02(d) (to the extent any such documents are included in materials otherwise filed with the SEC) may be delivered electronically and if so delivered, shall be deemed to have been delivered on the date (i) on which the Borrowers post such documents, or provides a link thereto on the Borrower's website on the Internet at the website address listed on Schedule 10.02; or (ii) on which such documents are posted on the Borrower's behalf on an Internet or intranet website, if any, to which each Lender and the Agent have access (whether a commercial, third-party website or whether sponsored by the Agent); provided that: (i) the Borrowers shall deliver paper copies

of such documents to the Agent or any Lender that requests the Borrowers to deliver such paper copies until a written request to cease delivering paper copies is given by the Agent or such Lender and (ii) the Borrowers shall notify the Agent and each Lender (by telecopier or electronic mail) of the posting of any such documents and provide to the Agent by electronic mail electronic versions (i.e., soft copies) of such documents.  Notwithstanding anything contained herein, in every instance the Borrowers shall be required to provide paper copies of the Compliance Certificates required by Section 6.02(b) to the Agent.  Except for such Compliance Certificates, the Agent shall have no obligation to request the delivery or to maintain copies of the documents referred to above, and in any event shall have no responsibility to monitor compliance by the Borrowers with any such request for delivery, and each Lender shall be solely responsible for requesting delivery to it or maintaining its copies of such documents.

The Borrowers hereby acknowledge that the Agent may make available to the Lenders, materials and/or information provided by or on behalf of the Borrowers hereunder (collectively, "Borrower Materials") by posting the Borrower Materials on Syndrak or another similar electronic system (the "Platform").

Section 6.03   Notices.  Promptly notify the Agent and each Lender:

(a)     of the occurrence of any Default;

(b)     of any matter that has resulted or could reasonably be expected to result in a Material Adverse Effect, including (i) breach or non-performance of, or any default under, a Contractual Obligation of any Loan Party or any Subsidiary thereof; (ii) any dispute, litigation, investigation, proceeding or suspension between any Loan Party or any Subsidiary thereof and any Governmental Authority; or (iii) the commencement of, or any material development in, any litigation or proceeding affecting any Loan Party or any Subsidiary thereof, including pursuant to any applicable Environmental Laws;

(c)     of the occurrence of any ERISA Event;

(d)     of any material change in accounting policies or financial reporting practices by any Loan Party or any Subsidiary thereof;

(e)     of the determination by Parent's independent accounting firm providing the opinion required under Section 6.01(a)(ii) (in connection with its preparation of such opinion) or Parent's determination at any time of the occurrence or existence of any Internal Control Event; and

(f)     of the (i) occurrence of any Disposition of property or assets for which the Borrowers are required to make a mandatory prepayment pursuant to Section 2.04(b)(i), (ii) occurrence of any sale of capital stock or other Equity Interests for which the Borrowers are required to make a mandatory prepayment pursuant to Section 2.04(b)(ii), (iii) incurrence or issuance of any Indebtedness for which the Borrowers are required to make a mandatory prepayment pursuant to Section 2.04(b)(iii), and (iv) receipt of any Extraordinary Receipt for which the Borrowers are required to make a mandatory prepayment pursuant to Section 2.04(b)(iv).

Each notice pursuant to this <u>Section 6.03</u> (other than <u>Section 6.03(f)</u>) shall be accompanied by a statement of a Responsible Officer of Parent setting forth details of the occurrence referred to therein and stating what action the Borrowers have taken and propose to take with respect thereto.  Each notice pursuant to <u>Section 6.03(a)</u> shall describe with particularity any and all provisions of this Agreement and any other Loan Document that have been breached.

**Section 6.04    Payment of Obligations**.  Pay and discharge as the same shall become due and payable, all its obligations and liabilities, including (a) all tax liabilities, assessments and governmental charges or levies upon it or its properties or assets, unless the same are being contested in good faith by appropriate proceedings diligently conducted and adequate reserves in accordance with GAAP are being maintained by the Borrowers or such Subsidiary; (b) all lawful claims which, if unpaid, would by law become a Lien upon its property; and (c) all Indebtedness, as and when due and payable, but subject to any subordination provisions contained in any instrument or agreement evidencing such Indebtedness.

**Section 6.05    Preservation of Existence, Etc.** (a)  Preserve, renew and maintain in full force and effect its legal existence and good standing under the Laws of the jurisdiction of its organization except in a transaction permitted by <u>Section 7.04</u> or <u>7.05</u>; (b) take all reasonable action to maintain all rights, privileges, permits, licenses and franchises necessary or desirable in the normal conduct of its business, except to the extent that failure to do so could not reasonably be expected to have a Material Adverse Effect; and (c) preserve or renew all of its registered patents, trademarks, trade names and service marks, the non-preservation of which could reasonably be expected to have a Material Adverse Effect.

**Section 6.06    Maintenance of Properties.** (a) Maintain, preserve and protect all of its material properties and equipment necessary in the operation of its business in good working order and condition, ordinary wear and tear excepted; (b) make all necessary repairs thereto and renewals and replacements thereof except where the failure to do so could not reasonably be expected to have a Material Adverse Effect; and (c) use the standard of care typical in the industry in the operation and maintenance of its facilities.

**Section 6.07    Maintenance of Insurance**.  Maintain, with financially sound and reputable insurance companies not Affiliates of any Borrower, insurance with respect to its properties and business against loss or damage of the kinds customarily insured against by Persons engaged in the same or similar business, of such types and in such amounts as are customarily carried under similar circumstances by such other Persons and providing for not less than thirty (30) days' prior notice to the Agent of termination, lapse or cancellation of such insurance.

**Section 6.08    Compliance with Laws**.  Comply in all material respects with the requirements of all Laws and all orders, writs, injunctions and decrees applicable to it or to its business or property, except in such instances in which (a) such requirement of Law or order, writ, injunction or decree is being contested in good faith by appropriate proceedings diligently conducted; or (b) the failure to comply therewith could not reasonably be expected to have a Material Adverse Effect.

**Section 6.09    Books and Records**. (a) Maintain proper books of record and account, in which full, true and correct entries in conformity with GAAP consistently applied shall be made of all financial transactions and matters involving the assets and business of the Borrowers or such Subsidiary, as the case may be; and (b) maintain such books of record and account in material conformity with all applicable requirements of any Governmental Authority having regulatory jurisdiction over the Borrowers or such Subsidiary, as the case may be.

**Section 6.10    Inspection Rights**. Permit representatives and independent contractors of the Agent and each Lender to visit and inspect any of its properties, to examine and audit its corporate, financial and operating records, and make copies thereof or abstracts therefrom, to conduct inspections and/or field examinations of any Loan Party and valuations or appraisals of any or all of the Collateral and/or business or enterprise valuations of the Loan Parties from time to time and to discuss its affairs, finances and accounts with its directors, officers, and independent public accountants, all at the expense of the Borrowers and at such reasonable times during normal business hours and as often as may be reasonably desired, upon reasonable advance notice to the Borrowers; provided, however, that when an Event of Default exists the Agent or any Lender (or any of their respective representatives or independent contractors) may do any of the foregoing at the expense of the Borrowers at any time and without advance notice. Without limiting the generality of the foregoing, the Agent shall require (i) field exams to be completed on a quarterly basis (i.e., 90 day cycle), (ii) quarterly inventory appraisals by an independent appraiser engaged by the Agent and (iii) Parent to provide at least 10 Business Days prior notice regarding any annual Inventory test counts conducted in connection with the audit of Parent's financial statements required to be delivered under Section 6.01(a), and the Agent shall be permitted to observe any such Inventory test counts.

**Section 6.11    Use of Proceeds**. Use the proceeds of the Borrowings for general corporate purposes not in contravention of any Law or of any Loan Document.

**Section 6.12    Covenant to Guarantee Obligations and Give Security**.

(a)    Upon the formation or acquisition of any new direct or indirect Subsidiary by any Loan Party or upon any Immaterial Subsidiary becoming a Material Subsidiary, then the Borrowers shall, at the Borrowers' expense, within ten (10) days after such formation or acquisition:

(i)    cause such Material Subsidiary, and cause each direct and indirect parent of such Material Subsidiary (if it has not already done so), to duly execute and deliver to the Agent a joinder to this Agreement or a guaranty or guaranty supplement, in form and substance satisfactory to the Agent, guaranteeing the other Loan Parties' obligations under the Loan Documents,

(ii)    furnish to the Agent a description of the real and personal properties of such Subsidiary, in detail satisfactory to the Agent,

(iii)    cause such Subsidiary and each direct and indirect parent of such Subsidiary (if it has not already done so) to duly execute and deliver to the Agent a pledge agreement, in form and substance satisfactory to the Agent, with

respect to 100% of the Equity Interests in and of such Subsidiary, together with such other instruments and documents reasonably requested by the Agent, securing payment of all the Obligations of such Subsidiary or such parent, as the case may be, under the Loan Documents and constituting Liens on such Equity Interest,

        (iv)     cause such Material Subsidiary and each direct and indirect parent of such Material Subsidiary (if it has not already done so) to duly execute and deliver to the Agent deeds of trust, trust deeds, deeds to secure debt, mortgages, leasehold mortgages, leasehold deeds of trust, Security Agreement Supplements, supplements to the IP Security Agreements, and other security and pledge agreements, as specified by and in form and substance satisfactory to the Agent, securing payment of all the Obligations of such Material Subsidiary or such parent, as the case may be, under the Loan Documents and constituting Liens on all such real and personal properties,

        (v)     cause such Subsidiary and each direct and indirect parent of such Subsidiary (if it has not already done so) to take whatever action (including the recording of mortgages, the filing of Uniform Commercial Code financing statements, the giving of notices and the endorsement of notices on title documents) may be necessary or advisable in the opinion of the Agent to vest in the Agent (or in any representative of the Agent designated by it) valid and subsisting Liens on the properties purported to be subject to the deeds of trust, trust deeds, deeds to secure debt, mortgages, leasehold mortgages, leasehold deeds of trust, Security Agreement Supplements, supplements to the IP Security Agreements and the Pledge Agreement and security and pledge agreements delivered pursuant to this Section 6.12, enforceable against all third parties in accordance with their terms,

        (vi)     deliver to the Agent, upon the request of the Agent in its sole discretion, a signed copy of a favorable opinion, addressed to the Agent and the other Secured Parties, of counsel for the Loan Parties acceptable to the Agent, and

        (vii)     deliver, if requested by the Agent in its sole discretion, to the Agent with respect to each parcel of real property owned or held by the entity that is the subject of such formation or acquisition title reports, surveys and engineering, soils and other reports, and environmental assessment reports, each in scope, form and substance satisfactory to the Agent, provided, however, that to the extent that any Loan Party or any of its Subsidiaries shall have otherwise received any of the foregoing items with respect to such real property, such items shall, promptly after the receipt thereof, be delivered to the Agent,

        (b)     Upon the acquisition of any property by any Loan Party, if such property, in the judgment of the Agent, shall not already be subject to a perfected first priority security interest in favor of the Agent for the benefit of the Secured Parties, then the Borrowers shall, at the Borrowers' expense, within ten (10) days after such acquisition:

(i)      furnish to the Agent a description of the property so acquired in detail satisfactory to the Agent,

(ii)      cause the applicable Loan Party to duly execute and deliver to the Agent deeds of trust, trust deeds, deeds to secure debt, mortgages, leasehold mortgages, leasehold deeds of trust, Security Agreement Supplements, Supplements to the IP Security Agreements and the Pledge Agreement and other security and pledge agreements, as specified by and in form and substance satisfactory to the Agent, securing payment of all the Obligations of the applicable Loan Party under the Loan Documents and constituting Liens on all such properties,

(iii)      cause the applicable Loan Party to take whatever action (including the recording of mortgages, the filing of Uniform Commercial Code financing statements, the giving of notices and the endorsement of notices on title documents) that may be necessary or advisable in the opinion of the Agent to vest in the Agent (or in any representative of the Agent designated by it) valid and subsisting Liens on such property, enforceable against all third parties,

(iv)      deliver to the Agent, upon the request of the Agent in its sole discretion, a signed copy of a favorable opinion, addressed to the Agent and the other Secured Parties, of counsel for the Loan Parties acceptable to the Agent as to the matters contained in clauses (ii) and (iii) above and as to such other matters as the Agent may reasonably request, and

(v)      deliver, if requested by the Agent in its sole discretion, to the Agent with respect to such property, if such property is real property, title reports, surveys and engineering, soils and other reports, and environmental assessment reports, each in scope, form and substance satisfactory to the Agent, provided, however, that to the extent that any Loan Party or any of its Subsidiaries shall have otherwise received any of the foregoing items with respect to such real property, such items shall, promptly after the receipt thereof, be delivered to the Agent,

(c)      Upon the request of the Agent following the occurrence and during the continuance of a Default, the Borrowers shall, at the Borrowers' expense, within ten (10) days after such request:

(i)      furnish to the Agent a description of the real and personal properties of the Loan Parties and their respective Subsidiaries in detail satisfactory to the Agent,

(ii)      duly execute and deliver, and cause each Loan Party (if it has not already done so) to duly execute and deliver, to the Agent deeds of trust, trust deeds, deeds to secure debt, mortgages, leasehold mortgages, leasehold deeds of trust, Security Agreement Supplements, supplements to the IP Security Agreements and the Pledge Agreement and other security and pledge agreements,

as specified by and in form and substance satisfactory to the Agent (including delivery of all Equity Interests, all Negotiable Collateral or other possessory Collateral, and such other documents and instruments reasonably requested by the Agent), securing payment of all the Obligations of the applicable Loan Party under the Loan Documents and constituting Liens on all such properties,

        (iii)    take, and cause each Loan Party to take, whatever action (including the recording of mortgages, the filing of Uniform Commercial Code financing statements, the giving of notices and the endorsement of notices on title documents) may be necessary or advisable in the opinion of the Agent to vest in the Agent (or in any representative of the Agent designated by it) valid and subsisting Liens on the properties purported to be subject to the deeds of trust, trust deeds, deeds to secure debt, mortgages, leasehold mortgages, leasehold deeds of trust, Security Agreement Supplements, supplements to the IP Security Agreements and the Pledge Agreement and security and pledge agreements delivered pursuant to this Section 6.12, enforceable against all third parties in accordance with their terms,

        (iv)    deliver to the Agent, if requested by the Agent in its sole discretion, a signed copy of a favorable opinion, addressed to the Agent and the other Secured Parties, of counsel for the Loan Parties acceptable to the Agent, and

        (v)    deliver, if requested by the Agent in its sole discretion, to the Agent with respect to each parcel of real property owned or held by Parent and its Subsidiaries, title reports, surveys and engineering, soils and other reports, and environmental assessment reports, each in scope, form and substance satisfactory to the Agent, provided, however, that to the extent that any Loan Party or any of its Subsidiaries shall have otherwise received any of the foregoing items with respect to such real property, such items shall, promptly after the receipt thereof, be delivered to the Agent.

        (d)    At any time upon request of the Agent, promptly execute and deliver any and all further instruments and documents and take all such other action as the Agent may deem necessary or desirable in obtaining the full benefits of, or (as applicable) in perfecting and preserving the Liens of, such guaranties, deeds of trust, trust deeds, deeds to secure debt, mortgages, leasehold mortgages, leasehold deeds of trust, Security Agreement Supplements, supplements to the IP Security Agreements and the Pledge Agreement, and other security and pledge agreements.

        **Section 6.13  Compliance with Environmental Laws**.  Comply, and cause all lessees and other Persons operating or occupying its properties to comply, in all material respects, with all applicable Environmental Laws and Environmental Permits; obtain and renew all Environmental Permits necessary for its operations and properties; and conduct any investigation, study, sampling and testing, and undertake any cleanup, removal, remedial or other action necessary to remove and clean up all Hazardous Materials from any of its properties, in accordance with the requirements of all Environmental Laws; provided, however, that neither the Borrowers nor any of their Subsidiaries shall be required to undertake any such cleanup,

removal, remedial or other action to the extent that its obligation to do so is being contested in good faith and by proper proceedings and appropriate reserves are being maintained with respect to such circumstances in accordance with GAAP.

**Section 6.14    Preparation of Environmental Reports**.  At the request of the Required Lenders from time to time, provide to the Lenders within sixty (60) days after such request, at the expense of the Borrowers, an environmental site assessment report for any of its properties described in such request, prepared by an environmental consulting firm acceptable to the Agent, indicating the presence or absence of Hazardous Materials and the estimated cost of any compliance, removal or remedial action in connection with any Hazardous Materials on such properties; without limiting the generality of the foregoing, if the Agent determines at any time that a material risk exists that any such report will not be provided within the time referred to above, the Agent may retain an environmental consulting firm to prepare such report at the expense of the Borrowers, and each Borrower hereby grants and agrees to cause any Subsidiary that owns any property described in such request to grant at the time of such request to the Agent, the Lenders, such firm and any agents or representatives thereof an irrevocable non-exclusive license, subject to the rights of tenants, to enter onto their respective properties to undertake such an assessment.

**Section 6.15    Further Assurances**.  Promptly upon request by the Agent, or any Lender through the Agent, (a) correct any material defect or error that may be discovered in any Loan Document or in the execution, acknowledgment, filing or recordation thereof, and (b) do, execute, acknowledge, deliver, record, re-record, file, re-file, register and re-register any and all such further acts, deeds, certificates, assurances and other instruments as the Agent, or any Lender through the Agent, may reasonably require from time to time in order to (i) carry out more effectively the purposes of the Loan Documents, (ii) to the fullest extent permitted by applicable Law, subject any Loan Party's or any of its Subsidiaries' properties, assets, rights or interests to the Liens now or hereafter intended to be covered by any of the Collateral Documents, (iii) perfect and maintain the validity, effectiveness and priority of any of the Collateral Documents and any of the Liens intended to be created thereunder and (iv) assure, convey, grant, assign, transfer, preserve, protect and confirm more effectively unto the Secured Parties the rights granted or now or hereafter intended to be granted to the Secured Parties under any Loan Document or under any other instrument executed in connection with any Loan Document to which any Loan Party or any of its Subsidiaries is or is to be a party, and cause each of its Subsidiaries to do so.

**Section 6.16    Compliance with Terms of Leaseholds**.  Make all payments and otherwise perform all obligations in respect of all leases of real property to which Parent or any of its Subsidiaries is a party, keep such leases in full force and effect and not allow such leases to lapse or be terminated or any rights to renew such leases to be forfeited or cancelled, notify the Agent of any default by any party with respect to such leases and cooperate with the Agent in all respects to cure any such default, and cause each of its Subsidiaries to do so, except, in any case, where the failure to do so, either individually or in the aggregate, could not be reasonably likely to have a Material Adverse Effect.

**Section 6.17    Intentionally Omitted**.

Section 6.18    **Lien Searches**.  Promptly following receipt of the acknowledgment copy of any financing statements filed under the Uniform Commercial Code in any jurisdiction by or on behalf of the Secured Parties, deliver to the Agent completed requests for information listing such financing statement and all other effective financing statements filed in such jurisdiction that name any Loan Party as debtor, together with copies of such other financing statements.

Section 6.19    **Material Contracts**.  Perform and observe all the terms and provisions of each Material Contract to be performed or observed by it, maintain each such Material Contract in full force and effect, enforce each such Material Contract in accordance with its terms, take all such action to such end as may be from time to time requested by the Agent and, upon request of the Agent, make to each other party to each such Material Contract such demands and requests for information and reports or for action as any Loan Party or any of its Subsidiaries is entitled to make under such Material Contract, and cause each of its Subsidiaries to do so, except, in any case where the failure to do so, either individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect.

Section 6.20    **Deposit Accounts; Control Agreements**.

(a)    Deposit Accounts.  Each Loan Party shall (i) cause all Collections received by such Loan Party to be deposited promptly (and in any event within one (1) Business Day after receipt) into a deposit account maintained with a depositary bank reasonably satisfactory to the Agent and (ii) to the extent that Loan Parties maintain more than two (2) deposit accounts, cause all such Collections to be swept, no later than the second Business Day after receipt thereof, into Loan Parties' main deposit account as identified as such on Schedule 5.22(a).

(b)    Account Control Agreements.  For each such deposit account that any Loan Party at any time maintains, such Loan Party shall cause each such depositary bank to enter into an agreement with the Agent in form and substance satisfactory to the Agent (a "Account Control Agreement"), providing, among other things, that such depositary bank (i) shall comply without further consent of such Loan Party at all times with written instructions from the Agent to such depositary bank directing the disposition of funds from time to time credited to such deposit account and (ii) shall forward all amounts in the applicable deposit account to an account designated by the Agent on a daily basis.  The provisions of Section 6.20(a) and (b) shall not apply to (x) deposit accounts specially and exclusively used for payroll, payroll taxes and other employee wage and benefit payments to or for the benefit of Loan Parties' employees and (y) deposit accounts with average monthly balances of less than $40,000, in the aggregate, at any time.

(c)    Securities Account Control Agreements.  For each securities account that any Loan Party at any time maintains, such Loan Party shall cause each the applicable securities intermediary or commodities intermediary to enter into an agreement with Agent in form and substance satisfactory to the Agent (a "Securities Account Control Agreement"), providing, among other things, that such Person shall comply, in each case without further consent of such Loan Party, at any time with entitlement orders or other instructions from the Agent to such securities intermediary as to such securities or other investment property, or (as the case may be) to apply any value distributed on account of any commodity contract as

directed by the Agent to such commodity intermediary.  The Agent agrees that the Agent shall not give any such entitlement orders or instructions or directions to any such securities intermediary or commodity intermediary unless an Event of Default has occurred and is continuing.

**Section 6.21    Supply Arrangement.**  Borrower shall remain at all times the exclusive reseller and distributor within the United States for each member of the ABC Export Group, and shall maintain such exclusive relationship in full force and effect, take all such action to such end as may be from time to time requested by the Agent and, upon request of the Agent, make to each member of the ABC Export Group such demands and requests for information and reports or for action as may be reasonably requested by the Agent.

**Section 6.22    Protection of Collateral.**

(a)    <u>Protection of Collateral</u>. The Borrowers shall pay all expenses of protecting, storing, warehousing, insuring, handling, maintaining and shipping the Collateral, all Taxes imposed by any applicable Law on any of the Collateral or in respect of the sale thereof, and all other payments required to be made by the Agent to any Person to realize upon any Collateral shall be borne and paid by the Borrowers. If the Borrowers fail to promptly pay any portion thereof when due, the Agent may, at its option, but shall not be required to, pay the same and charge the Borrowers therefor.  The Agent shall not be liable or responsible in any way for the safekeeping of any of the Collateral or for any loss or damage thereto (except for reasonable care in the custody thereof while any Collateral is in the Agent's actual possession) or for any diminution in the value thereof, or for any act or default of any warehouseman, carrier, forwarding agency, or other Person whomsoever, but the same shall be at the Borrowers' sole risk.

(b)    <u>Defense of Title to Collateral</u>. The Borrowers shall at all times defend the Borrowers' title to the Collateral and the Agent's Liens therein against all Persons and all claims and demands whatsoever.

(c)    <u>Records, Schedules and Assignments of Collateral</u>. The Borrowers shall keep (i) accurate and complete records of their Receivables and all payments and collections thereon, and (ii) accurate and complete records of their Inventory.  The Borrowers shall provide to the Agent a current schedule containing the foregoing information on at least an annual basis and more often if requested by the Agent.

**Section 6.23    Post-Closing Matters.**  The Borrowers shall perform or cause to be performed the following, each of which shall be in form and substance satisfactory to the Agent:

(a)    On or before December 31, 2006 (or such later date as may be agreed upon by the Agent in its sole discretion), deliver to the Agent evidence satisfactory to the Agent that Parent has notified each of its top twenty (20) customers (based on current years sales) that effective immediately all payments regarding Receivables or otherwise should be directed to Parent's lockbox account at Wachovia Bank, N.A.,

(b)    On or before December 31, 2006 (or such later date as may be agreed upon by the Agent in its sole discretion), deliver to the Agent evidence satisfactory to the

Agent that Parent has received an acknowledgement from each of Parent's top twenty customers notified pursuant to Section 6.23(a) that all future payments regarding Receivables or otherwise shall be directed to Parent's lockbox account at Wachovia Bank, N.A.,

(c) On or before January 10, 2007 (or such later date as may be agreed upon by the Agent in its sole discretion), deliver to the Agent evidence satisfactory to the Agent that Parent has notified all active customers that effective immediately all payments regarding Receivables or otherwise should be directed to Parent's lockbox account at Wachovia Bank, N.A.,

## ARTICLE VII.
## NEGATIVE COVENANTS

So long as any Lender shall have any Commitment hereunder, any Loan or other Obligation hereunder shall remain unpaid or unsatisfied, no Loan Party shall, nor shall it permit any Subsidiary to, directly or indirectly:

**Section 7.01 Liens.** Create, incur, assume or suffer to exist any Lien upon any of its property, assets or revenues, whether now owned or hereafter acquired, or sign or file or suffer to exist under the Uniform Commercial Code of any jurisdiction a financing statement that names Parent or any of its Subsidiaries as debtor, or assign any accounts or other right to receive income, other than the following:

(a) Liens pursuant to any Loan Document;

(b) Liens existing on the date hereof and listed on Schedule 5.08(b) and any renewals or extensions thereof, provided, that (i) the property covered thereby is not changed, (ii) the amount secured or benefited thereby is not increased except as contemplated by Section 7.02(h), (iii) the direct or any contingent obligor with respect thereto is not changed, and (iv) any renewal or extension of the obligations secured or benefited thereby is permitted by Section 7.02(h);

(c) Liens for unpaid taxes that (i) are not yet due or (ii) do not have priority over the Liens granted to the Agent pursuant to the Loan Documents, so long as such the underlying taxes are being contested in good faith and by appropriate proceedings diligently conducted, and with adequate reserves with respect thereto are maintained on the books of the applicable Person in accordance with GAAP;

(d) carriers', warehousemen's, mechanics', materialmen's, repairmen's or other like Liens arising in the ordinary course of business which are not overdue for a period of more than thirty (30) days or which are being contested in good faith and by appropriate proceedings diligently conducted, if adequate reserves with respect thereto are maintained on the books of the applicable Person;

(e)    pledges or deposits in the ordinary course of business in connection with workers' compensation, unemployment insurance and other social security legislation, other than any Lien imposed by ERISA;

(f)    deposits to secure the performance of bids, trade contracts and leases (other than Indebtedness), statutory obligations, surety and appeal bonds, performance bonds and other obligations of a like nature incurred in the ordinary course of business;

(g)    easements, rights-of-way, restrictions and other similar encumbrances affecting real property which, in the aggregate, are not substantial in amount, and which do not in any case materially detract from the value of the property subject thereto or materially interfere with the ordinary conduct of the business of the applicable Person;

(h)    Liens securing judgments for the payment of money not constituting an Event of Default under Section 8.01(h);

(i)    [Intentionally Omitted]; and

(j)    Liens securing Indebtedness permitted under Section 7.02(h); provided that (i) such Liens do not at any time encumber any property other than the property financed by such Indebtedness and (ii) the Indebtedness secured thereby does not exceed the cost or fair market value, whichever is lower, of the property being acquired on the date of acquisition.

**Section 7.02    Indebtedness**.  Create, incur, assume or suffer to exist any Indebtedness, except:

(a)    Indebtedness under the Loan Documents;

(b)    [Intentionally Omitted];

(c)    Indebtedness evidenced by the Stockholder Subordinated Debt Documents in an aggregate amount not to exceed $4,350,000, so long as such Indebtedness is subject to a Stockholder Subordination Agreement;

(d)    Indebtedness to off-shore vendors incurred for the purchase of Inventory in the ordinary course of business with payment terms not in excess of 180 days (or such longer period on agreed to and documented terms acceptable to Agent);

(e)    Indebtedness of a Subsidiary of a Loan Party owed to such Loan Party, which Indebtedness shall be otherwise permitted under the provisions of Section 7.03;

(f)    Indebtedness outstanding on the date hereof and listed on Schedule 7.02 and any refinancings, refundings, renewals or extensions thereof; provided that (i) the principal amount of such Indebtedness is not increased at the time of such refinancing, refunding, renewal or extension, (ii) such refinancing, refunding renewal or extension does not result in an increase in the applicable interest rate applicable to the Indebtedness being refinanced, refunded, renewed or extended, (iii) such refinancing,

refunding renewal or extension does not result in a shortening of the maturity of the Indebtedness being refinanced, refunded, renewed or extended, and (iv) the direct or any contingent obligor with respect thereto is not changed, as a result of or in connection with such refinancing, refunding, renewal or extension;

(g)     Guarantees of any Loan Party in respect of Indebtedness otherwise permitted hereunder; and

(h)     Indebtedness in respect of Capitalized Leases, Synthetic Lease Obligations and purchase money obligations for fixed or capital assets within the limitations set forth in Section 7.01(j); provided, however, that the aggregate amount of all such Indebtedness at any one time outstanding shall not exceed $250,000; and any refinancings, refundings, renewals or extensions thereof; provided that (i) the principal amount of such Indebtedness is not increased at the time of such refinancing, refunding, renewal or extension, (ii) such refinancing, refunding renewal or extension does not result in an increase in the applicable interest rate applicable to the Indebtedness being refinanced, refunded, renewed or extended, (iii) such refinancing, refunding renewal or extension does not result in a shortening of the maturity of the Indebtedness being refinanced, refunded, renewed or extended, and (iv) the direct or any contingent obligor with respect thereto is not changed, as a result of or in connection with such refinancing, refunding, renewal or extension;

provided, that, no Indebtedness otherwise permitted by clauses (c), (d), (f) or (g) shall be assumed, created or otherwise refinanced if a Default or Event of Default has occurred or would result therefrom.

**Section 7.03   Investments**. Make or hold any Investments, except:

(a)     Investments held by Parent and its Material Subsidiaries in the form of Cash Equivalents;

(b)     (i) Investments by Parent and its Subsidiaries in their respective Subsidiaries outstanding on the date hereof and (ii) additional Investments by Parent and its Subsidiaries in Loan Parties (other than Parent);

(c)     Investments consisting of extensions of credit in the nature of accounts receivable or notes receivable arising from the grant of trade credit in the ordinary course of business, and Investments received in satisfaction or partial satisfaction thereof from financially troubled account debtors to the extent reasonably necessary in order to prevent or limit loss;

(d)     Guarantees permitted by Section 7.02;

(e)     Investments existing on the date hereof (other than those referred to in Section 7.03(b)(i)) and set forth on Schedule 5.08(e); and

(f)     advances to officers, directors and employees of any Borrower and Subsidiaries in an aggregate amount not to exceed $25,000 at any time outstanding, for travel, entertainment, relocation and analogous ordinary business purposes.

**Section 7.04    Fundamental Changes**.  Merge, dissolve, liquidate, consolidate with or into another Person, or Dispose of (whether in one transaction or in a series of transactions) all or substantially all of its assets (whether now owned or hereafter acquired) to or in favor of any Person, except that, so long as no Default exists or would result therefrom:

      (a)      any Subsidiary may merge with (i) a Borrower, provided that such Borrower shall be the continuing or surviving Person, or (ii) any one or more other Subsidiaries, provided that when any Loan Party is merging with another Subsidiary, such Loan Party shall be the continuing or surviving Person;

      (b)      any Loan Party may Dispose of all or substantially all of its assets (upon voluntary liquidation or otherwise) to a Borrower or to another Loan Party (other than Parent);

      (c)      any Subsidiary that is not a Loan Party may dispose of all or substantially all its assets (including any Disposition that is in the nature of a liquidation) to (i) another Subsidiary that is not a Loan Party or (ii) to a Loan Party; and

      (d)      so long as no Default has occurred and is continuing or would result therefrom, any Loan Party and any of its Subsidiaries may merge into or consolidate with any other Person or permit any other Person to merge into or consolidate with it; provided, however, that in each case, immediately after giving effect thereto (i) in the case of any such merger to which any Borrower is a party, such Borrower is the surviving corporation and (ii) in the case of any such merger to which any Loan Party (other than any Borrower) is a party, such Loan Party is the surviving corporation.

**Section 7.05    Dispositions**.  Make any Disposition or enter into any agreement to make any Disposition, except:

      (a)      Dispositions of obsolete or worn out property, whether now owned or hereafter acquired, in the ordinary course of business;

      (b)      Dispositions of inventory in the ordinary course of business;

      (c)      Dispositions of equipment or real property to the extent that (i) such property is exchanged for credit against the purchase price of similar replacement property or (ii) the proceeds of such Disposition are reasonably promptly applied to the purchase price of such replacement property;

      (d)      Dispositions of property by any Subsidiary to any Borrower or to a wholly-owned Subsidiary; provided that if the transferor of such property is a Guarantor, the transferee thereof must either be a Borrower or a Guarantor;

      (e)      Dispositions permitted by Section 7.04(c); and

      (f)      non-exclusive licenses of IP Rights in the ordinary course of business and substantially consistent with past practice for terms not exceeding five (5) years;

      (g)     Dispositions by Parent and its Subsidiaries of Immaterial Subsidiaries; provided that (i) at the time of such Disposition, no Default shall exist or would result from such Disposition, (ii) the fair market value of such Immaterial Subsidiary shall not exceed $5,000, (iii) Parent and its Subsidiaries shall not retain any liability or obligations of any such Immaterial Subsidiary, and (iv) the purchase price for such asset shall be paid to the Borrowers or such Subsidiary solely in cash; and

      (h)     Dispositions by Parent and its Subsidiaries not otherwise permitted under this Section 7.05; provided that (i) at the time of such Disposition, no Default shall exist or would result from such Disposition, (ii) the aggregate book value of all property Disposed of in reliance on this clause (g) in any Fiscal Year shall not exceed $25,000 and (iii) the purchase price for such asset shall be paid to the Borrowers or such Subsidiary solely in cash;

provided, however, that any Disposition pursuant to Section 7.05(a) through Section 7.05(h) shall be for fair market value.

**Section 7.06    Restricted Payments**.  Declare or make, directly or indirectly, any Restricted Payment, or incur any obligation (contingent or otherwise) to do so, or issue or sell any Equity Interests or accept any capital contributions, except that, so long as no Default shall have occurred and be continuing at the time of any action described below or would result therefrom:

      (a)     each Subsidiary may make Restricted Payments to any Borrower, any Subsidiary of a Borrower that is a Guarantor and any other Person that owns a direct Equity Interest in such Subsidiary, ratably according to their respective holdings of the type of Equity Interest in respect of which such Restricted Payment is being made;

      (b)     the Borrowers and each Subsidiary may declare and make dividend payments or other distributions payable solely in the common stock or other common Equity Interests of such Person; and

      (c)     except to the extent the Net Cash Proceeds thereof are required to be applied to the prepayment of the Loans pursuant to Section 2.04(b)(ii), the Borrowers and each Subsidiary may purchase, redeem or otherwise acquire its common Equity Interests with the proceeds received from the substantially concurrent issue of new common Equity Interests.

**Section 7.07    Change in Nature of Business**.  Engage in any material line of business substantially different from those lines of business conducted by Parent and its Subsidiaries on the date hereof or any business substantially related or incidental thereto.

**Section 7.08    Transactions with Affiliates**.  Enter into any transaction of any kind with any Affiliate of any Borrower, whether or not in the ordinary course of business, other than on fair and reasonable terms substantially as favorable to any Borrower or such Subsidiary as would be obtainable by any Borrower or such Subsidiary at the time in a comparable arm's length transaction with a Person other than an Affiliate.

**Section 7.09    Burdensome Agreements**.  Enter into or permit to exist any Contractual Obligation (other than this Agreement or any other Loan Document) that limits the ability of (a) any Subsidiary to make Restricted Payments to a Borrower or any Guarantor or to otherwise transfer property to or invest in a Borrower or any Guarantor, except for any agreement in effect (i) on the date hereof and set forth on Schedule 7.09 or (ii) at the time any Subsidiary becomes a Subsidiary of a Borrower, so long as such agreement was not entered into solely in contemplation of such Person becoming a Subsidiary of a Borrower, (b) any Subsidiary to Guarantee the Indebtedness of a Borrower or (c) a Borrower or any Subsidiary to create, incur, assume or suffer to exist Liens on property of such Person.

**Section 7.10    Use of Proceeds**.  Use the proceeds of any Borrowing, whether directly or indirectly, and whether immediately, incidentally or ultimately, to purchase or carry margin stock (within the meaning of Regulation U of the FRB) or to extend credit to others for the purpose of purchasing or carrying margin stock or to refund indebtedness originally incurred for such purpose.

**Section 7.11    Financial Covenants**.

(a)    Minimum Consolidated EBITDA.  Permit Consolidated EBITDA of Parent and its Material Subsidiaries, measured on a monthly basis, at any time to be less than the required amount set forth in the following table for the applicable period set forth opposite thereto:

| Fiscal Period | Minimum Consolidated EBITDA |
|---|---|
| 1 month ended January 2007 | $133,800 |
| 2 months ended February 2007 | $323,800 |
| 3 months ended March 2007 | $576,800 |
| 4 months ended April 2007 | $710,600 |
| 5 months ended May 2007 | $844,300 |
| 6 months ended June 2007 | $956,900 |
| 7 months ended July 2007 | $1,090,700 |
| 8 months ended August 2007 | $1,364,900 |
| 9 months ended September 2007 | $1,720,100 |
| 10 months ended October 2007 | $2,134,900 |
| 11 months ended November 2007 | $2,409,100 |
| 12 months ended December 2007 | $2,483,400 |
| 12 months ended January 2008 | $2,492,400 |
| 12 months ended February 2008 | $2,515,400 |
| 12 months ended March 2008 | $2,534,800 |
| 12 months ended April 2008 | $2,497,100 |
| 12 months ended May 2008 | $2,459,300 |
| 12 months ended June 2008 | $2,479,000 |
| 12 months ended July 2008 | $2,534,700 |
| 12 months ended August 2008 | $2,566,900 |

| 12 months ended September 2008 | $2,509,600 |
|---|---|
| 12 months ended October 2008 | $2,448,000 |
| 12 months ended November 2008 | $2,456,800 |
| 12 months ended December 2008 and each 12 month period thereafter | $2,446,700 |

(b)    Consolidated Interest Coverage Ratio.  Permit the Consolidated Interest Coverage Ratio as of the end of any Fiscal Month of Parent and its Material Subsidiaries to be less than the ratio set forth below opposite such Fiscal Month for such applicable period:

| Fiscal Month | Minimum Consolidated Interest Coverage Ratio |
|---|---|
| 1 month ended January 2007 | 0.92 to 1.00 |
| 2 months ended February 2007 | 1.03 to 1.00 |
| 3 months ended March 2007 | 1.22 to 1.00 |
| 4 months ended April 2007 | 1.09 to 1.00 |
| 5 months ended May 2007 | 1.02 to 1.00 |
| 6 months ended June 2007 | 0.95 to 1.00 |
| 7 months ended July 2007 | 0.92 to 1.00 |
| 8 months ended August 2007 | 1.03 to 1.00 |
| 9 months ended September 2007 | 1.17 to 1.00 |
| 10 months ended October 2007 | 1.33 to 1.00 |
| 11 months ended November 2007 | 1.37 to 1.00 |
| 12 months ended December 2007 | 1.29 to 1.00 |
| 12 months ended January 2008 | 1.26 to 1.00 |
| 12 months ended February 2008 | 1.27 to 1.00 |
| 12 months ended March 2008 | 1.27 to 1.00 |
| 12 months ended April 2008 | 1.27 to 1.00 |
| 12 months ended May 2008 | 1.22 to 1.00 |
| 12 months ended June 2008 | 1.23 to 1.00 |
| 12 months ended July 2008 | 1.25 to 1.00 |
| 12 months ended August 2008 | 1.26 to 1.00 |
| 12 months ended September 2008 | 1.23 to 1.00 |
| 12 months ended October 2008 | 1.19 to 1.00 |
| 12 months ended November 2008 | 1.19 to 1.00 |
| 12 months ended December 2008 and each 12 month period thereafter | 1.19 to 1.00 |

Section 7.12    Capital Expenditures.  Make or become legally obligated to make any Capital Expenditure, except for Capital Expenditures in the ordinary course of business not

exceeding, in the aggregate for the Parent and its Subsidiaries during each Fiscal Year set forth below, the amount set forth opposite such Fiscal Year:

| Fiscal Year | Amount |
|---|---|
| 2007 | $345,000 |
| 2008 | $345,000 |
| 2009 | $345,000 |
| 2010 | $345,000 |
| 2011 | $345,000 |

**Section 7.13   Amendments of Organization Documents**.  Amend any of its Organization Documents or any Material Contract without the prior written consent of Agent.

**Section 7.14   Accounting Changes**.  Make any change in (a) accounting policies or reporting practices, except as required by GAAP, or (b) its Fiscal Week, Fiscal Month, Fiscal Quarter or Fiscal Year.

**Section 7.15   Prepayments, Etc. of Indebtedness**.  Prepay, redeem, purchase, defease or otherwise satisfy prior to the scheduled maturity thereof in any manner, or make any payment in violation of any subordination terms of, any Indebtedness, except (a) the prepayment of the Borrowings in accordance with the terms of this Agreement, (b) any refinancings or refundings of Indebtedness in compliance with Section 7.02(h) and (c) the payment of Indebtedness permitted pursuant to Section 7.02(d).

**Section 7.16   Amendment, Etc. of Indebtedness**.  Amend, modify or change in any manner any term or condition of any Indebtedness set forth in Schedule 7.02, except for any refinancing, refunding, renewal or extension thereof permitted by Section 7.02(f).

## ARTICLE VIII.
## EVENTS OF DEFAULT AND REMEDIES

**Section 8.01   Events of Default**.  Any of the following shall constitute an Event of Default:

(a)   Non-Payment.  The Borrowers or any other Loan Party fails to (i) pay when and as required to be paid herein, any amount of principal of any Loan, or (ii) pay within three (3) days after the same becomes due, any interest on any Loan, or any fee due hereunder, or (iii) pay within five (5) days after the same becomes due, any other amount payable hereunder or under any other Loan Document; or

(b)   Specific Covenants.  (i) The Loan Parties fail to perform or observe any term, covenant or agreement contained in any of Section 6.01 (other than clauses (c) or (e) thereof), 6.02 (other than clauses (k) or (l) thereof), 6.03, 6.05, 6.07, 6.10, 6.11, 6.12, 6.20, 6.22, 6.23 or Article VII, (ii) the Loan Parties fail to perform or observe any term, covenant or agreement contained in any of Section 6.01(c), 6.01(e), 6.02(k), 6.02(l) and such failure continues for five (5) Business Days, or (iii) any of the Loan Parties fails to perform

or observe any term, covenant or agreement contained in <u>Section 3</u>, <u>4</u>, <u>7</u> or <u>9</u> of the Security Agreement; or

      (c)     <u>Other Defaults</u>. Any Loan Party fails to perform or observe any other covenant or agreement (not specified in <u>Section 8.01(a)</u> or <u>(b)</u> above) contained in any Loan Document on its part to be performed or observed and such failure continues for twenty (20) Business Days; or

      (d)     <u>Representations and Warranties</u>. Any representation, warranty, certification or statement of fact made or deemed made by or on behalf of the Borrowers or any other Loan Party herein, in any other Loan Document, or in any document delivered in connection herewith or therewith shall be incorrect or misleading when made or deemed made; or

      (e)     <u>Cross-Default</u>. Any Loan Party or any Subsidiary thereof (A) fails to make any payment when due (whether by scheduled maturity, required prepayment, acceleration, demand, or otherwise) in respect of any Indebtedness or Guarantee (other than Indebtedness hereunder) having an aggregate principal amount (including undrawn committed or available amounts and including amounts owing to all creditors under any combined or syndicated credit arrangement) of more than the Threshold Amount, or (B) fails to observe or perform any other agreement or condition relating to any such Indebtedness or Guarantee or contained in any instrument or agreement evidencing, securing or relating thereto, or any other event occurs, the effect of which default or other event is to cause, or to permit the holder or holders of such Indebtedness or the beneficiary or beneficiaries of such Guarantee (or a trustee or agent on behalf of such holder or holders or beneficiary or beneficiaries) to cause, with the giving of notice if required, such Indebtedness to be demanded or to become due or to be repurchased, prepaid, defeased or redeemed (automatically or otherwise), or an offer to repurchase, prepay, defease or redeem such Indebtedness to be made, prior to its stated maturity, or such Guarantee to become payable or cash collateral in respect thereof to be demanded; or

      (f)     <u>Insolvency Proceedings, Etc</u>. Any Loan Party or any Subsidiary thereof institutes or consents to the institution of any proceeding under any Debtor Relief Law, or makes an assignment for the benefit of creditors; or applies for or consents to the appointment of any receiver, trustee, custodian, conservator, liquidator, rehabilitator or similar officer for it or for all or any material part of its property; or any receiver, trustee, custodian, conservator, liquidator, rehabilitator or similar officer is appointed without the application or consent of such Person and the appointment continues undischarged or unstayed for sixty (60) calendar days; or any proceeding under any Debtor Relief Law relating to any such Person or to all or any material part of its property is instituted without the consent of such Person and continues undismissed or unstayed for sixty (60) calendar days, or an order for relief is entered in any such proceeding; or

      (g)     <u>Inability to Pay Debts; Attachment</u>. (i) Any Loan Party or any Subsidiary thereof becomes unable or admits in writing its inability or fails generally to pay its debts as they become due, or (ii) any writ or warrant of attachment or execution or similar

process is issued or levied against all or any material part of the property of any such Person and is not released, vacated or fully bonded within thirty (30) days after its issue or levy; or

(h)    <u>Judgments</u>.  There is entered against any Loan Party or any Subsidiary thereof (i) one or more final judgments or orders for the payment of money in an aggregate amount (as to all such judgments and orders) exceeding the Threshold Amount (to the extent not covered by independent third-party insurance as to which the insurer is rated at least "A" by A.M. Best Company, has been notified of the potential claim and does not dispute coverage), or (ii) any one or more non-monetary final judgments that have, or could reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect and, in either case, (A) enforcement proceedings are commenced by any creditor upon such judgment or order, or (B) there is a period of 10 consecutive days during which a stay of enforcement of such judgment, by reason of a pending appeal or otherwise, is not in effect; or

(i)    <u>ERISA</u>.  (i) An ERISA Event occurs with respect to a Pension Plan or Multiemployer Plan which has resulted or could reasonably be expected to result in liability of the Borrowers under Title IV of ERISA to the Pension Plan, Multiemployer Plan or the PBGC in an aggregate amount in excess of the Threshold Amount, or (ii) any Borrower or any ERISA Affiliate fails to pay when due, after the expiration of any applicable grace period, any installment payment with respect to its withdrawal liability under Section 4201 of ERISA under a Multiemployer Plan in an aggregate amount in excess of the Threshold Amount; or

(j)    <u>Invalidity of Loan Documents</u>.  Any provision of any Loan Document, at any time after its execution and delivery and for any reason other than as expressly permitted hereunder or thereunder or satisfaction in full of all the Obligations, ceases to be in full force and effect; or any Loan Party or any other Person contests in any manner the validity or enforceability of any provision of any Loan Document; or any Loan Party denies that it has any or further liability or obligation under any provision of any Loan Document, or purports to revoke, terminate or rescind any provision of any Loan Document; or

(k)    <u>Change of Control</u>.  There occurs any Change of Control; or

(l)    <u>Collateral Documents</u>.  Any Collateral Document after delivery thereof shall for any reason (other than pursuant to the terms thereof) cease to create a valid and perfected first priority Lien (subject to Liens permitted by <u>Section 7.01</u>) on the Collateral purported to be covered thereby; or

(m)    <u>Subordination</u>.  (i) The subordination provisions contained in any Stockholder Subordination Agreement or any Stockholder Subordinated Debt Document (the "<u>Subordinated Provisions</u>") shall, in whole or in part, terminate, cease to be effective or cease to be legally valid, binding and enforceable against any holder of the applicable Subordinated Indebtedness; or (ii) the Borrowers or any other Loan Party shall, directly or indirectly, disavow or contest in any manner (A) the effectiveness, validity or enforceability of any of the Subordination Provisions, (B) that the Subordination Provisions exist for the benefit of the Agent and the Lenders or (C) that all payments of principal of or premium and interest on

the applicable Subordinated Indebtedness, or realized from the liquidation of any property of any Loan Party, shall be subject to any applicable Subordination Provision.

**Section 8.02    Remedies upon Event of Default**.  If any Event of Default occurs and is continuing, the Agent shall, at the request of, or may, with the consent of, the Required Lenders, take any or all of the following actions:

(a)    declare the commitment of each Lender to make Loans to be terminated, whereupon such commitments and obligation shall be terminated;

(b)    declare the unpaid principal amount of all outstanding Loans, all interest accrued and unpaid thereon, and all other amounts owing or payable hereunder or under any other Loan Document to be immediately due and payable, without presentment, demand, protest or other notice of any kind, all of which are hereby expressly waived by the Borrowers; and

(c)    exercise on behalf of itself and the Lenders all rights and remedies available to it and the Lenders under the Loan Documents;

provided, however, that upon the occurrence of an actual or deemed entry of an order for relief with respect to the Borrowers under the Bankruptcy Code of the United States, the obligation of each Lender to make Loans shall automatically terminate, the unpaid principal amount of all outstanding Loans and all interest and other amounts as aforesaid shall automatically become due and payable, in each case without further act of the Agent or any Lender.

**Section 8.03    Application of Funds**.  After the exercise of remedies provided for in Section 8.02 (or after the Loans have automatically become immediately due and payable as set forth in the proviso to Section 8.02), any amounts received on account of the Obligations shall be applied by the Agent in the following order:

First, to payment of that portion of the Obligations constituting fees, indemnities, expenses and other amounts (including fees, charges and disbursements of counsel to the Agent and amounts payable under Article III) payable to the Agent in its capacity as such;

Second, to payment of that portion of the Obligations constituting fees, indemnities and other amounts (other than principal and interest) payable to the Lenders (including fees, charges and disbursements of counsel to the respective Lenders (including fees and time charges for attorneys who may be employees of any Lender) and amounts payable under Article III, ratably among them in proportion to the respective amounts described in this clause Second payable to them;

Third, to payment of that portion of the Obligations constituting accrued and unpaid interest on the Loans and other Obligations, ratably among the Lenders in proportion to the respective amounts described in this clause Third payable to them;

Fourth, to payment of that portion of the Obligations constituting unpaid principal of the Loans, ratably among the Lenders in proportion to the respective amounts described in this clause Fourth held by them; and

<u>Last</u>, the balance, if any, after all of the Obligations have been indefeasibly paid in full, to the Borrowers or as otherwise required by Law.

# ARTICLE IX.
## AGENT

### Section 9.01    Appointment and Authority.

(a)    Each of the Lenders hereby irrevocably appoints Cratos Capital Management, LLC to act on its behalf as the Agent hereunder and under the other Loan Documents and authorizes the Agent to take such actions on its behalf and to exercise such powers as are delegated to the Agent by the terms hereof or thereof, together with such actions and powers as are reasonably incidental thereto.  The provisions of this Article are solely for the benefit of the Agent and the Lenders, and neither any Borrower nor any other Loan Party shall have rights as a third party beneficiary of any of such provisions.

(b)    The Agent shall also act as the "collateral agent" under the Loan Documents, and each of the Lenders hereby irrevocably appoints and authorizes the Agent to act as the agent of such Lender for purposes of acquiring, holding and enforcing any and all Liens on Collateral granted by any of the Loan Parties to secure any of the Obligations, together with such powers and discretion as are reasonably incidental thereto.  In this connection, the Agent, as "collateral agent" and any co-agents, sub-agents and attorneys-in-fact appointed by the Agent pursuant to <u>Section 9.05</u> for purposes of holding or enforcing any Lien on the Collateral (or any portion thereof) granted under the Collateral Documents, or for exercising any rights and remedies thereunder at the direction of the Agent), shall be entitled to the benefits of all provisions of this Article IX and Article XI (including <u>Section 10.04(c)</u>, as though such co-agents, sub-agents and attorneys-in-fact were the "collateral agent" under the Loan Documents) as if set forth in full herein with respect thereto.

### Section 9.02    Rights as a Lender.  The Person serving as the Agent hereunder shall have the same rights and powers in its capacity as a Lender as any other Lender and may exercise the same as though it were not the Agent and the term "Lender" or "Lenders" shall, unless otherwise expressly indicated or unless the context otherwise requires, include the Person serving as the Agent hereunder in its individual capacity.  Such Person and its Affiliates may accept deposits from, lend money to, act as the financial advisor or in any other advisory capacity for and generally engage in any kind of business with any Borrower or any Subsidiary or other Affiliate thereof as if such Person were not the Agent hereunder and without any duty to account therefor to the Lenders.

**Section 9.03    Exculpatory Provisions.**  The Agent shall not have any duties or obligations except those expressly set forth herein and in the other Loan Documents.  Without limiting the generality of the foregoing, the Agent:

(a)    shall not be subject to any fiduciary or other implied duties, regardless of whether a Default has occurred and is continuing;

(b)    shall not have any duty to take any discretionary action or exercise any discretionary powers, except discretionary rights and powers expressly contemplated hereby or by the other Loan Documents that the Agent is required to exercise as directed in writing by the Required Lenders (or such other number or percentage of the Lenders as shall be expressly provided for herein or in the other Loan Documents), provided that the Agent shall not be required to take any action that, in its opinion or the opinion of its counsel, may expose the Agent to liability or that is contrary to any Loan Document or applicable Law; and

(c)    shall not, except as expressly set forth herein and in the other Loan Documents, have any duty to disclose, and shall not be liable for the failure to disclose, any information relating to any Borrower or any of its Affiliates that is communicated to or obtained by the Person serving as the Agent or any of its Affiliates in any capacity.

The Agent shall not be liable for any action taken or not taken by it (i) with the consent or at the request of the Required Lenders (or such other number or percentage of the Lenders as shall be necessary, or as the Agent shall believe in good faith shall be necessary, under the circumstances as provided in Sections 10.01 and 8.02) or (ii) in the absence of its own gross negligence or willful misconduct.  The Agent shall be deemed not to have knowledge of any Default unless and until notice describing such Default is given to the Agent by the Borrowers, a Lender.

The Agent shall not be responsible for or have any duty to ascertain or inquire into (i) any statement, warranty or representation made in or in connection with this Agreement or any other Loan Document, (ii) the contents of any certificate, report or other document delivered hereunder or thereunder or in connection herewith or therewith, (iii) the performance or observance of any of the covenants, agreements or other terms or conditions set forth herein or therein or the occurrence of any Default, (iv) the validity, enforceability, effectiveness or genuineness of this Agreement, any other Loan Document or any other agreement, instrument or document, or the creation, perfection or priority of any Lien purported to be created by the Collateral Documents, (v) the value or the sufficiency of any Collateral, or (v) the satisfaction of any condition set forth in Article IV or elsewhere herein, other than to confirm receipt of items expressly required to be delivered to the Agent.

**Section 9.04    Reliance by Agent**.  The Agent shall be entitled to rely upon, and shall not incur any liability for relying upon, any notice, request, certificate, consent, statement, instrument, document or other writing (including any electronic message, Internet or intranet website posting or other distribution) believed by it to be genuine and to have been signed, sent or otherwise authenticated by the proper Person.  The Agent also may rely upon any statement made to it orally or by telephone and believed by it to have been made by the proper Person, and

shall not incur any liability for relying thereon.  In determining compliance with any condition hereunder to the making of a Loan that by its terms must be fulfilled to the satisfaction of a Lender, the Agent may presume that such condition is satisfactory to such Lender unless the Agent shall have received notice to the contrary from such Lender prior to the making of such Loan.  The Agent may consult with legal counsel (who may be counsel for the Borrowers), independent accountants and other experts selected by it, and shall not be liable for any action taken or not taken by it in accordance with the advice of any such counsel, accountants or experts.

Section 9.05    Delegation of Duties.  The Agent may perform any and all of its duties and exercise its rights and powers hereunder or under any other Loan Document by or through any one or more sub-agents appointed by the Agent.  The Agent and any such sub-agent may perform any and all of its duties and exercise its rights and powers by or through their respective Related Parties.  The exculpatory provisions of this Article shall apply to any such sub-agent and to the Related Parties of the Agent and any such sub-agent, and shall apply to their respective activities in connection with the syndication of the credit facilities provided for herein as well as activities as the Agent.

Section 9.06    Resignation of Agent.  The Agent may at any time give notice of its resignation to the Lenders and the Borrowers.  Upon receipt of any such notice of resignation, the Required Lenders shall have the right, in consultation with the Borrowers, to appoint a successor, which shall be a bank with an office in the United States, or an Affiliate of any such bank with an office in the United States.  If no such successor shall have been so appointed by the Required Lenders and shall have accepted such appointment within thirty (30) days after the retiring Agent gives notice of its resignation, then the retiring Agent may, on behalf of the Lenders, appoint a successor Agent meeting the qualifications set forth above; provided that if the Agent shall notify the Borrowers and the Lenders that no qualifying Person has accepted such appointment, then such resignation shall nonetheless become effective in accordance with such notice and (a) the retiring Agent shall be discharged from its duties and obligations hereunder and under the other Loan Documents (except that in the case of any collateral security held by the Agent on behalf of the Lenders under any of the Loan Documents, the retiring Agent shall continue to hold such collateral security until such time as a successor Agent is appointed) and (b) all payments, communications and determinations provided to be made by, to or through the Agent shall instead be made by or to each Lender directly, until such time as the Required Lenders appoint a successor Agent as provided for above in this Section 9.06.  Upon the acceptance of a successor's appointment as Agent hereunder, such successor shall succeed to and become vested with all of the rights, powers, privileges and duties of the retiring (or retired) Agent, and the retiring Agent shall be discharged from all of its duties and obligations hereunder or under the other Loan Documents (if not already discharged therefrom as provided above in this Section 9.06).  The fees payable by the Borrowers to a successor Agent shall be the same as those payable to its predecessor unless otherwise agreed between the Borrowers and such successor.  After the retiring Agent's resignation hereunder and under the other Loan Documents, the provisions of this Article IX and Section 10.04 shall continue in effect for the benefit of such retiring Agent, its sub-agents and their respective Related Parties in respect of any actions taken or omitted to be taken by any of them while the retiring Agent was acting as Agent.

LEGAL_US_E # 72583224.10                    95

**Section 9.07    Non-Reliance on Agent and Other Lenders**.  Each Lender acknowledges that it has, independently and without reliance upon the Agent or any other Lender or any of their Related Parties and based on such documents and information as it has deemed appropriate, made its own credit analysis and decision to enter into this Agreement.  Each Lender also acknowledges that it will, independently and without reliance upon the Agent or any other Lender or any of their Related Parties and based on such documents and information as it shall from time to time deem appropriate, continue to make its own decisions in taking or not taking action under or based upon this Agreement, any other Loan Document or any related agreement or any document furnished hereunder or thereunder.

**Section 9.08    Agent May File Proofs of Claim**.  In case of the pendency of any proceeding under any Debtor Relief Law or any other judicial proceeding relative to any Loan Party, the Agent (irrespective of whether the principal of any Loan shall then be due and payable as herein expressed or by declaration or otherwise and irrespective of whether the Agent shall have made any demand on the Borrowers) shall be entitled and empowered, by intervention in such proceeding or otherwise:

(a)    to file and prove a claim for the whole amount of the principal and interest owing and unpaid in respect of the Loans and all other Obligations that are owing and unpaid and to file such other documents as may be necessary or advisable in order to have the claims of the Lenders and the Agent (including any claim for the reasonable compensation, expenses, disbursements and advances of the Lenders and the Agent and their respective agents and counsel) allowed in such judicial proceeding; and

(b)    to collect and receive any monies or other property payable or deliverable on any such claims and to distribute the same;

and any custodian, receiver, assignee, trustee, liquidator, sequestrator or other similar official in any such judicial proceeding is hereby authorized by each Lender to make such payments to the Agent and, if the Agent shall consent to the making of such payments directly to the Lenders, to pay to the Agent any amount due for the reasonable compensation, expenses, disbursements and advances of the Agent and its agents and counsel, and any other amounts due the Agent under Sections 2.08.

Nothing contained herein shall be deemed to authorize the Agent to authorize or consent to or accept or adopt on behalf of any Lender any plan of reorganization, arrangement, adjustment or composition affecting the Obligations or the rights of any Lender to authorize the Agent to vote in respect of the claim of any Lender or in any such proceeding.

**Section 9.09    Collateral and Guaranty Matters**.  The Lenders irrevocably authorize the Agent, at its option and in its discretion,

(a)    to release any Lien on any property granted to or held by the Agent under any Loan Document (i) upon termination of the Aggregate Commitments and payment in full of all Obligations (other than contingent indemnification obligations), (ii) that is sold or to be sold as part of or in connection with any sale permitted hereunder or under any other

Loan Document, or (iii) if approved, authorized or ratified in writing in accordance with Section 10.01;

     (b)    to release any Guarantor from its obligations under the Guaranty to which it is a party if such Person ceases to be a Subsidiary as a result of a transaction permitted hereunder; and

     (c)    to subordinate any Lien on any property granted to or held by the Agent under any Loan Document to the holder of any Lien on such property that is permitted by Section 7.01(j).

Upon request by the Agent at any time, the Required Lenders will confirm in writing the Agent's authority to release or subordinate its interest in particular types or items of property, or to release any Guarantor from its obligations under the Guaranty to which it is a party pursuant to this Section 9.09. In each case as specified in this Section 9.09, the Agent will, at the Borrowers' expense, execute and deliver to the applicable Loan Party such documents as such Loan Party may reasonably request to evidence the release of such item of Collateral from the assignment and security interest granted under the Collateral Documents or to subordinate its interest in such item, or to release such Guarantor from its obligations under the Guaranty, in each case in accordance with the terms of the Loan Documents and this Section 9.09.

## ARTICLE X.
## MISCELLANEOUS

**Section 10.01 Amendments, Etc.** No amendment or waiver of any provision of this Agreement or any other Loan Document, and no consent to any departure by the Borrowers or any other Loan Party therefrom, shall be effective unless in writing signed by the Required Lenders and the Borrowers or the applicable Loan Party, as the case may be, and acknowledged by the Agent, and each such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given; provided, however, that no such amendment, waiver or consent shall:

     (a)    waive any condition set forth in Section 4.01 (other than Section 4.01(b)(i) or (c)), or, in the case of the initial Borrowing, Section 4.02, without the written consent of each Lender;

     (b)    without limiting the generality of clause (a) above, waive any condition set forth in Section 4.02 as to any Borrowing under a particular Facility without the written consent of the Required Revolving Lenders, the Required Term Loan A Lenders or the Required Term Loan B Lenders;

     (c)    extend or increase the Commitment of any Lender (or reinstate any Commitment terminated pursuant to Section 8.02) without the written consent of such Lender;

     (d)    postpone any date fixed by this Agreement or any other Loan Document for (i) any payment (excluding mandatory prepayments) of principal, interest, fees or other amounts due to the Lenders (or any of them) hereunder or under such other Loan

Document without the written consent of each Lender entitled to such payment or (ii) any scheduled reduction of any Facility hereunder or under any other Loan Document without the written consent of each Appropriate Lender;

(e)    reduce the principal of, or the rate of interest specified herein on, any Loan, or (subject to clause (iii) of the second proviso to this Section 10.01) any fees or other amounts payable hereunder or under any other Loan Document without the written consent of each Lender entitled to such amount; provided, however, that only the consent of the Required Lenders shall be necessary (i) to amend the definition of "Default Rate" or to waive any obligation of the Borrowers to pay interest at the Default Rate or (ii) to amend any financial covenant hereunder (or any defined term used therein) even if the effect of such amendment would be to reduce the rate of interest on any Loan or to reduce any fee payable hereunder;

(f)    change (i) Section 8.03 in a manner that would alter the pro rata sharing of payments required thereby without the written consent of each Lender or (ii) the order of application of any reduction in the Commitments or any prepayment of Loans among the Facilities from the application thereof set forth in the applicable provisions of Section 2.04(b) or 2.05(b), respectively, in any manner that materially and adversely affects the Lenders under a Facility without the written consent of (i) if such Facility is the Term Loan A Facility, the Required Term Loan A Lenders, (ii) if such Facility is the Term Loan B Facility, the Required Term Loan B Lenders and (iii) if such Facility is the Revolving Loan Facility, the Required Revolving Lenders;

(g)    change (i) any provision of this Section 10.01 or the definition of "Required Lenders" or any other provision hereof specifying the number or percentage of Lenders required to amend, waive or otherwise modify any rights hereunder or make any determination or grant any consent hereunder (other than the definitions specified in clause (ii) of this Section 10.01(g)), without the written consent of each Lender or (ii) the definition of "Required Revolving Lenders," "Required Term Loan A Lenders," or "Required Term Loan B Lenders," without the written consent of each Lender under the applicable Facility;

(h)    release all or substantially all of the Collateral in any transaction or series of related transactions, without the written consent of each Lender;

(i)    release all or substantially all of the value of the Guaranty, without the written consent of each Lender; or

(j)    impose any greater restriction on the ability of any Lender under a Facility to assign any of its rights or obligations hereunder without the written consent of (i) if such Facility is the Term Loan A Facility, the Required Term Loan A Lenders, (ii) if such Facility is the Term Loan B Facility, the Required Term Loan B Lenders, and (iii) if such Facility is the Revolving Loan Facility, the Required Revolving Lenders;

and provided, further, that (i) no amendment, waiver or consent shall, unless in writing and signed by the Agent in addition to the Lenders required above, affect the rights or duties of the Agent under this Agreement or any other Loan Document; (ii) Section 10.06(h) may not be

amended, waived or otherwise modified without the consent of each Granting Lender all or any part of whose Loans are being funded by an SPC at the time of such amendment, waiver or other modification; and (iii) the Fee Letter may be amended, or rights or privileges thereunder waived, in a writing executed only by the parties thereto.  Notwithstanding anything to the contrary herein, no Defaulting Lender shall have any right to approve or disapprove any amendment, waiver or consent hereunder, except that the Commitment of such Lender may not be increased or extended without the consent of such Lender.

**Section 10.02 Notices; Effectiveness; Electronic Communications.**  (a) <u>Notices Generally</u>.  Except in the case of notices and other communications expressly permitted to be given by telephone (and except as provided in subsection (b) below), all notices and other communications provided for herein shall be in writing and shall be delivered by hand or overnight courier service, mailed by certified or registered mail or sent by telecopier, and all notices and other communications expressly permitted hereunder to be given by telephone shall be made to the applicable telephone number, as follows:

(i)      if to Administrative Borrower or the Agent, to the address, telecopier number, electronic mail address or telephone number specified for such Person on <u>Schedule 10.02</u>; and

(ii)     if to any other Lender, to the address, telecopier number, electronic mail address or telephone number specified in its Administrative Questionnaire.

Notices sent by hand or overnight courier service, or mailed by certified or registered mail, shall be deemed to have been given when received; notices sent by telecopier shall be deemed to have been given when sent (except that, if not given during normal business hours for the recipient, shall be deemed to have been given at the opening of business on the next business day for the recipient).  Notices delivered through electronic communications to the extent provided in subsection (b) below shall be effective as provided in such subsection (b).

(b)      <u>Electronic Communications</u>.  Notices and other communications to the Lenders hereunder may be delivered or furnished by electronic communication (including e-mail and Internet or intranet websites) pursuant to procedures approved by the Agent, <u>provided</u> that the foregoing shall not apply to notices to any Lender pursuant to <u>Article II</u> if such Lender has notified the Agent that it is incapable of receiving notices under such Article by electronic communication.  The Agent or the Administrative Borrower may, in their discretion, agree to accept notices and other communications to it or their hereunder by electronic communications pursuant to procedures approved by it, <u>provided</u> that approval of such procedures may be limited to particular notices or communications.

Unless the Agent otherwise prescribes, (i) notices and other communications sent to an e-mail address shall be deemed received upon the sender's receipt of an acknowledgement from the intended recipient (such as by the "return receipt requested" function, as available, return e-mail or other written acknowledgement), <u>provided</u> that if such notice or other communication is not sent during the normal business hours of the recipient, such notice or communication shall be deemed to have been sent at the opening of business on the next business day for the recipient,

Case 14-05282-mgd    Doc 1-1    Filed 09/08/14    Entered 09/08/14 16:35:49    Desc
Exhibit A    Page 109 of 124

and (ii) notices or communications posted to an Internet or intranet website shall be deemed received upon the deemed receipt by the intended recipient at its e-mail address as described in the foregoing clause (i) of notification that such notice or communication is available and identifying the website address therefor.

(c)    The Platform. THE PLATFORM IS PROVIDED "AS IS" AND "AS AVAILABLE." THE AGENT PARTIES (AS DEFINED BELOW) DO NOT WARRANT THE ACCURACY OR COMPLETENESS OF THE BORROWER MATERIALS OR THE ADEQUACY OF THE PLATFORM, AND EXPRESSLY DISCLAIM LIABILITY FOR ERRORS IN OR OMISSIONS FROM THE BORROWER MATERIALS. NO WARRANTY OF ANY KIND, EXPRESS, IMPLIED OR STATUTORY, INCLUDING ANY WARRANTY OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, NON-INFRINGEMENT OF THIRD PARTY RIGHTS OR FREEDOM FROM VIRUSES OR OTHER CODE DEFECTS, IS MADE BY ANY AGENT PARTY IN CONNECTION WITH THE BORROWER MATERIALS OR THE PLATFORM. In no event shall the Agent or any of its Related Parties (collectively, the "Agent Parties") have any liability to the Loan Parties, any Lender or any other Person for losses, claims, damages, liabilities or expenses of any kind (whether in tort, contract or otherwise) arising out of the Borrowers' or the Agent's transmission of Borrower Materials through the Internet, except to the extent that such losses, claims, damages, liabilities or expenses are determined by a court of competent jurisdiction by a final and nonappealable judgment to have resulted from the gross negligence or willful misconduct of such Agent Party; provided, however, that in no event shall any Agent Party have any liability to Parent, the Borrowers, any Lender or any other Person for indirect, special, incidental, consequential or punitive damages (as opposed to direct or actual damages).

(d)    Change of Address, Etc. Each of Loan Party and the Agent may change its address, telecopier or telephone number for notices and other communications hereunder by notice to the other parties hereto. Each other Lender may change its address, telecopier or telephone number for notices and other communications hereunder by notice to the Borrowers and the Agent. In addition, each Lender agrees to notify the Agent from time to time to ensure that the Agent has on record (i) an effective address, contact name, telephone number, telecopier number and electronic mail address to which notices and other communications may be sent and (ii) accurate wire instructions for such Lender.

(e)    Reliance by Agent and Lenders. The Agent and the Lenders shall be entitled to rely and act upon any notices (including telephonic Committed Loan Notices) purportedly given by or on behalf of the Borrowers even if (i) such notices were not made in a manner specified herein, were incomplete or were not preceded or followed by any other form of notice specified herein, or (ii) the terms thereof, as understood by the recipient, varied from any confirmation thereof. The Borrowers shall indemnify the Agent, each Lender and the Related Parties of each of them from all losses, costs, expenses and liabilities resulting from the reliance by such Person on each notice purportedly given by or on behalf of the Borrowers. All telephonic notices to and other telephonic communications with the Agent may be recorded by the Agent, and each of the parties hereto hereby consents to such recording.

**Section 10.03 No Waiver; Cumulative Remedies.** No failure by any Lender or the Agent to exercise, and no delay by any such Person in exercising, any right, remedy, power or privilege hereunder or under any other Loan Document shall operate as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege. The rights, remedies, powers and privileges herein provided, and provided under each other Loan Document, are cumulative and not exclusive of any rights, remedies, powers and privileges provided by Law.

**Section 10.04 Expenses; Indemnity; Damage Waiver.** (a) <u>Costs and Expenses</u>. The Borrowers shall pay (i) fees or charges paid or incurred by the Agent in connection with the Agent's and the Lenders' transactions with Parent or its Subsidiaries, including, fees or charges for photocopying, notarization, couriers and messengers, telecommunication, public record searches (including tax lien, litigation, and UCC searches and including searches with the patent and trademark office, the copyright office, or the department of motor vehicles), filing, recording, publication, appraisal (including periodic collateral appraisals (including patent appraisals) or business valuations), real estate surveys, real estate title policies and endorsements, and environmental audits (if applicable), (ii) costs and expenses incurred by the Agent in the disbursement of funds to Borrowers or the Lenders (by wire transfer or otherwise), (iii) charges paid or incurred by the Agent resulting from the dishonor of checks, (iv) costs and expenses paid or incurred by the Lenders to correct any default or enforce any provision of the Loan Documents, or in gaining possession of, maintaining, handling, preserving, storing, shipping, selling, preparing for sale, or advertising to sell the Collateral, or any portion thereof, irrespective of whether a sale is consummated, (v) subject to any limitations set forth in the Fee Letter, audit fees and expenses of the Agent related to any inspections or audits of the Collateral, (vi) costs and expenses of third party claims or any other suit paid or incurred by the Agent and the Lenders in enforcing or defending the Loan Documents or in connection with the transactions contemplated by the Loan Documents or the Agent's and the Lenders' relationship with any Loan Party, (vii) the Agent's and each Lender's and each of their Affiliates' and Approved Funds' costs and expenses (including reasonable attorneys fees and all fees payable to rating agencies) incurred in advising, structuring, drafting, reviewing, administering, syndicating (including rating the Term Loan A Facility and Term Loan B Facility), or amending the Loan Documents, and (viii) the Agent's and each Lender's costs and expenses (including reasonable attorneys, accountants, consultants, and other advisors fees and expenses) incurred in terminating, enforcing (including reasonable attorneys, accountants, consultants, and other advisors fees and expenses incurred in connection with a "workout," a "restructuring," or an insolvency proceeding or other proceeding under Debtor Relief Laws concerning any Loan Party or in exercising rights or remedies under the Loan Documents), or defending the Loan Documents, irrespective of whether suit is brought.

(b)    <u>Indemnification by the Borrowers</u>. The Borrowers shall indemnify the Agent (and any sub-agent thereof), each Lender and each Related Party of any of the foregoing Persons (each such Person being called an "<u>Indemnitee</u>") against, and hold each Indemnitee harmless from, any and all losses, claims, damages, liabilities and related expenses (including the fees, charges and disbursements of any counsel for any Indemnitee), incurred by any Indemnitee or asserted against any Indemnitee by any third party or by the Borrowers or any other Loan Party arising out of, in connection with, or as a result of (i) the

execution or delivery of this Agreement, any other Loan Document or any agreement or instrument contemplated hereby or thereby, the performance by the parties hereto of their respective obligations hereunder or thereunder or the consummation of the transactions contemplated hereby or thereby, or, in the case of the Agent (and any sub-agent thereof) and its Related Parties only, the administration of this Agreement and the other Loan Documents, (ii) any Loan or the use or proposed use of the proceeds therefrom, (iii) any actual or alleged presence or release of Hazardous Materials on or from any property owned or operated by Parent or any of its Subsidiaries, or any Environmental Liability related in any way to Parent or any of its Subsidiaries, or (iv) any actual or prospective claim, litigation, investigation or proceeding relating to any of the foregoing, whether based on contract, tort or any other theory, whether brought by a third party or by any Borrower or any other Loan Party or any of any Borrower's or such Loan Party's directors, shareholders or creditors, and regardless of whether any Indemnitee is a party thereto, in all cases, whether or not caused by or arising, in whole or in part, out of the comparative, contributory or sole negligence of the Indemnitee <u>provided</u> that such indemnity shall not, as to any Indemnitee, be available to the extent that such losses, claims, damages, liabilities or related expenses (x) are determined by a court of competent jurisdiction by final and nonappealable judgment to have resulted from the gross negligence or willful misconduct of such Indemnitee, or (y) result from a claim brought by any Borrower or any other Loan Party against an Indemnitee for breach of such Indemnitee's obligations hereunder or under any other Loan Document, if such Borrower or such Loan Party has obtained a final and nonappealable judgment in its favor on such claim as determined by a court of competent jurisdiction.

(c)    <u>Reimbursement by Lenders</u>.  To the extent that the Borrowers for any reason fail to indefeasibly pay any amount required under subsection (a) or (b) of this <u>Section 10.04</u> to be paid by it to the Agent (or any sub-agent thereof), or any Related Party of any of the foregoing, each Lender severally agrees to pay to the Agent (or any such sub-agent) or such Related Party, as the case may be, such Lender's Applicable Percentage (determined as of the time that the applicable unreimbursed expense or indemnity payment is sought) of such unpaid amount, <u>provided</u> that the unreimbursed expense or indemnified loss, claim, damage, liability or related expense, as the case may be, was incurred by or asserted against the Agent (or any such sub-agent), or against any Related Party of any of the foregoing acting for the Agent (or any such sub-agent) in connection with such capacity.  The obligations of the Lenders under this subsection (c) are subject to the provisions of <u>Section 2.12</u>.

(d)    <u>Waiver of Consequential Damages, Etc</u>.  To the fullest extent permitted by applicable Law, the Borrowers shall not assert, and hereby waives, any claim against any Indemnitee, on any theory of liability, for special, indirect, consequential or punitive damages (as opposed to direct or actual damages) arising out of, in connection with, or as a result of, this Agreement, any other Loan Document or any agreement or instrument contemplated hereby, the transactions contemplated hereby or thereby, any Loan or the use of the proceeds thereof.  No Indemnitee referred to in subsection (b) above shall be liable for any damages arising from the use by unintended recipients of any information or other materials distributed to such unintended recipients by such Indemnitee through telecommunications, electronic or other information transmission systems in connection with this Agreement or the other Loan Documents or the transactions contemplated hereby or

thereby other than for direct or actual damages resulting from the gross negligence or willful misconduct of such Indemnitee as determined by a final and nonappealable judgment of a court of competent jurisdiction.

(e)    Payments.  All amounts due under this Section 10.04 shall be payable not later than ten (10) Business Days after demand therefor.

(f)    Survival.  The agreements in this Section 10.04 shall survive the resignation of the Agent, the replacement of any Lender, the termination of the Aggregate Commitments and the repayment, satisfaction or discharge of all the other Obligations.

Section 10.05 Payments Set Aside.  To the extent that any payment by or on behalf of the Borrowers is made to the Agent or any Lender, or the Agent or any Lender exercises its right of setoff, and such payment or the proceeds of such setoff or any part thereof is subsequently invalidated, declared to be fraudulent or preferential, set aside or required (including pursuant to any settlement entered into by the Agent or such Lender in its discretion) to be repaid to a trustee, receiver or any other party, in connection with any proceeding under any Debtor Relief Law or otherwise, then (a) to the extent of such recovery, the obligation or part thereof originally intended to be satisfied shall be revived and continued in full force and effect as if such payment had not been made or such setoff had not occurred, and (b) each Lender severally agrees to pay to the Agent upon demand its applicable share (without duplication) of any amount so recovered from or repaid by the Agent, plus interest thereon from the date of such demand to the date such payment is made at a rate per annum equal to the Federal Funds Rate from time to time in effect. The obligations of the Lenders under clause (b) of the preceding sentence shall survive the payment in full of the Obligations and the termination of this Agreement.

Section 10.06 Successors and Assigns.  (a)  Successors and Assigns Generally.  The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns permitted hereby, except that neither the Borrowers nor any other Loan Party may assign or otherwise transfer any of its rights or obligations hereunder without the prior written consent of the Agent and each Lender and no Lender may assign or otherwise transfer any of its rights or obligations hereunder except (i) to an assignee in accordance with the provisions of Section 10.06(b), (ii) by way of participation in accordance with the provisions of Section 10.06(d), (iii) by way of pledge or assignment of a security interest subject to the restrictions of Section 10.06(f), or (iv) to an SPC in accordance with the provisions of Section 10.06(h) (and any other attempted assignment or transfer by any party hereto shall be null and void).  Nothing in this Agreement, expressed or implied, shall be construed to confer upon any Person (other than the parties hereto, their respective successors and assigns permitted hereby, Participants to the extent provided in subsection (d) of this Section 10.06 and, to the extent expressly contemplated hereby, the Related Parties of each of the Agent and the Lenders) any legal or equitable right, remedy or claim under or by reason of this Agreement.

(b)    Assignments by Lenders.  Any Lender may at any time assign to one or more assignees all or a portion of its rights and obligations under this Agreement (including all or a portion of its Commitment(s) and the Loans at the time owing to it); provided that any such assignment shall be subject to the following conditions:

(i)    Minimum Amounts.

(A)    in the case of an assignment of the entire remaining amount of the assigning Lender's Commitment under any Facility and the Loans at the time owing to it under such Facility or in the case of an assignment to a Lender, an Affiliate of a Lender or an Approved Fund, no minimum amount need be assigned; and

(B)    in any case not described in subsection (b)(i)(A) of this Section 10.06, the aggregate amount of the Commitment (which for this purpose includes Loans outstanding thereunder) or, if the Commitment is not then in effect, the principal outstanding balance of the Loans of the assigning Lender subject to each such assignment, determined as of the date the Assignment and Assumption with respect to such assignment is delivered to the Agent or, if "Trade Date" is specified in the Assignment and Assumption, as of the Trade Date, shall not be less than $1,000,000, in the case of any assignment in respect of the Term Loan A Facility or Term Loan B Facility, and $1,000,000 in the case of any assignments in respect of the Revolving Credit Facility, unless each of the Agent and, so long as no Credit Risk Event has occurred and is continuing, the Borrowers otherwise consent (each such consent not to be unreasonably withheld or delayed); provided, however, that concurrent assignments to members of an Assignee Group and concurrent assignments from members of an Assignee Group to a single Eligible Assignee (or to an Eligible Assignee and members of its Assignee Group) will be treated as a single assignment for purposes of determining whether such minimum amount has been met;

(ii)    Required Consents.  No consent shall be required for any assignment except to the extent required by subsection (b)(i)(B) of this Section 10.06 and, in addition:

(A)    the consent of the Borrowers (such consent not to be unreasonably withheld or delayed) shall be required unless (1) a Credit Risk Event has occurred and is continuing at the time of such assignment (2) such assignment is to a Lender, an Affiliate of a Lender or an Approved Fund, or (3) such assignment is to an Eligible Financial Institution; and

(B)    the consent of the Agent (such consent not to be unreasonably withheld or delayed) shall be required for assignments in respect of (i) any Term Loan A Commitment, any Term Loan B Commitment or Revolving Loan Commitment if such assignment is to a Person that is not a Lender with a Commitment in respect of the applicable Facility, an Affiliate of such Lender or an Approved Fund with respect to such Lender or (ii) any Term Loan to a Person that is not a Lender, an Affiliate of a Lender or an Approved Fund.

(iii) <u>Assignment and Assumption</u>. The parties to each assignment shall execute and deliver to the Agent an Assignment and Assumption, together with a processing and recordation fee in the amount of $3,500; <u>provided</u>, <u>however</u>, that (x) the Agent may, in its sole discretion, elect to waive such processing and recordation fee in the case of any assignment and (y) such fee shall not be required in connection with an assignment by a Lender to an Affiliate or Approved Fund. The assignee, if it shall not be a Lender, shall deliver to the Agent an Administrative Questionnaire.

(iv) <u>No Assignment to any Borrower</u>. No such assignment shall be made to any Borrower or any of any Borrower's Affiliates or Subsidiaries.

(v) <u>No Assignment to Natural Persons</u>. No such assignment shall be made to a natural person.

Subject to acceptance and recording thereof by the Agent pursuant to subsection (c) of this <u>Section 10.06</u>, from and after the effective date specified in each Assignment and Assumption, the assignee thereunder shall be a party to this Agreement and, to the extent of the interest assigned by such Assignment and Assumption, have the rights and obligations of a Lender under this Agreement, and the assigning Lender thereunder shall, to the extent of the interest assigned by such Assignment and Assumption, be released from its obligations under this Agreement (and, in the case of an Assignment and Assumption covering all of the assigning Lender's rights and obligations under this Agreement, such Lender shall cease to be a party hereto but shall continue to be entitled to the benefits of <u>Sections 3.01</u>, <u>3.04</u>, <u>3.05</u> and <u>10.04</u> with respect to facts and circumstances occurring prior to the effective date of such assignment). Upon request, the Borrowers (at their expense) shall execute and deliver a Note to the assignee Lender. Any assignment or transfer by a Lender of rights or obligations under this Agreement that does not comply with this subsection shall be treated for purposes of this Agreement as a sale by such Lender of a participation in such rights and obligations in accordance with <u>Section 10.06(d)</u>.

(c) <u>Register</u>. The Agent, acting solely for this purpose as an agent of the Borrowers, shall maintain at the Agent's Office a copy of each Assignment and Assumption delivered to it and a register for the recordation of the names and addresses of the Lenders, and the Commitments of, and principal amounts of the Loans owing to, each Lender pursuant to the terms hereof from time to time (the "<u>Register</u>"). The entries in the Register shall be conclusive, and the Borrowers, the Agent and the Lenders may treat each Person whose name is recorded in the Register pursuant to the terms hereof as a Lender hereunder for all purposes of this Agreement, notwithstanding notice to the contrary. The Register shall be available for inspection by the Borrowers and any Lender, at any reasonable time and from time to time upon reasonable prior notice.

(d) <u>Participations</u>. Any Lender may at any time, without the consent of, or notice to, the Borrowers or the Agent, sell participations to any Person (other than a natural person or the Borrowers or any of the Borrowers' Affiliates or Subsidiaries) (each, a "<u>Participant</u>") in all or a portion of such Lender's rights and/or obligations under this Agreement (including all or a portion of its Commitment and/or the Loans owing to it); <u>provided</u> that (i) such Lender's obligations under this Agreement shall remain unchanged,

(ii) such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations and (iii) the Borrowers, the Agent and the Lenders shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement. Any agreement or instrument pursuant to which a Lender sells such a participation shall provide that such Lender shall retain the sole right to enforce this Agreement and to approve any amendment, modification or waiver of any provision of this Agreement; provided that such agreement or instrument may provide that such Lender will not, without the consent of the Participant, agree to any amendment, waiver or other modification described in the first proviso to Section 10.01 that affects such Participant. Subject to subsection (e) of this Section 10.06, the Borrowers agree that each Participant shall be entitled to the benefits of Sections 3.01, 3.04 and 3.05 to the same extent as if it were a Lender and had acquired its interest by assignment pursuant to Section 10.06(b). To the extent permitted by Law, each Participant also shall be entitled to the benefits of Section 10.08 as though it were a Lender, provided that such Participant agrees to be subject to Section 2.12 as though it were a Lender.

(e)    Limitations upon Participant Rights. A Participant shall not be entitled to receive any greater payment under Section 3.01 or 3.04 than the applicable Lender would have been entitled to receive with respect to the participation sold to such Participant, unless the sale of the participation to such Participant is made with the Borrowers' prior written consent. A Participant that would be a Foreign Lender if it were a Lender shall not be entitled to the benefits of Section 3.01 unless the Borrowers are notified of the participation sold to such Participant and such Participant agrees, for the benefit of the Borrowers, to comply with Section 3.01(e) as though it were a Lender.

(f)    Certain Pledges. Any Lender may at any time pledge or assign a security interest in all or any portion of its rights under this Agreement (including under its Note, if any) to secure obligations of such Lender, including any pledge or assignment to secure obligations to a Federal Reserve Bank; provided that no such pledge or assignment shall release such Lender from any of its obligations hereunder or substitute any such pledgee or assignee for such Lender as a party hereto.

(g)    Electronic Execution of Assignments. The words "execution," "signed," "signature," and words of like import in any Assignment and Assumption shall be deemed to include electronic signatures or the keeping of records in electronic form, each of which shall be of the same legal effect, validity or enforceability as a manually executed signature or the use of a paper-based recordkeeping system, as the case may be, to the extent and as provided for in any applicable Law, including the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act, or any other similar state Laws based on the Uniform Electronic Transactions Act.

(h)    Special Purpose Funding Vehicles. Notwithstanding anything to the contrary contained herein, any Lender (a "Granting Lender") may grant to a special purpose funding vehicle that is an Affiliate or Approved Fund of such Granting Lender and that is identified as such in writing from time to time by the Granting Lender to the Agent and the Borrowers (an "SPC") the option to provide all or any part of any Loan that such Granting Lender would otherwise be obligated to make pursuant to this Agreement; provided that (i)

nothing herein shall constitute a commitment by any SPC to fund any Loan, and (ii) if an SPC elects not to exercise such option or otherwise fails to make all or any part of such Loan, the Granting Lender shall be obligated to make such Loan pursuant to the terms hereof or, if it fails to do so, to make such payment to the Agent as is required under <u>Section 2.11(b)(i)</u>. Each party hereto hereby agrees that (i) neither the grant to any SPC nor the exercise by any SPC of such option shall increase the costs or expenses or otherwise increase or change the obligations of the Borrowers under this Agreement (including its obligations under <u>Section 3.04</u>), (ii) no SPC shall be liable for any indemnity or similar payment obligation under this Agreement for which a Lender would be liable, and (iii) the Granting Lender shall for all purposes, including the approval of any amendment, waiver or other modification of any provision of any Loan Document, remain the lender of record hereunder.  The making of a Loan by an SPC hereunder shall utilize the Commitment of the Granting Lender to the same extent, and as if, such Loan were made by such Granting Lender.  In furtherance of the foregoing, each party hereto hereby agrees (which agreement shall survive the termination of this Agreement) that, prior to the date that is one (1) year and one (1) day after the payment in full of all outstanding commercial paper or other senior debt of any SPC, it will not institute against, or join any other Person in instituting against, such SPC any bankruptcy, reorganization, arrangement, insolvency, or liquidation proceeding under the Laws of the United States or any State thereof.  Notwithstanding anything to the contrary contained herein, any SPC may (i) with notice to, but without prior consent of the Borrowers and the Agent and with the payment of a processing fee in the amount of $3,500 (which processing fee may be waived by the Agent in its sole discretion) assign all or any portion of its right to receive payment with respect to any Loan to the Granting Lender and (ii) disclose on a confidential basis any non-public information relating to its funding of Loans to any rating agency, commercial paper dealer or provider of any surety or Guarantee or credit or liquidity enhancement to such SPC.

**Section 10.07 Treatment of Certain Information; Confidentiality**.  Each of the Agent and the Lenders agrees to maintain the confidentiality of the Information (as defined below), except that Information may be disclosed (a) to its Affiliates and to its and its Affiliates' respective partners, directors, officers, employees, agents, advisors and representatives (it being understood that the Persons to whom such disclosure is made will be informed of the confidential nature of such Information and instructed to keep such Information confidential), (b) to the extent requested by any regulatory authority purporting to have jurisdiction over it (including any self-regulatory authority, such as the National Association of Insurance Commissioners), (c) to the extent required by applicable Laws or regulations or by any subpoena or similar legal process, (d) to any other party hereto, (e) in connection with the exercise of any remedies hereunder or under any other Loan Document or any action or proceeding relating to this Agreement or any other Loan Document or the enforcement of rights hereunder or thereunder, (f) subject to an agreement containing provisions substantially the same as those of this Section, to (i) any assignee of or Participant in, or any prospective assignee of or Participant in, any of its rights or obligations under this Agreement or (ii) any actual or prospective counterparty (or its advisors) to any swap or derivative transaction relating to the Borrowers and their obligations, (g) with the consent of the Borrowers or (h) to the extent such Information (i) becomes publicly available other than as a result of a breach of this <u>Section 10.07</u> or (ii) becomes available to the Agent, any Lender or any of their respective Affiliates on a nonconfidential basis from a source other than the Borrowers.

For purposes of this Section 10.07, "Information" means all information received from any Loan Party or any Subsidiary thereof relating to any Loan Party or any Subsidiary thereof or their respective businesses, other than any such information that is available to the Agent or any Lender on a nonconfidential basis prior to disclosure by any Loan Party or any Subsidiary thereof, provided that, in the case of information received from a Loan Party or any such Subsidiary after the date hereof, such information is clearly identified at the time of delivery as confidential.  Any Person required to maintain the confidentiality of Information as provided in this Section 10.07 shall be considered to have complied with its obligation to do so if such Person has exercised the same degree of care to maintain the confidentiality of such Information as such Person would accord to its own confidential information.

Each of the Agent and the Lenders acknowledges that (a) the Information may include material non-public information concerning the Borrowers or a Subsidiary, as the case may be, (b) it has developed compliance procedures regarding the use of material non-public information and (c) it will handle such material non-public information in accordance with applicable Law, including Federal and state securities Laws.

**Section 10.08  Right of Setoff**.  If an Event of Default shall have occurred and be continuing, each Lender and each of their respective Affiliates is hereby authorized at any time and from time to time, after obtaining the prior written consent of the Agent, to the fullest extent permitted by applicable Law, to set off and apply any and all deposits (general or special, time or demand, provisional or final, in whatever currency) at any time held and other obligations (in whatever currency) at any time owing by such Lender or any such Affiliate to or for the credit or the account of any Borrower or any other Loan Party against any and all of the obligations of any Borrower or such Loan Party now or hereafter existing under this Agreement or any other Loan Document to such Lender, irrespective of whether or not such Lender shall have made any demand under this Agreement or any other Loan Document and although such obligations of any Borrower or such Loan Party may be contingent or unmatured or are owed to a branch or office of such Lender different from the branch or office holding such deposit or obligated on such indebtedness.  The rights of each Lender and their respective Affiliates under this Section 10.08 are in addition to other rights and remedies (including other rights of setoff) that such Lender or their respective Affiliates may have.  Each Lender agrees to notify the Borrowers and the Agent promptly after any such setoff and application, provided that the failure to give such notice shall not affect the validity of such setoff and application.

**Section 10.09  Interest Rate Limitation**.  Notwithstanding anything to the contrary contained in any Loan Document, the interest paid or agreed to be paid under the Loan Documents shall not exceed the maximum rate of non-usurious interest permitted by applicable Law (the "Maximum Rate").  If the Agent or any Lender shall receive interest in an amount that exceeds the Maximum Rate, the excess interest shall be applied to the principal of the Loans or, if it exceeds such unpaid principal, refunded to the Borrowers.  In determining whether the interest contracted for, charged, or received by the Agent or a Lender exceeds the Maximum Rate, such Person may, to the extent permitted by applicable Law, (a) characterize any payment that is not principal as an expense, fee, or premium rather than interest, (b) exclude voluntary prepayments and the effects thereof, and (c) amortize, prorate, allocate, and spread in equal or unequal parts the total amount of interest throughout the contemplated term of the Obligations hereunder.

**Section 10.10  Counterparts; Integration; Effectiveness**.  This Agreement may be executed in counterparts (and by different parties hereto in different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract.  This Agreement and the other Loan Documents constitute the entire contract among the parties relating to the subject matter hereof and supersede any and all previous agreements and understandings, oral or written, relating to the subject matter hereof.  Except as provided in Section 4.01, this Agreement shall become effective when it shall have been executed by the Agent and when the Agent shall have received counterparts hereof that, when taken together, bear the signatures of each of the other parties hereto.  Delivery of an executed counterpart of a signature page of this Agreement by telecopy or electronic mail transmission shall be effective as delivery of a manually executed counterpart of this Agreement.

**Section 10.11  Survival of Representations and Warranties**.  All representations and warranties made hereunder and in any other Loan Document or other document delivered pursuant hereto or thereto or in connection herewith or therewith shall survive the execution and delivery hereof and thereof.  Such representations and warranties have been or will be relied upon by the Agent and each Lender, regardless of any investigation made by the Agent or any Lender or on their behalf and notwithstanding that the Agent or any Lender may have had notice or knowledge of any Default at the time of any Borrowing, and shall continue in full force and effect as long as any Loan or any other Obligation hereunder shall remain unpaid or unsatisfied.

**Section 10.12  Severability**.  If any provision of this Agreement or the other Loan Documents is held to be illegal, invalid or unenforceable, (a) the legality, validity and enforceability of the remaining provisions of this Agreement and the other Loan Documents shall not be affected or impaired thereby and (b) the parties shall endeavor in good faith negotiations to replace the illegal, invalid or unenforceable provisions with valid provisions the economic effect of which comes as close as possible to that of the illegal, invalid or unenforceable provisions.  The invalidity of a provision in a particular jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

**Section 10.13  Replacement of Lenders**.  If any Lender requests compensation under Section 3.04, or if the Borrowers are required to pay any additional amount to any Lender or any Governmental Authority for the account of any Lender pursuant to Section 3.01, if any Lender is a Defaulting Lender or if any other circumstance exists hereunder that gives the Borrowers the right to replace a Lender as a party hereto, then the Borrowers may, at their sole expense and effort, upon notice to such Lender and the Agent, require such Lender to assign and delegate, without recourse (in accordance with and subject to the restrictions contained in, and consents required by, Section 10.06), all of its interests, rights and obligations under this Agreement and the related Loan Documents to an assignee that shall assume such obligations (which assignee may be another Lender, if a Lender accepts such assignment), provided that:

> (a)  the Borrowers shall have paid to the Agent the assignment fee specified in Section 10.06(b);

> (b)  such Lender shall have received payment of an amount equal to the outstanding principal of its Loans, accrued interest thereon, accrued fees and all other amounts payable to it hereunder and under the other Loan Documents (including any

amounts under Section 3.05) from the assignee (to the extent of such outstanding principal and accrued interest and fees) or the Borrowers (in the case of all other amounts);

(c)    in the case of any such assignment resulting from a claim for compensation under Section 3.04 or payments required to be made pursuant to Section 3.01, such assignment will result in a reduction in such compensation or payments thereafter; and

(d)    such assignment does not conflict with applicable Laws.

A Lender shall not be required to make any such assignment or delegation if, prior thereto, as a result of a waiver by such Lender or otherwise, the circumstances entitling the Borrowers to require such assignment and delegation cease to apply.

**Section 10.14 Governing Law; Jurisdiction; Etc.** (a) GOVERNING LAW. THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS ARE INTENDED TO TAKE EFFECT AS SEALED INSTRUMENTS AND SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF GEORGIA, WITHOUT REGARD TO THE CONFLICT OF LAWS PRINCIPLES THEREOF, EXCEPT TO THE EXTENT OTHERWISE PROVIDED IN THE LOAN DOCUMENTS.

(a)    SUBMISSION TO JURISDICTION. EACH BORROWER AND EACH OTHER LOAN PARTY IRREVOCABLY AND UNCONDITIONALLY SUBMITS, FOR ITSELF AND ITS PROPERTY, TO THE NONEXCLUSIVE JURISDICTION OF THE COURTS OF THE STATE OF GEORGIA SITTING IN FULTON COUNTY AND OF THE UNITED STATES DISTRICT COURTS OF THE NORTHERN DISTRICT OF GEORGIA, AND ANY APPELLATE COURT FROM ANY THEREOF, IN ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT, OR FOR RECOGNITION OR ENFORCEMENT OF ANY JUDGMENT, AND EACH OF THE PARTIES HERETO IRREVOCABLY AND UNCONDITIONALLY AGREES THAT ALL CLAIMS IN RESPECT OF ANY SUCH ACTION OR PROCEEDING MAY BE HEARD AND DETERMINED IN SUCH GEORGIA STATE COURT OR, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, IN SUCH FEDERAL COURT. EACH OF THE PARTIES HERETO AGREES THAT A FINAL JUDGMENT IN ANY SUCH ACTION OR PROCEEDING SHALL BE CONCLUSIVE AND MAY BE ENFORCED IN OTHER JURISDICTIONS BY SUIT ON THE JUDGMENT OR IN ANY OTHER MANNER PROVIDED BY LAW. NOTHING IN THIS AGREEMENT OR IN ANY OTHER LOAN DOCUMENT SHALL AFFECT ANY RIGHT THAT THE AGENT OR ANY LENDER MAY OTHERWISE HAVE TO BRING ANY ACTION OR PROCEEDING RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT AGAINST EACH BORROWER OR ANY OTHER LOAN PARTY OR ITS PROPERTIES IN THE COURTS OF ANY JURISDICTION.

(b)    WAIVER OF VENUE. EACH BORROWER AND EACH OTHER LOAN PARTY IRREVOCABLY AND UNCONDITIONALLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY OBJECTION THAT IT MAY NOW OR HEREAFTER HAVE TO THE LAYING OF VENUE OF ANY ACTION

OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR
ANY OTHER LOAN DOCUMENT IN ANY COURT REFERRED TO IN
PARAGRAPH (a) OF THIS SECTION 10.14.  EACH OF THE PARTIES HERETO
HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY
APPLICABLE LAW, THE DEFENSE OF AN INCONVENIENT FORUM TO THE
MAINTENANCE OF SUCH ACTION OR PROCEEDING IN ANY SUCH COURT.

(c)    SERVICE OF PROCESS.  EACH PARTY HERETO
IRREVOCABLY CONSENTS TO SERVICE OF PROCESS IN THE MANNER
PROVIDED FOR NOTICES IN SECTION 10.02.  NOTHING IN THIS AGREEMENT
WILL AFFECT THE RIGHT OF ANY PARTY HERETO TO SERVE PROCESS IN ANY
OTHER MANNER PERMITTED BY APPLICABLE LAW.

**Section 10.15  Waiver of Jury Trial**.  EACH PARTY HERETO HEREBY
IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE
LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL
PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS
AGREEMENT OR ANY OTHER LOAN DOCUMENT OR THE TRANSACTIONS
CONTEMPLATED HEREBY OR THEREBY (WHETHER BASED ON CONTRACT, TORT
OR ANY OTHER THEORY).  EACH PARTY HERETO (A) CERTIFIES THAT NO
REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PERSON HAS
REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PERSON WOULD
NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER
AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE
BEEN INDUCED TO ENTER INTO THIS AGREEMENT AND THE OTHER LOAN
DOCUMENTS BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND
CERTIFICATIONS IN THIS SECTION 10.15.

**Section 10.16  No Advisory or Fiduciary Responsibility**.  In connection with all aspects
of each transaction contemplated hereby, the Borrowers and Parent acknowledge and agree, and
acknowledge their respective Affiliates' understanding, that: (i) the credit facilities provided for
hereunder and any related arranging or other services in connection therewith (including in
connection with any amendment, waiver or other modification hereof or of any other Loan
Document) are an arm's-length commercial transaction between the Borrowers, Parent and their
respective Affiliates, on the one hand, and the Agent, on the other hand, and each of the
Borrowers and Parent are capable of evaluating and understanding and understands and accepts
the terms, risks and conditions of the transactions contemplated hereby and by the other Loan
Documents (including any amendment, waiver or other modification hereof or thereof); (ii) in
connection with the process leading to such transaction, the Agent each is and has been acting
solely as a principal and is not the financial advisor, agent or fiduciary, for any Borrower or any
of its respective Affiliates, stockholders, creditors or employees or any other Person; (iii) the
Agent has not assumed or will assume an advisory, agency or fiduciary responsibility in favor of
the Borrowers or Parent with respect to any of the transactions contemplated hereby or the
process leading thereto, including with respect to any amendment, waiver or other modification
hereof or of any other Loan Document (irrespective of whether the Agent has advised or is
currently advising the Borrowers, Parent or any of their respective Affiliates on other matters)
and neither the Agent has any obligation to the Borrowers or any of their respective Affiliates

with respect to the transactions contemplated hereby except those obligations expressly set forth herein and in the other Loan Documents; (iv) the Agent and their respective Affiliates may be engaged in a broad range of transactions that involve interests that differ from those of the Borrowers, Parent and their respective Affiliates, and neither the Agent has any obligation to disclose any of such interests by virtue of any advisory, agency or fiduciary relationship; and (v) the Agent have not provided and will not provide any legal, accounting, regulatory or tax advice with respect to any of the transactions contemplated hereby (including any amendment, waiver or other modification hereof or of any other Loan Document) and each of the Borrowers and Parent has consulted its own legal, accounting, regulatory and tax advisors to the extent it has deemed appropriate. Each of the Borrowers and Parent hereby waives and releases, to the fullest extent permitted by Law, any claims that it may have against the Agent with respect to any breach or alleged breach of agency or fiduciary duty.

Section 10.17  **USA PATRIOT Act Notice**. Each Lender that is subject to the Patriot Act (as hereinafter defined) and the Agent (for itself and not on behalf of any Lender) hereby notifies the Borrowers that pursuant to the requirements of the USA Patriot Act (Title III of Pub. L. 107-56 (signed into law October 26, 2001)) (the "Patriot Act"), it is required to obtain, verify and record information that identifies each Loan Party, which information includes the name and address of each Loan Party and other information that will allow such Lender or the Agent, as applicable, to identify each Loan Party in accordance with the Patriot Act.

Section 10.18  **Time of the Essence**. Time is of the essence of the Loan Documents.

Section 10.19  **ENTIRE AGREEMENT**. THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS REPRESENT THE FINAL AGREEMENT AMONG THE PARTIES AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS, OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES. THERE ARE NO UNWRITTEN ORAL AGREEMENTS AMONG THE PARTIES.

Section 10.20  **Parent as Agent for Borrowers**. Each Borrower hereby irrevocably appoints Parent as the borrowing agent and attorney-in-fact for all Borrowers (the "Administrative Borrower") which appointment shall remain in full force and effect unless and until the Agent shall have received prior written notice signed by each Borrower that such appointment has been revoked and that another Borrower has been appointed Administrative Borrower. Each Borrower hereby irrevocably appoints and authorizes the Administrative Borrower (i) to provide the Agent with all notices with respect to Revolving Loan Borrowings obtained for the benefit of any Borrower and all other notices and instructions under this Agreement and (ii) to take such action as the Administrative Borrower deems appropriate on its behalf to obtain Revolving Loan Borrowings and to exercise such other powers as are reasonably incidental thereto to carry out the purposes of this Agreement. Each Borrower hereby jointly and severally agrees to indemnify each Lender and hold each Lender harmless against any and all liability, expense, loss or claim of damage or injury, made against the Lenders by any Borrower or by any third party whosoever, arising from or incurred by reason of the Lenders' relying on any instructions of the Administrative Borrower.

[remainder of this page intentionally left blank]

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed as of the date first above written.

**BORROWERS:**

**TRADE AM INTERNATIONAL, INC.**

By: _Ashutosh Ladha_
Name: Ashutosh Ladha
Title: President

CREDIT AGREEMENT

AGENT:

**CRATOS CAPITAL MANAGEMENT, LLC**
As Agent

By:    Cratos Capital Partners, LLC
       Its Manager

By:
Name: Phyliss Hasen
Title: Director

CREDIT AGREEMENT

**LENDERS:**

**CRATOS CLO I LTD.,**
As a Lender

By:   Cratos CDO Management, LLC
       As Attorney-in-Fact


    By:   Cratos Capital Partners, LLC
         Its Manager


         By:
         Name: Phyliss Hasen
         Title: Director

CREDIT AGREEMENT